**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ANARIA CABRERA, et al.,

       *Plaintiffs*,

       v.

UNITED STATES DEPARTMENT OF
LABOR, et al.,

       *Defendants*.

Civil Action No. 25-01909-DLF

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ....................................................................................................................... 2

    A.    Statutory and Regulatory Background .......................................................... 2

    B.    The Job Corps Program ................................................................................. 3

    C.    DOL Contracts for Operation of Job Corps Centers ..................................... 4

    D.    Basis for Privately-operated Job Corps Center Operations Pause ................ 5

    E.    Job Corps Contract Terminations .................................................................. 7

    F.    Transition Services for Job Corps Participants ............................................. 8

    G.    Related Lawsuit ............................................................................................. 9

    H.    Plaintiffs' Lawsuit ...................................................................................... 10

STANDARD OF REVIEW .................................................................................................... 10

ARGUMENT .......................................................................................................................... 11

I.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Repackaged Contract
Claims .................................................................................................................... 11

II.    Plaintiffs Cannot Show Substantial Likelihood of Standing .................................. 14

    A.    Plaintiffs Lack Standing to Challenge a Contract Claim ............................ 15

    B.    Plaintiffs Fail to Otherwise Show an Injury-in-Fact .................................. 15

III.    Plaintiffs Do Not Demonstrate a Likelihood of Success on the Merits of their APA
Claims .................................................................................................................... 16

    A.    Defendants properly exercised their discretionary authority under the WIOA to
pause private Job Corps center operations, thereby precluding judicial review
under the APA. ........................................................................................... 17

    B.    DOL has not "eliminated" the Job Corps program ultra vires ................... 21

    C.    DOL did not otherwise fail to comply with the WIOA, in violation of the APA ............ 23

    D.    DOL has not violated appropriations law, nor could Plaintiffs make such a claim .......... 24

IV.    DOL has not "eliminated" the Job Corps program ultra vires ............................... 25

V.    Plaintiffs Have Not Shown Irreparable Harm ....................................................... 26

VI.    A Preliminary Injunction Would Not Serve the Public Interest ................................................... 28

VII.   Any Injunction Ordered in This Case Should Be Narrowly Tailored and Require
       Plaintiffs to Post a Bond ............................................................................................................ 28

CONCLUSION ........................................................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES**

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ................................................................................ 11

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*,
   770 F. Supp. 3d 121 (D.D.C. 2025) ......................................................................... 24

*Albrecht v. Comm. on Emp. Benefits*,
   357 F.3d 62 (D.C. Cir. 2004) .................................................................................. 13

*Barton v. U.S. Dep't of Labor*,
   757 F. Supp. 3d 766 (E.D. Ky. 2024)...................................................................... 29

*Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
   934 F.2d 30 (2d 1991) ............................................................................................. 26

*Brenntag Int'l Chem., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999).................................................................................... 26

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................................ 14

*Cohen v. Postal Holdings, LLC*,
   873 F.3d 394 (2d Cir. 2017).................................................................................... 12

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ................................................................................................ 14

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) .......................................................................... 2, 11

*Dep't of Educ. v. California*,
   145 S. Ct. 966 (Apr. 4, 2025) ................................................................................. 12

*Dorfmann v. Boozer*,
   414 F.2d 1168 (D.C. Cir. 1969) ............................................................................. 11

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ................................................................................................ 21

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005).................................................................................... 26

*Glass v. United States*,
   258 F.3d 1349 (Fed. Cir. 2001) .............................................................................. 15

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007)...................................................................................... 26

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .................................................................................... 17, 18, 20

*Ingersoll-Rand Co. v. United States,*
  780 F.2d 74, 79–80 (D.C. Cir. 1985) ............................................................ 13, 14, 15

*Kondapally v. U.S. Citizenship & Immigr. Servs.*,
  No. 20-00920 (BAH), 2020 WL 5061735 (D.D.C. 2020) ................................ 11

*Lujan v. Def. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................... 15, 16

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) .................................................................................... 29

*Magellan Tech., Inc. v. FDA*,
  70 F.4th 622 (2d Cir. 2023) ......................................................................... 21

*Maryland v. Corp. for Nat'l & Community Serv.*,
  No. CV DLB-25-1363, 2025 WL 1585051 (D. Md. June 5, 2025) ................... 29

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) .................................................................................... 13

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .................................................................................... 10

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ...................................................................... 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983),
  *cert. denied*, No. 23-799, 2025 WL 1151226 (U.S. Apr. 21, 2025) ................ 21

*Munaf v. Geren*,
  553 U.S. 674 (2008) .................................................................................... 10

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000) .................................................................. 11

*Navajo Nation v. United States Dep't of Interior*,
  852 F.3d 1124 (D.C. Cir. 2017) .................................................................... 25

*New York v. U.S. Dep't of Homeland Security*,
  969 F.3d 42 (2d Cir. 2020) ........................................................................... 26, 29

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................... 28

*Nuclear Regul. Comm'n v. Texas*,
    No. 23-1300, 2025 WL 1698781 (U.S. June 18, 2025) ................................... 25, 26

*Pac. Gas & Elec. Co. v. United States*,
    838 F.3d 1341 (Fed. Cir. 2016) ................................................................................ 15

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ................................................................................. 13

*Rodriguez ex rel. Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999) ..................................................................................... 26

*Sardarian v. Fed. Emergency Mgmt. Agency*,
    No. 3:19-CV-00910 (OAW), 2022 WL 4080325 (D. Conn. Apr. 1, 2022) ........................... 15

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ................................................................................. 11

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ................................................................................. 14

*Texas Health Choice, L.C. v. Office of Personnel Mgmt.*,
    400 F.3d 895 (Fed. Cir. 2005) ............................................................................... 5, 12

*Tuck v. Un. Servs. Auto. Ass'n*,
    859 F.2d 842 (10th Cir. 1988) ................................................................................. 11

*United Aeronautical Corp. v. United States Air Force*,
    80 F.4th 1017 (9th Cir. 2023) .................................................................................. 12

*United States v. J&E Salvage Co.*,
    55 F.3d 985 (4th Cir. 1995) ..................................................................................... 12

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
    82 F.4th 1273 (D.C. Cir. 2023) ............................................................................... 23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ....................................................................................................... 11

*Yee v. Jewell*,
    228 F. Supp. 3d 48 (D.D.C. 2017) ........................................................................... 12

**STATUTES**

2 U.S.C. § 681 ...................................................................................................................... 24

2 U.S.C. § 683 ...................................................................................................................... 24

5 U.S.C. § 701 .......................................................................................................... 17, 18, 20

5 U.S.C. § 702 .............................................................................................................. 12, 17

5 U.S.C. § 706.................................................................................................. 10, 17

22 U.S.C. § 2151b............................................................................................... 24

28 U.S.C. § 1346................................................................................................. 12

29 U.S.C. § 2899(g) (1998)............................................................................... 3, 18

29 U.S.C. § 3193................................................................................................. 24

29 U.S.C. § 3197.............................................................................................. 3, 4

29 U.S.C. § 3202................................................................................................... 4

29 U.S.C. § 3209.......................................................................................... *passim*

29 U.S.C. §§ 3191-3212...................................................................................... 3

31 U.S.C. § 1341............................................................................................. 25, 28

31 U.S.C. § 1342............................................................................................. 25, 28

31 U.S.C. § 1517............................................................................................. 25, 28

41 U.S.C. §§ 7101-7109....................................................................................... 5

Pub. L. 88-452, 78 Stat. 508 (1964).................................................................... 2

