UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANARIA CABRERA, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF LABOR, et al.,<br><br>      Defendants. | No. 1:25-cv-1909<br><br>BRIEF OF AMICI STATES WASHINGTON, NEVADA, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WISCONSIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

NICHOLAS W. BROWN
Attorney General
State of Washington

ZANE MULLER
Assistant Attorney General
CRISTINA SEPE
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
Zane.Muller@atg.wa.gov
Cristina.Sepe@atg.wa.gov

AARON D. FORD
Attorney General
State of Nevada

HEIDI P. STERN
Solicitor General
100 North Carson Street
Carson City, NV 89701
702-486-3594
HStern@ag.nv.gov

**TABLE OF CONTENTS**

I.   INTRODUCTION AND INTEREST OF THE AMICI ............................................................. 1

II.  ARGUMENT ................................................................................................................... 2

    A.  Job Corps Provides a Unique Combination of Services to Young Adults that Promote State Policy Goals and Augment State-Provided Services .................................................. 2

        1.  An injunction is necessary to protect the public interest ............................................. 7

        2.  The Department of Labor's arbitrary and capricious and *ultra vires* termination of Job Corps should be enjoined ................................................................................................ 8

III. CONCLUSION ................................................................................................................. 9


# TABLE OF AUTHORITIES

## **Cases**

*Colorado v. U.S. Dep't of Health & Hum. Servs.*,
   No. 1:25-CV-00121-MSM-LDA, 2025 WL 1426226 (D.R.I. May 16, 2025) ............................ 8

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
   No. DLB-25-1363, 2025 WL 1585051 (D. Md. June 5, 2025) ..................................................... 8

*Nat'l Job Corps Ass'n v. Dep't of Lab.*,
   2025 WL 1752414 (S.D.N.Y. June 25, 2025) .............................................................................. 8

*New York v. McMahon*,
   No. CV 25-10601-MJJ, 2025 WL 1463009 (D. Mass. May 22, 2025) ........................................ 8

*Prince v. Massachusetts*,
   321 U.S. 158 (1944) ..................................................................................................................... 1

*Thatikonda v. U.S. Citizen &, Immigr. Servs.*,
   2020 WL 2126716 (D.D.C. May 5, 2020) ................................................................................... 7

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................................................................... 7

## **Statutes**

29 U.S.C. § 3102(36) ......................................................................................................................... 3

29 U.S.C. § 3191(1) ........................................................................................................................... 7

29 U.S.C. § 3191 ................................................................................................................................ 3

Md. Code Ann., Educ. § 7-301(a)(12) ............................................................................................... 5

Minn. Stat. § 260C.452 ...................................................................................................................... 5

Pub. L. No. 113-128, 128 Stat. 1425 (2014) ..................................................................................... 3

Wash. Rev. Code § 43.330.720 ......................................................................................................... 5

## **Other Authorities**

Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022) ................... 2, 3, 4, 5

Benjamin Collins, Adam K. Edgerton, Kyle D. Shohfi, Cong. Rsch. Serv., R47099,
   Workforce Innovation and Opportunity Act of 2022 (H.R. 7309) ............................................. 3

David Collins, *'Monumental mistake': Maryland Job Corps Center part of locations to close nationwide,* WBAL TV 11, June 2, 2025 .................................................................. 6

*From Classroom to SpaceX: Daniel's Journey of Excellent*, 20 Westover Job Corps Center 1, 2 (November 2024) ............................................................................................ 4

Jack Belcher, *Cascade Job Corps closure leaves dozens of students searching for a home*, The Bellingham Herald, June 6, 2025 ................................................................................ 6

Job Corps Benefits. ............................................................................................................... 4

Job Corps Policy and Requirements Handbook Chapter 1: Enrollment Services, Exhibit 1-1: Job Corps Eligibility Requirements. ........................................................................ 3

Joni Auden Land, *Facing federal closures, Job Corps students and staff in Astoria weigh their futures*, OPB (June 10, 2025) ................................................................................ 7