Pub. L. No. 113-128, 128 Stat. 1425 (2014), *codified at* 29 U.S.C. § 3209(j)) ............................ 3, 18

**RULES**

Fed. R. Civ. P. 12(h)(3)...................................................................................... 11

Fed. R. Civ. P. 65(c) .......................................................................................... 29

**REGULATIONS**

20 C.F.R. § 686.400........................................................................................ 4, 26

20 C.F.R. § 686.300............................................................................................ 23

48 C.F.R. § 52.233-1........................................................................................ 4, 5

48 C.F.R. § 52.249-1........................................................................................ 4, 5

FAR 52.233-1................................................................................................ 4, 12

FAR 52.249-1.............................................................................................. 4, 7, 8

**OTHER AUTHORITIES**

*Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)*,
    http://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-
    civil-procedure-65c/ ................................................................................................................ 29

**INTRODUCTION**

Participants in the Job Corps Program ("Plaintiffs"), a no-cost nationwide residential career-training program administered by the Department of Labor and Lori Chavez-Deremer, Secretary of Labor, ("Defendants"), ask this Court to enjoin DOL's decision in May 2025 to pause operations at all privately-operated Job Corps centers in the face of their $86 million deficit for Program Year (PY) 2025 and successive years of low graduation rates and high rates of serious safety and security incidents involving program participants.  Although the Department of Labor maintains discretionary and contractual authority to suspend center operations via termination of center operator contracts, as it has done in past years and did so here, Plaintiffs have construed that action as a "closure" subject to the "notice and comment" requirements of the Workforce Innovation and Opportunity Act ("WIOA"), as well as an "elimination" of the Job Corps program in its entirety. And based on that mistaken premise, Plaintiffs contend that the Department of Labor and Lori Chavez-Deremer, in her official capacity as Secretary of Labor (the "Secretary" and collectively, "DOL") have thereby failed to comply with or otherwise exceeded their authority under the WIOA and the Impoundment Control Act ("ICA"), in violation of the Administrative Procedures Act ("APA"), and seek a preliminary injunction enjoining DOL from taking such actions. Plaintiffs' request for a preliminary injunction should be denied for several reasons.

First, this Court lacks subject matter jurisdiction over Plaintiffs' claims—which at their core challenge the terminations or non-renewals of the relevant Job Corps contracts. The Tucker Act provides exclusive jurisdiction in the Court of Federal Claims for claims brought in federal court based on government contracts that are subject to the Contract Disputes Act ("CDA").  And Plaintiffs, as Job Corps program participants with no privity, lack standing to challenge those terminations.  Their alleged injuries, moreover, are not caused by DOL, and speculative,  given the extensive resources DOL has committed to assisting affected Job Corps participants find

alternative sources of support. .

Second, under the deferential APA standard, Plaintiffs are unlikely to prevail on the merits of any of their claims—all erroneously predicated on DOL's alleged closure of the Job Corps Program. Because of that false predicate, Plaintiffs' claims all fail as a matter of law. Plaintiffs allege that DOL failed to comply with the WIOA and the ICA, in violation of the APA, by "closing" Job Corps centers. However, DOL did not "close" the centers, but rather exercised its long-held discretionary authority to suspend center operations through contract terminations to address program management challenges—which is not subject to judicial review under the APA. In any event, DOL's decision to do so was made in accordance with law – and with longstanding Department practice – and was a reasonable decision based upon the careful consideration of all of the relevant factors.

Finally, because Plaintiffs have not demonstrated irreparable injury or a likelihood of success on the merits, "it is clear [Plaintiffs] cannot make the corresponding strong showings [on the remaining factors—public interest and balance of equities—] required to tip the balance in [their] favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). Any consideration of those factors on the record here favors the pause in operations of a struggling program. Those factors include a potential $86 million deficit for Program Year 2025, successive years of low graduation rates and high rates of serious safety and security incidents involving program participants.

Accordingly, the Court should deny Plaintiffs' motion.

## **BACKGROUND**

### **A. Statutory and Regulatory Background**

Job Corps was created by the Economic Opportunity Act of 1964, as part of President Lyndon B. Johnson's War on Poverty. Pub. L. 88-452, §§ 101–110, 78 Stat. 508, 508–11 (1964).

The program is currently authorized under Title I, Subtitle C, of the Workforce Innovation and Opportunity Act ("WIOA"), 29 U.S.C. §§ 3191-3212. Under current law, DOL is required to enter into agreements for the operation of each Job Corps center, 29 U.S.C. § 3197(a), and may also enter into agreements with the Department of Agriculture for that Department to operate "Civilian Conservation Centers," *id.*§ 3197(d).

The WIOA authorizes DOL to take various actions short of center closure to remedy program performance issues—including but not limited to changing center management staff; replacing a center operator; reducing center capacity; and relocating a center. 29 USC 3209 (f). The WIOA requires that prior to the *closure* of any Job Corps center, DOL announce its proposed decision to the general public through publication in the Federal Register or other appropriate means; that it establish a notice-and-comment period; and that it notify the Member of Congress who represents the district in which such center is located before any final decision. Pub. L. No. 113-128, § 159(j), 128 Stat. 1425, 1557–58 (July 22, 2014), *codified* at 29 U.S.C. § 3209(j)); see also 29 U.S.C. § 2899(g) (1998)). The statute does not define the term "closure".

In addition, Chapter 686 of Title 20, Part V of the Code of Federal Regulations (CFR) outlines the eligibility requirements for Job Corps program (see Section B below).

### B.  The Job Corps Program

Job Corps was designed to assist participants with completing their high school education and with learning vocational and other skills in specific training areas. *See* McGee Decl. p. 2-3. *Nat'l Job Corps Ass'n v. DOL*, No. 25-cv-04641 (ALC) (S.D.N.Y. June 10, 2025), at 3. To be eligible for the program, individuals must be  "low-income ,"at least 16 but not more than 24 years old at the time of enrollment and face one or more of the following barriers to education and employment: is basic skills deficient, a school dropout, homeless; or a parent; or requires additional education, career technical training, or workforce preparation skills in order to obtain

and retain employment that leads to economic self-sufficiency. 20 CFR 686.400.

As of May 2025, Job Corps operated through 123 centers located around the country. *Id.* ¶ 4. Of these, 99 are operated by private contractors through contracts with the DOL. *Id.* ¶ 5. Additionally, the U.S. Department of Agriculture's ("USDA") Forest Service operates 24 Civilian Conservation Centers as part of the Job Corps program, *see* 29 U.S.C. § 3197(d). *Id.*

The Job Corps program partners, through its individual centers, with numerous state and local entities to provide additional assistance and resources to Job Corps participants. *See* Frazier Decl. ¶¶ 3, 4. These resources include job training and placement assistance in addition to other community-based services. . See 29 U.S.C. § 3197(a)(1); 3202.