Maria Staubs, *Job Corps students, staff still in limbo as judge temporarily halts shutdown*, KGUN 9 Tuscon, June 6 2025 ..................................................................... 6

Megan Lebowitz, *'A gut punch': Job Corps alumni and faculty lament Trump administration threats to the program,* NBC News (June 5, 2025) ............................ 7

Peter Schochet, John Burghardt, Sheena McConnell, *Does Job Corps Work? Impact Findings from the National Job Corps Study*, 98 Am. Econ. Rev. 1864 (2008) .......... 4

Peter Z. Schochet, *National Job Corps Study: 20-Year Follow-Up Study Using Tax Data*, Mathematica Pol'y Rsch (2018) ..................................................................................... 6

U.S. Dep't of Labor, *Congressional Budget Justification employment and Training Administration: Job Corps* ............................................................................................ 4

Wash. Dep't of Soc. and Health Serv., *Homlessness Among Youth Exiting Systems of Case in Washington State*, RDA Rep. No. 11.254 (2024) .................................................... 5

I.     INTRODUCTION AND INTEREST OF THE AMICI

"A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944). In the sixty years since Congress created Job Corps, millions of young Americans from low-income backgrounds have been served by the program's unique combination of education, training, housing, healthcare and community. Job Corps furthers many of Amici States' priorities: reducing youth unemployment, re-engaging students who have not completed high school, building a skilled workforce and, in many cases, providing irreplaceable housing and social services to at-risk youth and young adults. By providing no-cost education, vocational training, residence on-campus and wrap-around services to vulnerable young Americans, Job Corps empowers these students and effectively supplements and amplifies state efforts in workforce development, education and public health. Empirical research confirms that the program improves participants' lifetime earnings and supports long-term self-sufficiency, promoting the policy objectives of the Amici States.

The Department of Labor's unlawful termination of Job Corps, if allowed to proceed, will cause irreparable harm to the Amici States and their residents by closing almost one hundred Job Corps centers across the fifty states and terminating in-progress training and benefits programs in which tens of thousands of young Americans are currently enrolled. Many of these program participants were unhoused or in foster care when they enrolled. Thousands of them rely on housing provided at Job Corps centers and have nowhere else to go, and state social service and housing providers do not have the capacity to meet a sudden influx of young people in need.

Elimination of the Job Corps program appears to be part and parcel of a wide-ranging campaign by the executive branch to unlawfully dismantle congressionally mandated programs it

opposes. The Amici States have sued the federal government in various jurisdictions alleging that the agencies have exceeded their statutory authority in terminating federal programs and acting in an arbitrary and capricious manner in violation of the Administrative Procedure Act, and filed an *amicus* brief in support of Plaintiffs' successful motion for a preliminary injunction in *Nat'l Job Corps Ass'n v. Dep't of Labor,* No. 1:25-cv-04641 (S.D.N.Y. 2025). The Amici States have a strong interest in vindicating separation of powers principles and enjoining violations of federal law that have caused and, if unchecked, will continue to cause concrete injuries to the States and threaten the constitutional balance of power between the States and the federal government.

For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction against the Department of Labor's unlawful elimination of the Job Corps program.

## II. ARGUMENT

### A. Job Corps Provides a Unique Combination of Services to Young Adults that Promote State Policy Goals and Augment State-Provided Services

Congress created Job Corps by passing the Economic Opportunity Act of 1964, a legislative cornerstone of President Lyndon B. Johnson's War on Poverty, to tackle the problem of youth unemployment. The program was modeled on the Civilian Conservation Corps, a 1933 work relief program that gave millions of young men employment on environmental projects as part of President Franklin D. Roosevelt's New Deal.[1] Congress created Job Corps to:

> (A) assist eligible youth to connect to the labor force by providing them with intensive social, academic, career and technical education, and service-learning opportunities, in primarily residential centers, in order for such youth to obtain secondary school diplomas or recognized postsecondary credentials leading to (i) successful careers, in in-demand industry sectors or occupations or the Armed Forces, that will result in economic self-sufficiency and opportunities for advancement; or (ii) enrollment in postsecondary education, including an apprenticeship program; and (B) support responsible citizenship.