C. **DOL Contracts for Operation of Job Corps Centers**

WIOA provides that DOL shall enter into an agreement "with a Federal, State, or local agency, an area career and technical education school, a residential career and technical education school, or a private organization, for the operation of each Job Corps center." 29 U.S.C. § 3197(a)(1)(A). The contracts are awarded for an initial term of no more than two years. *Id.* § 3197(f). The agency may exercise a contractual option to renew the agreement in one-year increments for up to three additional years. *Id.*; *see* Matz Decl. ¶ 9, Matz Decl. ¶ 12, *Nat'l Job Corps Ass'n v. DOL,* No. 25-cv-04641 (ALC) (S.D.N.Y. June 10, 2025),

DOL entered into contracts with private contractors to operate each of the 99 contracted Job Corps centers. Matz Decl. ¶ 1. DOL also entered into contracts, "National Training Contracts," with other private entities to provide vocational training and other services at Job Corps centers. *Id.* ¶¶ 3. All of DOL's contracts with private contractors incorporate by reference certain standard provisions from the Federal Acquisition Regulation ("FAR"), including FAR 52.249-1 (Termination for Convenience of the Government (Fixed Price) (Short Form)) and FAR 52.233-1 (Disputes), 48 C.F.R. §§ 52.249-1, 52.233-1. *See* Matz Decl. ¶¶ 6-8, 11 & Exs. 1-2.

The Termination for Convenience of the Government clause in these contracts allows DOL's Contracting Officer to terminate a contract when it is in the Government's interest merely upon written notice to the contractor. *Id.* ¶ 7 (citing 48 C.F.R. § 52.249-1). The FAR Disputes clause provides that these contracts are subject to the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101-7109, and that except as provided in that statute, "all disputes arising under or related to this contract shall be resolved under this clause." *Id.* ¶ 8 (quoting 48 C.F.R. § 52.233-1(a)-(b)). The CDA has established exclusive procedures for resolving disputes related to termination of those contracts, including channeling through the Court of Federal Claims.. *See Texas Health Choice, L.C. v. Office of Personnel Mgmt.*, 400 F.3d 895, 898-99 (Fed. Cir. 2005). DOL employs this clause to terminate Job Corps center operator contracts when the agency determines, at its discretion, that a pause in center operations is in the government's best interest. See McGee Decl. ¶ 10 & Ex. 9.

**D**. **Justification for DOL's Pause to Privately-operated Job Corps Center Operations**

On April 25, 2025, DOL released a Job Corps Transparency Report analyzing the recent financial performance and operation costs of the Job Corps program, accompanied by a press release. *See* McGee Decl. ¶ 7 & Exs. 1, 2 ("Transparency Report"). The report provided "a granular, data-centric examination of program expenditures and efficiency metrics, aggregating unmanipulated financial data and performance evaluations produced by [DOL's] national Job Corps Office." *Id.* Ex. 1. The report also analyzed "the most recently available metrics from program year 2023, including cost per enrollee and per graduate." *Id.* Specifically, the report showed that the program had low average graduation rates (32% or 38%, depending on the definition), and high average costs per enrollee (approx. $49,000 regardless of length of stay) and even higher costs per graduate (approx. $155,000, according to the WIOA definition). *Id.* Finally, the report showed that Job Corps participants earned relatively low average wages (less than

$17,000 per year) after separating from the program. *Id.*

On May 29, 2025, DOL announced that it would begin a "phased pause in operations at contractor-operated Job Corps centers nationwide, initiating an orderly transition for students, staff, and local communities." *Id.* ¶ 8 & Ex. 3. DOL further explained that "[t]he decision follows an internal review of the program's outcome and structure and will be carried out in accordance with available funding, the statutory framework established under the Workforce Innovation and Opportunity Act, and congressional notification requirements." *Id.* Ex. 3. DOL announced that "[t]he pause of operations at all contractor-operated Job Corps centers will occur by June 30, 2025." *Id.* DOL's announcement noted that in Program Year 2024, the Job Corps program operated at a $140 million deficit, which necessitated "a pause in center operations to complete the program year." *Id.*; *see also* McGee Decl. ¶ 15 (describing the steps DOL took regarding that deficit). The announcement explained that the program deficit was projected to grow to $213 million in Program Year 2025. *See Id.* Ex. 3. Also concerning was that there had been almost 15,000 "serious incident reports" in Job Corps centers in 2023, including sexual assaults, acts of violence, drug use, and breaches of safety or security. *Id.*

Attached to DOL's announcement was a set of responses to frequently asked questions (FAQ) relating to the operations pause. *See* McGee Decl. ¶ 8 & Ex. 4. The FAQs explained that DOL's reason for pausing operations at the contractor-operated centers was that "[t]he Job Corps program has been in a financial crisis for years, creating constant uncertainty for participants and administrators," citing the $140 million deficit in Program Year 2024 and the projected $213 million deficit for Program Year 2025. *Id.* Ex. 4 at Q9. The FAQs further noted that "[a]ccording to the recently released Job Corps Transparency Report, the highest graduation rate among all Job Corps centers was 65.4%" and that "[h]igh schools with graduation rates below 67% are generally considered low performing under federal law." *Id.*

As documented in a December 2024 DOL decision memorandum (McGee Decl. ¶ 15, Ex. 9), the then-Acting DOL Secretary approved several measures to reduce the $140 million deficit costs. These included pausing reestablishment of a Job Corps Center, descoping portions of national training, as well center operations contracts, reducing the number of national training programs, and recommending additional center pauses. That decision memorandum also outlined the process for "pausing" a center, stating that DOL would not exercise the option to extend the center operator contract. *Id.* DOL would work with the contractor to transition the center to "on-pause status" and then set up caretaker services for the government's owned property upon the contractor's exit. *Id.* The decision memorandum noted the action required Secretary approval. Additionally, as the memorandum indicates, the program developed a modified approach to conducting center performance evaluations for the purpose of identifying centers to pause, citing the "immediacy of the operating budget shortfall" and the "immediate need to achieve savings." The memorandum also stated that a center may be unpaused "when the program can maintain a structurally balanced budget without a projected shortfall." *Id*. Finally, the memorandum noted that for PY 25 and beyond, "additional action is required to ensure the medium- and long-term financial stability of the Job Corps program." *Id*.