---

[1] Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022), https://www.congress.gov/crs-product/R47208.

2

29 U.S.C. § 3191. The program is currently authorized under Subtitle C, Title I of the Workforce Innovation and Opportunity Act. Pub. L. No. 113-128, 128 Stat. 1425 (2014). Since creating Job Corps over sixty years ago, Congress has appropriated tens of billions of dollars to fund it with bipartisan support.[2]

Job Corps is administered by six regional offices headquartered in Boston, Philadelphia, Atlanta, Dallas, Chicago, and San Francisco, which report to a national office in Washington, D.C. The regional offices oversee close to one hundred Job Corps centers located in each of the fifty states, the District of Columbia, and Puerto Rico.[3] The Amici States and their residents who enroll benefit enormously from the services that these centers provide.

Congress created Job Corps to serve high-need young Americans and established eligibility criteria reflecting this purpose. To be eligible, an applicant must be between the ages of 16 and 24 and be either a U.S. citizen; a lawfully admitted permanent resident alien, refugee, asylee, or parolee, or other alien who has been authorized to work in the United States; or a resident of a U.S. territory. An applicant must also be a "low-income individual," meaning that she or he must meet certain criteria such as experiencing homelessness, having income below the poverty level, not having graduated from high school, or being a victim of human trafficking.[4]

Job Corps centers function as residential campuses, with at least 80% of program enrollees living on-site.[5] These centers provide wrap-around services to young adults, including career planning, on-the-job training, job placement assistance, housing, food, health and dental care at no

---

[2] Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022), https://www.congress.gov/crs-product/R47208.

[3] Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022), https://www.congress.gov/crs-product/R47208.

[4] 29 U.S.C. § 3102(36); *see also* Job Corps Policy and Requirements Handbook Chapter 1: Enrollment Services, Exhibit 1-1: Job Corps Eligibility Requirements, https://prh.jobcorps.gov/Enrollment Services/1.2 Eligibility/Program Requirements/Exhibit 1-1 Job Corps Eligibility Requirements.pdf.

[5] Benjamin Collins, Adam K. Edgerton, Kyle D. Shohfi, Cong. Rsch. Serv., R47099, Workforce Innovation and Opportunity Act of 2022 (H.R. 7309), https://www.congress.gov/crs-product/R47099.

cost to enrollees.[6] While various State-level social programs may seek to provide education, health care or job placement assistance to at-risk young people, Job Corps' wrap-around model providing all of these services in a residential campus setting is unique, and the Job Corps' national job placement network goes beyond what individual States can provide.[7]

Not only does Job Corps serve residents of the Amici States and promote the States' policy goals, but it also complements and facilitates the work of State agencies that serve young people. Job Corps plays an important complementary role to state education departments by providing education and vocational training to students who have not completed a high school equivalent degree. One national controlled study found that among a cohort of 75,000 program enrollees, 93% of the members enrolled in an education or training program during the first 48 months, and the group saw a 21% increase in GED certificates earned compared to eligible young people not enrolled in Job Corps.[8] Job Corps centers often train students for in-demand roles in cutting edge industries; in Massachusetts, for example, one student, Daniel O., obtained a job at SpaceX after graduating with "an astounding 20 primary welding credentials across four applications."[9]

In particular, Job Corps provides a crucial bridge for young people in State foster care to become independent and self-sufficient. According to the Department of Labor's own Congressional Budget Justification for fiscal year 2025, a significant portion of the approximately 25,000 annual enrollees in Job Corps were either homeless or enrolled in state-administered foster care prior to joining the program, including 14% of enrollees in program year 2022.[10] State foster