### E. Job Corps Contract Terminations

On or around May 29, DOL sent notices to the contractors operating the 99 privately operated Job Corps centers advising them that operations would cease as of June 30, 2025. Given the various contract end dates, DOL informed the contractors that the cessation would occur through either the termination or non-renewal of their contracts or limited extensions through June 30. *See* Matz Decl. ¶¶ 12,13. The termination notices explained that the contracts were being terminated for the Government's convenience in accordance with FAR 52.249-1. *See, e.g.*, *id.* Ex. 5 at 1. The notices further directed the contractors to begin immediately "all work necessary to

provide a safe, orderly, and prompt shutdown of center operations" which were to be completed by "June 30, 2025, at which time the contract [would] be considered terminated in its entirety." *Id.*

### F. Transition Services for Job Corps Participants

In connection with the service pause, DOL ensured that Job Corps participants were provided with transition resources and assistance. For example, the Notices of Termination attached a document setting forth the contracting officer's Orders Regarding Orderly Shutdown of Center Operations that instructed center operators to take all necessary steps to ensure students are safely separated and transported to their home of record. *Id.* at Exs. 3-5. Those instructions were subsequently clarified by email dated June 1, 2025, DOL that explained that "[t]he paramount consideration is the safety and well-being of students on center . . . there is no hard deadline for transferring students to their home of record, especially where their safety and well-being are concerned. We want to reiterate that [DOL] defer[s] to center operators regarding the length of time necessary to ensure that this transition is as safe and supportive as it can be in these circumstances." *Id.* (emphasis omitted).

In addition, DOL's notices to contractors also directed center operators to register each student with the American Job Center nearest to his or her home of record and to register each student with his or her home state's Labor Exchange system as well as to discuss with each student the "Authorization to Share Job Corps Student Records for Program Eligibility" form. "By signing, the student grants the Department of Labor permission to disclose certain information contained in the Job Corps Student personnel file to assist students in identifying additional job placement, training, educational and other supportive services." *See* Matz Decl., Exs. 6-7. Through its 'FAQ's', DOL stated "[a]ll students [would] be connected with the resources they need to succeed as this transition takes place. It also communicated its intent to create a student resource page on the agency's website with links to other job opportunities and

that students would receive an eligibility determination for WIOA programs and be offered

apprenticeship and Pell grant opportunities. *See* McGee Decl., Ex. 4.

Furthermore, DOL's Employment and Training Administration (ETA) coordinated with

states, workforce boards, American Job Centers, and local resources to provide assistance and

services to transitioning Job Corps students.  These efforts included mobilizing mobile units and

rapid response teams on the regional and local level to connect students with alternative training

and employment opportunities and other resources. *See* Frazier Decl. ¶ 5. On the federal level,

DOL reached out to the U.S. Housing and Urban Development and the U.S. Department of

Health and Human Services to identify resources for eligible students to assist with housing,

benefits, and other services available to Job Corps students." *Id.* ¶ 5.  Mobile units and rapid

response teams engaged in various activities to support the students, including visiting Job Corps

centers to meet with students, conducting job fairs, and determining eligibility for other

workforce programs, such as DOL's YouthBuild and Workforce Innovation and Opportunity Act

(WIOA) youth program services provided on the state and local levels. *Id.*

**G. Related Lawsuit**:

On June 3, 2025, several contractors operating Job Corps centers under contracts with

DOL (i.e., Adams and Associates, Inc., Alternate Perspectives, Inc., Education & Training

Resources, LLC, and Strategix Management LLC); a labor union that offers job training at

certain Job Corps centers under a contract with DOL (i.e., Transportation Communications

Union/IAM); a trade organization founded to "represent operators in the Job Corps program"

(i.e., the National Job Corps Association ("NJCA")); and a current student at the Glenmont Job

Corps Center in Callicoon, New York (Jocelyn Rivera), together filed a complaint in the

Southern District of New York.

Those plaintiffs allege that DOL's suspension of operations at Job Corps centers operated

by private contractors violated the APA, 5 U.S.C. § 706(2)(A), (C), was an ultra vires action, and violated the constitutional separation of powers. Id. ¶¶ 48-69. The plaintiffs filed a motion seeking a temporary restraining order ("TRO") and preliminary injunction. On June 4, 2025, the court entered a TRO and set a briefing schedule and a hearing on the motion for June 25, 2025. On June 25, the Court issued a nationwide preliminary injunction, enjoining DOL from closing the private Job Corps centers and taking any further action to eliminate the Job Corps program. Op. Ord., *Nat'l Job Corps Ass'n v. DOL*, No. 25-cv-04641 (ALC) (S.D.N.Y. June 10, 2025).

### H. Plaintiffs' Lawsuit

On June 18, 2025, Plaintiffs filed this complaint in this action on behalf of a putative class of Job Corps participants. (Comp.) Plaintiffs include six current Job Corps program participants receiving support from various private Job Corps centers: Anaria Cabrera, Deondre Burkes, Maddex Davis-Newman, Athena Sasser, Logan Christensen, Abigail Shauger, and Plaintiff C.D. (a minor). On June 18, 2025, Plaintiffs filed on behalf of a putative class a motion for a preliminary injunction against and stay of "the closure of the 99 Job Corps centers" and "the suspension of Job Corps program operations" and further seek an order requiring Defendants "to take any and all necessary steps to ensure resumption or continued provision of [Job Corps] services."

### STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted); see also *Trump, et al. v. CASA, Inc., et al.*, No. 24A884 (June 27, 2025) ("The injunctions before us today reflect a more recent development: district courts asserting the power to prohibit enforcement of a law or policy against anyone. These injunctions—known as "universal injunctions"—likely exceed the equitable authority that Congress has granted to federal courts.").An injunction is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v.*

*Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). The movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The "most important factor" is whether the movant has "established a likelihood of success on the merits," *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). Furthermore, the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised." *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000) (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969))). "Plaintiffs seeking this type of relief . . . face 'an additional hurdle' when proving their entitlement to relief," and courts "exercise extreme caution in assessing" such motions. *Kondapally*, 2020 WL 5061735, at *3.

## ARGUMENT

### I.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Repackaged Contract Claims

Plaintiffs cannot prevail in this case because this Court lacks subject matter jurisdiction over their claims—which at their core challenge the terminations or non-renewals of the relevant Job Corps contracts. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3)*.* "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Tuck v. Un. Servs. Auto. Ass'n*, 859 F.2d 842, 844 (10th Cir. 1988) (citations omitted).

Although Plaintiffs do not specifically request that the Court enjoin DOL from terminating the Job Corps program contracts in question, the only means by which Plaintiffs can achieve their

requested relief is through the reinstatement of these contracts. Thus, notwithstanding that Plaintiffs have styled their claims as APA violations, they effectively are challenging the termination of DOL contracts. That challenge cannot be brought in this Court, however, because each of those contracts is explicitly subject to the Contract Disputes Act (CDA). *See* Matz Decl. ¶¶ 8, 11 & Exs. 1-2 (incorporating by reference FAR 52.233-1). The CDA has established exclusive procedures for resolving disputes related to termination of those contracts, including channeling through the Court of Federal Claims.. *See Texas Health Choice, L.C. v. Office of Personnel Mgmt.*, 400 F.3d 895, 898-99 (Fed. Cir. 2005) ("The CDA exclusively governs Government contracts and Government contract disputes" and, "[w]hen the [CDA] applies, it provides the exclusive mechanism for dispute resolution."); *see also United Aeronautical Corp. v. United States Air Force,* 80 F.4th 1017, 1025 (9th Cir. 2023) ("hold[ing] that the CDA 'impliedly forbids' [plaintiff] from invoking the otherwise-applicable waiver of sovereign immunity contained in the APA."); *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 402 (2d Cir. 2017); *see also United States v. J&E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995) ("It is well-established . . . that disguised contract actions may not escape the CDA. Neither contractors nor the government may bring a contract action in federal district court simply by recasting claims in tort language or as some statutory or regulatory violation." (citations omitted)).