---

[6] Job Corps Benefits, https://www.jobcorps.gov/benefits (last visited July 1, 2025).
[7] Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022), https://www.congress.gov/crs-product/R47208.
[8] Peter Schochet, John Burghardt, Sheena McConnell, *Does Job Corps Work? Impact Findings from the National Job Corps Study*, 98 Am. Econ. Rev. 1864 (2008).
[9] *From Classroom to SpaceX: Daniel's Journey of Excellent*, 20 Westover Job Corps Center 1, 2 (November 2024).
[10] U.S. Dep't of Labor, *Congressional Budget Justification employment and Training Administration: Job Corps*, https://www.dol.gov/sites/dolgov/files/general/budget/2025/CBJ-2025-V1-04.pdf.

care agencies and child protective services in the Amici States rely on Job Corps as a critical resource for placement of young people who age out of foster care. Sudden terminations of job centers, as directed by Defendants, would cause many Amici State agencies to respond quickly to gap-fill resources in order to support their vulnerable residents, avoid youth homelessness, and fulfill requirements under State law. For example, Job Corps is an approved "alternative educational program" under Maryland law, so youth under aged 18 are exempt from compulsory school attendance if they participate in Job Corps. Md. Code Ann., Educ. § 7-301(a)(12). Washington state law requires that the Washington Department of Children, Youth and Families develop a plan to ensure that "no unaccompanied youth is discharged from a publicly funded system of care into homelessness." Wash. Rev. Code § 43.330.720.[11] Minnesota law similarly requires that youth who go through the foster system be provided with services in the areas of employment, daily living skills such as financial literacy and driving instruction, education and training, and housing. Minn. Stat. § 260C.452. Amici State agencies face persistent challenges in tackling youth homelessness—an issue further exacerbated by Defendants' conduct.

The long-run benefits to the Amici States and their residents are no less significant: the same national controlled study found that three years later, program participants earned $1,150 more annually than those in the control group.[12] Follow-up studies showed that more time spent receiving Job Corps training was positively correlated with higher earnings. Participants who spent at least 40 weeks in training saw an increase of $1,612 annually two years after random assignment, which was $462 more than the average impact for all participants.[13] Another follow-up study

---

[11] Wash. Dep't of Soc. and Health Serv., *Homelessness Among Youth Exiting Systems of Case in Washington State*, RDA Rep. No. 11.254 (2024), https://www.dshs.wa.gov/sites/default/files/rda/reports/research-11-254.pdf.

[12] Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022), https://www.congress.gov/crs-product/R47208.

[13] Adam K. Edgerton, Cong. Rsch. Serv., R47208, Job Corps: A Primer (2022), https://www.congress.gov/crs-product/R47208.

examining participants' tax records twenty years later found that Jobs Corps enrollees who began at age 20 or older continued to benefit from the program in terms of their earnings over subsequent decades.[14] In Maryland, the Woodland Job Corps Center has an estimated annual community impact of $17 million, returning $1.91 for every dollar spent.[15] In Massachusetts, the Westover Job Corps Center serves approximately 500 students each year, employs over 175 people, and brings in $35 million per year to the local community, training students in advanced manufacturing, automative, construction, health care, hospitality, and transportation.

Abruptly shutting down Job Corps centers and terminating the program, as Defendants seek to do, would have devastating effects for young Americans in the Amici States and create a crisis for Amici State agencies. Not only would termination disrupt the local economies served by the centers and derail the skill training of vulnerable young people, but it also risks destabilizing access to basic services, including safe places to live and regular meals. At some centers, it already has: at Arizona's Fred G. Acosta Job Corps Center, all but four of the nearly 180 students have been displaced from their dormitories as a result of Defendants' announcement; twelve have since been living in a local homeless shelter.[16] At the Cascades Job Corps Center in Sedro-Woolley, Washington, over 250 students are currently enrolled and residing on campus, and an estimated 60 would become homeless if the campus closed.[17] News reports have also highlighted that, prior to

---

[14] Peter Z. Schochet, *National Job Corps Study: 20-Year Follow-Up Study Using Tax Data*, Mathematica Pol'y Rsch (2018), https://www.dol.gov/sites/dolgov/files/ETA/publications/ETAOP2019-13 Job-Corps-IRS-Report.pdf

[15] David Collins, *'Monumental mistake': Maryland Job Corps Center part of locations to close nationwide*, WBAL TV 11, June 2, 2025, https://www.wbaltv.com/article/maryland-job-corps-center-closing-nationwide/64948723.