The Tucker Act provides exclusive jurisdiction in the Court of Federal Claims for claims brought in federal court based on government contracts that are subject to the CDA. *See* 28 U.S.C. § 1346(a)(2). Although the APA provides a limited waiver of sovereign immunity for claims "seeking relief other than money damages," 5 U.S.C. § 702, that waiver does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,'" *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (Apr. 4, 2025) (quoting 5 U.S.C. § 702), and the Tucker Act impliedly forbids such relief. *Yee v. Jewell*, 228 F. Supp. 3d 48, 55

(D.D.C. 2017). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 215 (2012).

Accordingly, regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in its essence contractual." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (internal quotation marks omitted); *see also Albrecht v. Comm. on Emp. Benefits,* 357 F.3d 62, 68 (D.C. Cir. 2004). "Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both 'the source of the rights upon which the plaintiff bases [his] claims, and . . . the type of relief sought.'" *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Here, both prongs establish that the Plaintiffs' challenge is in essence a contractual claim seeking the quintessential contract remedy of specific performance (*i.e.*, reinstatement of the Job Corps contracts) — a claim that cannot be brought here.

First, the Job Corps operator contracts are plainly "the source of the rights upon which" the Plaintiffs base their claims. *Megapulse*, 672 F.2d at 968. Under similar circumstances, the D.C. Circuit rejected a contractor's claims that a contract termination violated two federal regulations, was arbitrary and capricious under the APA, and required reinstatement of the contract. *Ingersoll-Rand*, 780 F.2d at 76-80. Since the claims depended on whether the contract permitted termination in the circumstances, and the dispute was thus "entirely contained within the terms of the contract," even if "the termination also arguably violate[d] certain other regulations," the court concluded that the claims ultimately sounded in contract, and thus belonged in the Court of Federal Claims. *Id.* at 78. The D.C. Circuit further concluded that the contractor's request for reinstatement "amount[ed] to a request for specific performance" of the contract. *Id.* at 80.

Second, the relief that Plaintiffs seek is likewise contractual. While the complaint broadly

discusses the potential elimination of the Job Corps program and Plaintiffs do not specifically request reinstatement of contracts, it is only through reinstatement of the contracts between private Job Corps operators and the Federal Government that Plaintffs will achieve the broad relief they request. Accordingly, Plaintiffs' claims clearly sound in contract. In essence, Plaintiffs seek "the classic contractual remedy of specific performance," a remedy that is unavailable against the Government, *Spectrum Leasing Corp.*, 764 F.2d at 894; *see also Ingersoll-Rand*, 780 F.2d at 79-80 (order "reinstating the original award of [a] contract . . . amount[ed] to a request for specific performance" and "[a] complaint involving a request for specific performance must be resolved by the Claims Court. . . [where plaintiff] will have available to it a damages remedy for wrongful termination of the contract.")—and for which these Plaintiffs lack standing, in any event. *See* Pt. II, *infra*.

Therefore, because Plaintiffs' claims are contract claims in disguise, this Court lacks subject matter jurisdiction over their challenge to the termination of their respective Job Corps center operator contracts.

## II.    Plaintiffs Cannot Show Substantial Likelihood of Standing

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). One element of this limitation is that a plaintiff must have standing to sue, a requirement that is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* As the parties invoking this Court's jurisdiction, Plaintiffs bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing,"—namely that they have (1) suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete

and particularized," "actual or imminent" and not "conjectural" or "hypothetical" that is (2) "fairly traceable" to the challenged conduct of the defendant, and will (3) "likely" be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992).

### A. Plaintiffs Lack Standing to Challenge a Contract Claim

Plaintiffs are not parties to contracts with DOL, nor are they in privity of contract, and accordingly they lack standing to challenge the termination of those contracts. *See P. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1350 (Fed. Cir. 2016) ("*PG&E*") (recognizing that standing to sue the United States on a contract claim is limited to those in privity of contract with the government). As demonstrated above, Plaintiffs' challenge is in essence a contractual claim seeking the quintessential contract remedy of specific performance. *See* Pt. I, *supra*; *cf; see also Ingersoll-Rand Co. v. United States, 780 F.2d 74, 79–80 (D.C. Cir. 1985)* and *Sardarian v. Fed. Emergency Mgmt. Agency*, No. 3:19-CV-00910 (OAW), 2022 WL 4080325, at *1–2 (D. Conn. Apr. 1, 2022) (dismissing suit for lack of standing where the plaintiff town resident did not have a "legally protected interest" because agency awarded "the grant in question" to the state and municipality, not individual residents, and plaintiff was thus not the recipient of the grant "for purposes of establishing jurisdiction"). However, as Job Corps program participants, Plaintiffs are not a party to the contract between DOL and the operator of their respective Job Corps centers and have not pointed to anything in their respective center contract agreements, demonstrating that the contracting parties intended to confer a direct benefit on them. "In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001). Plaintiffs have not done that here and therefore lack standing to challenge the contract terminations.

### B. Plaintiffs Otherwise Fail to Show an Injury-in-Fact

Plaintiffs have not sufficiently shown they will suffer actual or imminent injury in fact. *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992)("any injury must be 'actual or imminent'). Plaintiffs bring this lawsuit on behalf of themselves and their proposed class. In their motion for preliminary injunctive relief, Plaintiffs allege they have lost, or are at risk of losing, access to Job Corps center-provided "training, vocational services, housing, and health services" (Pl. Mot. at 10), because of DOL's decision to pause Job Corps program activities at their respective centers. However, when DOL made the decision to suspend private Job Corps center operations in May 2025, it directed center operators to provide transition assistance to Job Corps participants via the program's numerous state and local program partners. *see* Matz Decl., Exs .3-5. DOL moreover leveraged its Job Corps partnerships with other DOL, Federal Government and state and local resources to facilitate Job Corps program participants' continued access to similar assistance and services. "Prior to the May 29 announcement, DOL developed a comprehensive outreach plan that included coordinating with federal, state, and local agencies and partners to identify and provide services and resources to students transitioning out of the Job Corps program. On the federal level, DOL reached out to the U.S. Housing and Urban Development and the U.S. Department of Health and Human Services to identify resources for eligible students to assist with housing, benefits, and other services available to Job Corps students." Frazier Decl. ¶¶ 3, 4. In addition, DOL's Employment and Training Administration (ETA) coordinated with states, workforce boards, American Job Centers, and local resources to provide assistance and services to transitioning Job Corps students. DOL mobile units and rapid response teams engaged in various activities to support the students, including visiting Job Corps centers to meet with students, conducting job fairs, and determining eligibility for other workforce programs, such as DOL's YouthBuild and Workforce Innovation and Opportunity Act (WIOA) youth program services provided on the state and local levels. *Id.* at ¶5. DOL was able

to make progress transitioning Job Corps participants throughout the country. The six Regional Offices reported the progress of outreach efforts in their regions and success in connecting Job Corps students to other workforce development programs such as YouthBuild and in locating additional placement services through state youth coordinators. *Id.* at ¶16. And as demonstrated by Plaintiffs' declarations, many have arranged for alternative housing (Christensen Decl. ¶6), others have other potential job opportunities lined up (See Burkes Decl., ¶7), while others have enrolled in other educational institutions (Cabrera Decl. ¶14). .