[16] Maria Staubs, *Job Corps students, staff still in limbo as judge temporarily halts shutdown*, KGUN 9 Tuscon, June 6 2025, https://www.kgun9.com/news/community-inspired-journalism/midtown-news/job-corps-students-staff-still-in-limbo-as-judge-temporarily-halts-shutdown.

[17] Jack Belcher, *Cascade Job Corps closure leaves dozens of students searching for a home*, The Bellingham Herald, June 6, 2025, https://www.msn.com/en-us/money/careers/cascades-job-corps-closure-leaves-dozens-of-students-searching-for-a-home/ar-AA1Ga6P5?ocid=BingNewsSerp.

6

the entry of a temporary restraining order, the Tongue Point Job Corps Center in Astoria, Oregon, was trying to find housing for more than two dozen students who were homeless before starting the program, with the Department of Labor providing little to no help for students since announcing the closures of centers.[18]

### 1. An injunction is necessary to protect the public interest

In light of the dire consequences of shuttering Job Corps campuses and turning thousands of young Americans out of their homes, the balance of equities and public interest overwhelmingly militate in favor of an injunction, and "the Court must weigh them with 'serious consideration.'" *Thatikonda v. U.S. Citizen &, Immigr. Servs.*, 2020 WL 2126716, at *6 (D.D.C. May 5, 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20-24 (2008)).[19] Here, the public interest is unusually significant and squarely in favor of the plaintiffs, whose motion aligns with immediate interests of vulnerable citizens of Amici States as well as the States' medium and long-term policy goals. Congress created the Job Corps program to serve the public interest by "support[ing] responsible citizenship" and "assist[ing] eligible youth to connect to the labor force," leading them to "successful careers, in in-demand industry sectors or occupations or the Armed Forces, that will result in economic self-sufficiency and opportunities for advancement" or "enrollment in postsecondary education." 29 U.S.C. § 3191(1). Allowing this unlawful termination to take effect would undermine those goals and result in a profound setback for the vulnerable young people who enrolled in Job Corps on the promise that it offered a path to stability and self-sufficiency. As the Department of Labor has conceded in parallel litigation, if closures proceed,

---

[18] Megan Lebowitz, *'A gut punch': Job Corps alumni and faculty lament Trump administration threats to the program,* NBC News (June 5, 2025), https://www.nbcnews.com/politics/trump-administration/job-corps-alumni-faculty-lament-trump-administration-cuts-program-rcna210674; Joni Auden Land, *Facing federal closures, Job Corps students and staff in Astoria weigh their futures*, OPB (June 10, 2025), https://www.opb.org/article/2025/06/06/astoria-oregon-job-corps-students-staff-future-uncertain-federal-closures/.

[19] These factors merge "when the government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009).

7

"thousands of abused children and/or young people will be kicked off Job Corps campuses, rendering them homeless instantly because they have nowhere else to go." *Nat'l Job Corps Ass'n v. Dep't of Lab.*, 2025 WL 1752414, at *2 (S.D.N.Y. June 25, 2025).