 For the above reasons, Plaintiffs have not shown actual or imminent injury in fact.[1]

## III.  Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits of their APA Claims

    A.    **Defendants' properly exercised their discretionary authority under the WOIA to pause private Job Corps center operations, thereby precluding judicial review under the APA**

The APA provides for judicial review of final agency actions, 5 U.S.C. §§ 702, 704, and directs courts to vacate such actions if they are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," id. § 706(2)(C); or "without observance of procedure required by law," id. § 706(2)(D).  Judicial review is barred, however, to the extent that the challenged action "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—where, effectively, "there is no law to apply"—the APA does not permit judicial review. *Id.* When considering whether a matter is committed to agency

---

[1]

discretion, courts review the statutory scheme to determine if it provides an adequate standard of review. *Id.* at 831. "Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, is there 'law to apply' under § 701(a)(2)." *Id.* at 833-34. Courts may also consider whether, as a matter of tradition, action is committed to agency discretion. *See id.* at 832 ("[S]uch a decision has traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition.").

Plaintiffs allege that DOL failed to comply with WIOA procedural requirements for "closing" Job Corps centers and therefore violated the APA. That contention, however, depends entirely on Plaintiffs' mischaracterization of the actions taken by DOL to date, as a "*closure*" of all 99 Job Corps centers.  Pl. Mot at 1.  DOL's actions in suspending private Job Corps center operations did not constitute a "closure" of those centers under WIOA. Instead, DOL exercised its long-held discretionary authority, as contemplated by the WIOA, to pause center operations in response to program, challenges. Because DOL's pause of center operations is a discretionary action under the WIOA, it is not subject to judicial review under the APA.

The WIOA requires that prior to the *closure* of any Job Corps center, DOL announce its proposed decision to the general public through publication in the *Federal Register* or other appropriate means; that it establish a notice-and-comment period; and that it notify the Member of Congress who represents the district in which the impacted center is located before  any final decision. Pub. L. No. 113-128, § 159(j), 128 Stat. 1425, 1557–58 (July 22, 2014), *codified* at 29 U.S.C. § 3209(j)); see also 29 U.S.C. § 2899(g) (1998)). Although the statute does not define the term "closure," DOL standard of  practice has long differentiated between a center "closure" and a "pause" or "suspension" of center operations, executed via contract action. *See* McGee Dec. and

Ex 1 and Ex 4. Indeed, the WIOA authorizes DOL to take various actions short of center closure to remedy program performance issues—including but not limited to changing center management staff; replacing a center operator; reducing center capacity; and relocating a center." 29 USC 3209 (f). Over the past decade, DOL has exercised its discretionary authority to pause center operations and/or place centers in 'inactive status" on multiple occasions, in accordance with the WOIA. *Id*. Across Presidential administrations and a recently as December 2024, to offset the Job Corps program's $114 million PY 2024 deficit, DOL reduced program capacity, including "pausing" operations at two centers, by opting not to extend the centers' respective operator contracts. *McGee* Decl. ¶ 10-15 DOL revisits such a decision to "unpause" center operations only "when the *program* can maintain a structurally balanced budget without a projected shortfall." *Id* at Ex 9.

DOL effected such pauses to center operations (including the pauses of the 99 Job Corps centers at issue here) either through terminating or opting not to extend or renew center operator contracts. *See* Matz Decl. ¶ 12-13. DOL properly exercised its discretionary authority to end these contracts, in accordance with the contracts' standard provisions and clauses (see FAR clause 52.249-1). *See* Matz Decl. ¶ 6-7. The Termination for Convenience of the Government clause in these contracts allows DOL's Contracting Officer to terminate a contract when it is in the Government's interest merely upon written notice to the contractor. *Id.* ¶ 7 (citing 48 C.F.R. § 52.249-1).

Here, as in the past, when center operations were paused upon termination of operator contracts, DOL did end the Job Corps program but continued to maintain the government-owned property via caretaker contracts. *See* McGee Decl. ¶ 10-15. \ In some instances, it took years before a final decision was made and action was taken to formally close the center—*in accordance with the WIOA's closure requirements*. For example, in November 2015, DOL terminated the contract of a Job Corps contractor that operated a center in Florida, putting the center in "inactive status,"

after a violent crime near the campus. *Id.* ¶ 11. But DOL did not formally close the center until two years later, before which it provided public notice of the proposed closure. *Id.* ¶ 11 & Exs. 5-6. And in September 2017, DOL stopped contract work at Job Corps facilities in Florida and Puerto Rico that had suffered hurricane-related damage and went into "inactive status" thereafter. *Id.* ¶¶ 12-13. But DOL did not formally close those centers until more than a year later. *Id.* ¶ 14 & Exs. 7-8. Finally, in January 2025, in response to the Job Corps' budget issues, DOL terminated one operator's contract and did not extend another at Job Corps facilities in Kentucky and Maryland but has not formally closed either facility. *Id.* ¶ 15 & Exs. 9-10.

Accordingly, Defendants' pausing of center operations via contract termination was not a "closure" of Job Corps centers as Plaintiffs erroneously contend and therefore all of their APA claims so predicated are unlikely to succeed.   Comp. ¶¶ 50-52 (Count I:  Failure to Observe Procedure Required by Law); Comp. ¶¶ 53-57 (Count II: Action Contrary to Law – WIOA); Comp. ¶¶ 58-61 (Count III: Arbitrary and Capricious Action); Comp. ¶¶ 62-65 (Count IV: Action in Excess of Statutory Authority). DOL acted within its discretionary authority under the WIOA when it paused center operations by way of contract termination (see 29 USC 3209 (f)), to address issues of program performance, budget and safety issues. Because the agency possesses long-held discretionary authority to suspend center operations when necessary to resolve program issues, the agency's actions in pausing center operations is therefore not reviewable under the APA. *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("Congress may limit an agency's exercise of enforcement power…but only when [it] has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, is there 'law to apply' under § 701(a)(2)'"…"Courts may also consider whether, as a matter of tradition, action is committed to agency discretion.").

**B.  DOL has not acted arbitrarily and capriciously.**

Plaintiffs are likewise unlikely to succeed on their claim that DOL's "closure of centers without engaging with the criteria it promulgated for doing so, pursuant to statute, is arbitrary and capricious" (Pl. Mot. at 1)—because that again is a misconception of DOL's actions. Should the Court nevertheless find this action reviewable under the APA[2], it should determine whether DOL's decision to pause Job Corps center operations by terminating Job Corps contracts was reasonable.. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77 L. Ed. 2d 443 (1983); see also *Magellan Tech., Inc. v. FDA*, 70 F.4th 622, 628 (2d Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), cert. denied, No. 23-799, 2025 WL 1151226 (U.S. Apr. 21, 2025). "Under the arbitrary-and-capricious standard, judicial review of agency action is necessarily narrow. A reviewing court may not itself weigh the evidence or substitute its judgment for that of the agency." *Magellan Tech, Inc..* at 628-29 (internal quotation marks omitted). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness." *Prometheus Radio*, 592 U.S. at 423.  DOL's actions here clearly did.