### 2. The Department of Labor's arbitrary and capricious and *ultra vires* termination of Job Corps should be enjoined

The Amici States agree with Plaintiffs that the Department of Labor's actions since March 2025, culminating in the May 29, 2025 announcement of its plan to shut down all Job Corps centers nationwide, amount to an unlawful effort to terminate Job Corps in violation of federal law and the Constitution. *See* ECF Nos. 1, 3; *accord Nat'l Job Corps Ass'n*, 2025 WL 1752414, at *11. Defendants' efforts to terminate Job Corps without congressional authority represents the latest episode in the Trump Administration's unlawful campaign to dismantle congressionally mandated and appropriated programs it dislikes, which the Amici States have challenged and courts have enjoined. *See, e.g.*, *Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. DLB-25-1363, 2025 WL 1585051 (D. Md. June 5, 2025) (preliminary injunction requiring the restoration of AmeriCorps programs in 24 plaintiff states); *New York v. McMahon*, No. CV 25-10601-MJJ, 2025 WL 1463009 (D. Mass. May 22, 2025) (enjoining federal defendants from dismantling the U.S. Department of Education; Defendants have applied to the U.S. Supreme Court for a stay of the injunction); *Colorado v. U.S. Dep't of Health & Hum. Servs.*, No. 1:25-CV-00121-MSM-LDA, 2025 WL 1426226 (D.R.I. May 16, 2025) (preliminary injunction enjoining HHS's decision to terminate billions in congressionally appropriated public health funding). It is Congress—not the Department of Labor—that has the exclusive power to create (or eliminate) the program.

8

### III. CONCLUSION

This Court should reaffirm the principle that the Amici States have repeatedly sought to vindicate—that the executive branch is bound by federal law and the Constitution—and grant Plaintiffs' motion for a preliminary injunction.

DATED this 2nd day of July 2025.

NICHOLAS W. BROWN
Attorney General
State of Washington

*/s/ Zane Muller*
ZANE MULLER, WSBA #63777
Assistant Attorney General
CRISTINA SEPE, WSBA #53609
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
Zane.Muller@atg.wa.gov
Cristina.Sepe@atg.wa.gov
*Attorneys for Amicus State of Washington*

AARON D. FORD
Attorney General
State of Nevada

*/s/ Heidi P. Stern*
HEIDI P. STERN, NVB #8873
Solicitor General
100 North Carson Street
Carson City, NV 89701
702-486-3594
HStern@ag.nv.gov
*Attorney for Amicus State of Nevada*

List of Additional Amici States Below

KRIS MAYES
Attorney General
State of Arizona
2005 N. Central Ave
Phoenix, AZ 85004

PHILIP J. WEISER
Attorney General
State of Colorado
1300 Broadway
Denver, CO 80203

KATHLEEN JENNINGS
Attorney General
State of Delaware
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
Attorney General
State of Hawaiʻi
425 Queen Street
Honolulu, HI 96813

AARON M. FREY
Attorney General
State of Maine
6 State House Station
Augusta, ME 04333

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

ROB BONTA
Attorney General
State of California
1515 Clay Street
Oakland, CA 94612

WILLIAM TONG
Attorney General
State of Connecticut
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
Attorney General
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

KWAME RAOUL
Attorney General
State of Illinois
115 South LaSalle Street
Chicago, IL 60603

ANTHONY G. BROWN
Attorney General
State of Maryland
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
Attorney General
State of Michigan
P.O. Box 30212
Lansing, MI 48909

MATTHEW J. PLATKIN
Attorney General
State of New Jersey
25 Market Street
Trenton, NJ 08625

| | |
|---|---|
| RAÚL TORREZ<br>Attorney General<br>State of New Mexico<br>408 Galisteo Street<br>Santa Fe, New Mexico 87501 | LETITIA JAMES<br>Attorney General<br>State of New York<br>28 Liberty Street<br>New York, NY 10005 |
| DAN RAYFIELD<br>Attorney General<br>State of Oregon<br>1162 Court Street NE<br>Salem, OR 97301 | PETER F. NERONHA<br>Attorney General<br>State of Rhode Island<br>150 South Main Street<br>Providence, RI 02903 |
| CHARITY R. CLARK<br>Attorney General<br>State of Vermont<br>109 State Street<br>Montpelier, VT 05609 | JOSHUA L. KAUL<br>Attorney General<br>State of Wisconsin<br>17 West Main Street<br>Madison, WI 53703 |