DOL considered the relevant factors and made a reasoned decision, based on the Job Corps program's financial difficulties and related financial metrics, the poor enrollee outcomes, and the

high number of serious incidents at Job Corps facilities. *See* McGee Decl. Ex. 4, at Q9. Nothing more is required under the APA. The Job Corps Transparency Report showed that the program had low graduation rates, high costs per enrollee, and even higher costs per graduate—but that Job Corps participants earned relatively low average wages after separating from the program. McGee Decl. ¶ 7 & Exs. 1-2. In explaining the agency's action, the Secretary concluded that "the program is no longer achieving the intended outcomes that students deserve" based on the agency's "in-depth fiscal analysis" and "a startling number of serious incident reports." *Id*. Ex. 3.

Specifically, in announcing the decision to terminate the contracts and pause program operations, DOL noted that in Program Year 2024, the Job Corps program operated at a $140 million deficit, which necessitated "a pause in center operations to complete the program year." *Id.*; *see also* McGee Decl. ¶ 15. In addition, when determining mitigation measures to offset $140 million deficit in PY 2024, which included the pausing of multiple center operations, DOL found that those measures were insufficient to ensure medium or long-term program financial stability, and that additional action would be required in PY 2025. *Id.* at Ex 9. DOL explained that the PY 2024 deficit was projected to grow to $213 million in PY 2025. *See id*. Ex. 3.  Moreover, the DOL announcement noted as another factor in making its decision, that there had been almost 15,000 "serious incident reports" in Job Corps centers in Program Year 2023— including sexual assaults, acts of violence, drug use, and breaches of safety or security—and highlighted the Job Corps program's low graduation rates. *Id.*

DOL's decision to pause Job Corps center operations at privately contracted centers and terminate or not renew the operators' contracts was reasonable in that it was based on a consideration of relevant factors—the financial condition of the program, the per-student cost and student outcomes, and the number of serious incidents that occurred in operating the program. These are the types of factors that agencies consider in evaluating and making decisions about

program operations, and to which this Court should defer. *See Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1288 (D.C. Cir. 2023) ("[C]ost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency." (internal quotation marks omitted));.

Accordingly, DOL's reasonable decision to pause privately-operated Job Corps centers by terminating center operator contracts was not arbitrary and capricious, and Plaintiffs are unlikely to succeed on that claim.

### C. DOL did not otherwise fail to comply with the WIOA, in violation of the APA

Plaintiffs separately allege that Defendants violated WIOA's requirement under Section 3197(a)(1) that DOL enter into agreements with third parties for the operation of each Job Corps center, by "terminating all such agreements, with no intent to enter into any new agreements." Pl. Mot. at 14. As discussed above, DOL possesses discretionary and contractual authority to pause or suspend center operations in accordance with WIOA through the termination of center operator agreements—when the agency determines there are performance and safety risks or when it must remedy a deficit. See 29 USC 3209 (f).  Furthermore, Section 3197 does not require that DOL enter into agreements with private entities but authorizes agreements with other Federal agencies, state agencies and non-governmental organizations. 20 CFR § 686.300. Despite the termination of agreements with all private Job Corps center operators, DOL's agreements with USDA to run the other 24 Job Corps program Civilian Conservation Centers are still in place. Thus, where center operations are still ongoing, DOL remains in compliance with Section 3197(a)(1) and has not violated the APA.

Plaintiffs also allege that Defendants exceeded their authority under the WIOA in violation of the APA by "indefinitely suspending" or "eliminating" the Job Corps program. Pl. Mot. at 13. Contrary to Plaintiffs' argument, DOL has not violated the statutory command that "there shall be

within the Department of Labor a 'Job Corps.'" 29 U.S.C. § 3193. While DOL has taken actions to suspend operations at the 99 privately-operated Job Corps centers, it has not "closed" any Job Corps centers, and the 24 USDA-run centers continue to operate. *See* McGee Decl. Ex. 4 at Q11; *accord* ECF No. 6 ("PI Mem.") at 4. Furthermore, while the White House's proposed budget for Fiscal Year 2026 calls for the elimination of the Job Corps program (*See* Pl. Mot. at 5), that decision would necessitate an enactment by Congress. Put another way, the *proposal* reflects DOL's understanding that any decision to eliminate the Job Corps program requires Congressional approval.

### D. DOL has not violated appropriations law, nor could Plaintiffs make such a claim.

Plaintiffs' argument that DOL's actions violate the Impoundment Control Act ("ICA"), 2 U.S.C. § 681 *et seq.*, (Pl. Mot.) is without merit. DOL has not "withheld appropriated funds" in pausing program operations at privately-operated Job Corps centers. Under the ICA, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b). Defendants do not dispute the Executive's obligations under the ICA but contend that the law generally bestows upon the President significant discretion in administering appropriated funds. *See Aids Vaccine Advoc. Coal. v. United States Dep't of State,* 770 F. Supp. 3d 121, 147 (D.D.C. 2025), "No one does or could doubt that the Executive is afforded significant discretion in administering the funds appropriated or, as Defendants put it, 'how to use these funds.'" *See, e.g.*, 22 U.S.C. § 2151b(c)(1) (authorizing the President "to furnish assistance, on such terms and conditions as he may determine," for certain programs). "The constitutional partnership between the political branches has always recognized the Executive's role in determining *how* appropriated funds are spent." *Aids Vaccine Advoc. Coal.,* 770 F. Supp. 3d 121, 147 (D.D.C. 2025).

Here, DOL appropriately exercised the Executive's discretionary authority to administer Job Corps program funds, when it paused center operations via contract termination. The decision

to suspend center operations was based largely on the potential risk of another significant program budget deficit for PY 2025, an estimated at $213 million beyond what has been appropriated. In regard to deficit dollars, there can be no ICA violation, where the funds at issue have not been appropriated. Furthermore, as a steward of taxpayer dollars, DOL has fiscal and legal responsibility to properly manage funds and avoid deficiencies. See Anti-Deficiency Act, 31 U.S.C. §§ 1341, 1342, 1517; "The [Anti-deficiency] Act prohibits a government agency from incurring obligations in excess of appropriations, *Navajo Nation v. United States Dep't of Interior*, 852 F.3d 1124, 1129 (D.C. Cir. 2017). In addition, DOL has not made any final agency decision as to the expenditure of these funds and thus Plaintiffs cannot bring such a claim. Accordingly, Plaintiffs are unlikely to succeed on their ICA claim.

## IV.  DOL has not "eliminated" the Job Corps program ultra vires

Plaintiffs' allegation that DOL's pause of center operations via contract terminations is an *ultra vires* "elimination" of the Job Corps program also has no merit (Pl. Mot). Plaintiffs' non-APA *ultra vires* arguments, however, mirror their APA arguments that DOL "exceeded its authority." Pl. Mot. at 17. Non-statutory judicial review of an agency action alleged to be ultra vires is unavailable if a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review. *Nuclear Regul. Comm'n v. Texas*, No. 23-1300, 2025 WL 1698781, at *8 (U.S. June 18, 2025).  Such a review is an exception to statutory judicial-review mechanisms and applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute. *Id*. at 9. "Before enactment of the APA . . . courts sometimes entertained 'a bill in equity to attack administrative action when no statutory review was available.'" *Id*. at *8 (citation omitted). More recently, however, courts "have strictly limited non-statutory ultra vires review," lest it "become an easy end-run around … judicial review

statute[s]." *Id.* at *9.

Because Plaintiffs have clearly repackaged contract and APA claims, for which there is a review scheme, as *ultra vires* claims, the latter are barred.

## V.  Plaintiffs Have Not Shown Irreparable Harm

Plaintiffs have also failed to show irreparable harm. To establish irreparable harm, a plaintiff must show an "injury that is neither remote nor speculative, but actual and imminent," and that "cannot be remedied by an award of monetary damages." *New York v. U.S. Dep't of Homeland Security*, 969 F.3d 42, 86 (2d Cir. 2020) (internal quotation marks and citation omitted). Such injuries "cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citation omitted). Accordingly, "[o]nly when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999) (internal quotation marks omitted). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

Plaintiffs have not demonstrated such injury here. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted); *Borey*, 934 F.2d at 34 ("[A] mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction."). While the Plaintiffs all allege potential harms that *might* occur if they have to leave their respective centers, none has actually suffered such harms, and indeed, by their own account, some Plaintiffs do have alternative housing options.[3]    (Christensen Decl.

---

[3] As Plaintiffs acknowledge, in order to be eligible for the Job Corps program, applicants must be facing one or more obstacles to employment, which could include homelessness or lack of other financial means. 20 CFR 686.400

¶6).Moreover, DOL has demonstrated that the agency's "paramount consideration is the safety and well-being of students." *See* Matz Decl. at 2.

In addition,, DOL is "collaborating with state and local workforce partners to assist current students in advancing their training and connecting them with education and employment opportunities." McGee Decl. ¶ 9 & Ex. 3. DOL has numerous partnership agreements with state and local governments and other entities through which Job Corps participants receive additional support in the form of job placement, financial assistance, job training, healthcare services. Frazier Decl. ¶¶ 3-6. As previously mentioned above, DOL's Employment and Training Administration (ETA) coordinated with states, workforce boards, American Job Centers, and local resources to provide assistance and services to transitioning Job Corps students.  DOL mobile units and rapid response teams engaged in various activities to support the students, including visiting Job Corps centers to meet with students, conducting job fairs, and determining eligibility for other workforce programs, such as DOL's YouthBuild and Workforce Innovation and Opportunity Act (WIOA) youth program services provided on the state and local levels.  *Id.* at ¶5.    DOL was able to make progress transitioning Job Corps participants throughout the country. The six Regional Offices reported the progress of outreach efforts in their regions and success in connecting Job Corps students to other workforce development programs such as YouthBuild and in locating additional placement services through state youth coordinators. None of Plaintiffs have disputed the continued available of such resources. Again, Plaintiffs here have also asserted they have found other job and educational opportunities (See Burkes Decl., ¶7 and Cabrera Decl. ¶14).

Accordingly, Plaintiffs have not shown that they will suffer actual and imminent injury sufficient absent the extraordinary relief of a preliminary injunction, and such relief is not warranted for speculative injuries, as alleged here.

**VI. A Preliminary Injunction Would Not Serve the Public Interest**

The final two factors, the balance of equities and the public interest, also weigh in DOL's favor. These two factors merge when the Government is the party opposing a motion for preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 435-36 (2009). DOL, as a steward of the public fisc, must consider whether the expenditure of federal funds accords with government priorities and produces good value and outcomes for program participants and others. As reflected in the Transparency Report, the Job Corps program has produced disappointing outcomes for participants—low graduation rates, low post-graduation salaries, and a high incident of student injuries and victimization—all at a high taxpayer cost. *See* McGee Decl. Exs. 2-3. Moreover, the program is projected to run another similarly large deficit in the coming program year as in the current year—which has already required the suspension of operations at certain centers and other cost-cutting steps. *See id.* ¶ 15. Furthermore, any amount of deficit risks a possible Anti-deficiency Act violation, which can have serious consequences for the agency. See Anti-Deficiency Act, 31 U.S.C. §§ 1341, 1342, 1517.

For these reasons, DOL has determined that continuing to fund the contracts at the impacted centers is not in the public's interest. As the Secretary has explained: "Job Corps was created to help young adults build a pathway to a better life through education, training, and community. However, a startling number of serious incident reports and our in-depth fiscal analysis reveal the program is no longer achieving the intended outcomes that students deserve." *Id.* Ex. 3. Under these circumstances, a preliminary injunction is clearly not warranted.

**VII. Any Injunction Ordered in This Case Should Be Narrowly Tailored and Require Plaintiffs to Post a Bond**

Finally, even if the Court were to conclude that injunctive relief is appropriate, such relief should be narrowly tailored to that necessary to afford relief only to the named Plaintiffs, and not the putative class or other parties not before the Court. Injunctive relief "should be no more

burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Courts thus must narrowly tailor any injunctive relief to the plaintiffs themselves. *See, e.g.*, *Maryland v. Corp. for Nat'l & Community Serv.*, No. CV DLB-25-1363, 2025 WL 1585051, at *38 (D. Md. June 5, 2025) ("The scope of the injunction is narrowly tailored to restore the AmeriCorps-funded programs in the plaintiff states."); *Barton v. U.S. Dep't of Labor*, 757 F. Supp. 3d 766, 793 (E.D. Ky. 2024) ("Although this Court recognizes the incongruity in affording relief only to the parties to the suit, issuing preliminary relief any broader than to the parties currently before it (or who may be joined subsequently) is unnecessary and runs afoul of our federal system."); *cf. New York*, 969 F.3d at 87 ("The issuance of nationwide injunctions has been the subject of increasing scrutiny in recent years ").

Moreover, in accordance with Federal Rule of Civil Procedure 65(c) and the President's March 11, 2025, memorandum titled *Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c),* if the Court enters a preliminary injunction, DOL respectfully requests that the Court require Plaintiffs to post a bond in an appropriate amount. See McGee Decl. ¶ 16 (noting that DOL spends around $3 million per day to fund the 99 contractor-operated Job Corps centers); Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."); http://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/. DOL further requests that, if a preliminary injunction is entered, the Court enter a stay of this action pending the disposition of any appeal authorized by the Solicitor General.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: June 27, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JACQUELINE COLEMAN SNEAD
Assistant Branch Director
Civil Division, Federal Programs Branch

*Zareen Iqbal*
ZAREEN IQBAL
(N.Y. Bar No. 5481940)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: (202) 353-5639
E-mail: zareen.iqbal2@usdoj.gov

*Attorneys for Defendants*