UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANARIA CABRERA, *et al.*,

    *Plaintiffs*,

v.

U.S. DEPARTMENT OF LABOR, *et al.*,

    *Defendants*.

No. 25-cv-1909 (DLF)

**MEMORANDUM OPINION**

Seven Job Corps student-enrollees bring this action challenging the Department of Labor's (DOL) shuttering of 99 privately operated Job Corps centers. Before the Court is the plaintiffs' Motion for a Preliminary Injunction, Dkt. 3. For the reasons that follow, the Court will grant the plaintiffs' motion and stay the challenged agency action under 5 U.S.C. § 705.

**I.  BACKGROUND**

The Job Corps is a national program designed to "assist eligible youth to connect to the labor force by providing them with intensive social, academic, career and technical education, and service-learning opportunities, in primarily residential centers, in order for such youth to obtain secondary school diplomas or recognized postsecondary credentials." Title I, Subtitle C of the Workforce Innovation and Opportunity Act (WIOA), 29 U.S.C. §§ 3191–3212. Under the WIOA, the Department of Labor is required to enter into agreements "for the operation of each Job Corps center." 29 U.S.C. § 3197(a)(1)(A). DOL also enters into agreements with the Department of Agriculture to operate Civilian Conservation Centers in primarily rural areas. 29 U.S.C. § 3197(d)(1). There are currently 123 Job Corps centers nationwide—99 centers operated by private entities under contracts with DOL, and 24 Civil Conservation Centers operated by the

Department of Agriculture pursuant to an inter-agency agreement. *See* Decl. of Erin McGee ¶¶ 4–5., Dkt. 20-2.

Under the WIOA, the Department of Labor must comply with certain procedural requirements "[p]rior to the closure of any Job Corps center." 29 U.S.C. § 3209(j). Specifically, DOL must publicly announce the proposed decision to close any center through a publication in the Federal Register; undertake a "reasonable comment period"; and notify "the Member of Congress who represents the district" encompassing the center "within a reasonable period of time in advance of any final decision to close the center." *Id.* In addition, the statute requires DOL to "establish written criteria" that it "shall use to determine when a Job Corps center supported under this part is to be closed." *Id.* § 3211(c); *see also* Job Corps Center Proposal for Deactivation, 84 Fed. Reg. 25,071, 25,072 (May 30, 2019) (discussing the Department's criteria for center closure). The statute also permits DOL to take actions short of permanent closure for poorly performing Job Corps centers pursuant to a "performance improvement plan." 29 U.S.C. § 3209(f)(2).

On May 29, 2025, DOL leadership issued a directive "announcing that performance under the operations contracts at the 99 contractor-operated Job Corps Centers should be terminated immediately with all shutdown activities to be completed no later than June 30, 2025." Decl. of Jillian Matz ¶ 12, Dkt. 20-1. Following that directive, DOL issued notices of termination or non-renewal to each Job Corps contractor. *Id.* ¶ 13. Those notices instructed contractors to "commence immediately an orderly shutdown of operations" at their Job Corps centers "[i]n anticipation of the cessation of operations . . . after June 30th." Notice of Non-Renewal, Matz Decl. Ex. 3 at 1. The notices also instructed center operators to promptly separate students from the Job Corps program and to ensure that there be "no expectation of transfer to another center or return to their current

center." *Id.* at 3.  DOL did not publish its directive in the Federal Register, establish a comment period, or inform Congress of its decision.  *See* Matz Decl. ¶ 15.

Also on May 29, DOL issued a press release announcing "a phased pause in contractor-operated Job Corps centers nationwide" to "occur by June 30, 2025."  DOL Press Release, Decl. of Adam Pulver Ex. 2, Dkt. 3-2.  The press release stated that the Job Corps program was being shut down because it was experiencing "significant financial challenges under its current operating structure" and was "no longer achieving the intended outcomes that students deserve." *Id.* (citing DOL, Job Corps Transparency Report 2025, Apr. 25, 2025, https://www.dol.gov/sites/dolgov/files/ETA/jobcorps/reports/JobCorps-Transparency-Report-2025.xlsx).  It noted that the shutdown "decision aligns with the President's FY 2026 budget proposal."  *Id.*; *see also* Letter from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Sen. Susan Collins (May 2, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf; Job Corps Pause FAQs, Pulver Decl. Ex. 3 at 2 (explaining that the "pause [of] operations at all centers" was due to the program's financial straits).

Following DOL's issuance of the termination and non-renewal notices, all 99 privately operated Job Corps centers across the country began to shut down.  Students were informed that they were to promptly depart the affected centers and find alternative housing.  *See, e.g.*, Decl. of Anaria Cabrera ¶ 10, Dkt. 3-3 (students at the Turner Job Corps Center were told that they had to leave by the week of June 9, 2025); Decl. of Deondre Burkes ¶ 4, Dkt. 3-4 (students at the Gulfport Job Corps Center were instructed to find alternative housing by June 11, 2025).  The shutdowns disrupted students' studies and vocational training and restricted their access to services previously provided by Job Corps centers.  *See, e.g.*, Cabrera Decl. ¶ 12 (describing inability to complete trade program); Decl. of Athena Sasser ¶ 9, Dkt. 3-6 (describing termination of health care services).

3

On June 18, 2025, the plaintiffs—seven student-enrollees in the Job Corps program—filed this suit on behalf of themselves and a putative class of student-enrollees at all 99 affected centers. *See* Compl. ¶¶ 11–17, Dkt. 1; Mot. for Class Cert., at 1, Dkt. 4. The plaintiffs challenge DOL's "closure of the 99 Job Corps centers and indefinite suspension of the Job Corps program," Compl. ¶ 54, as arbitrary and capricious and not in accordance with law, in excess of statutory authority, and implemented without observance of procedure required by law, all in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706, Compl. ¶¶ 50–70. The plaintiffs seek a preliminary injunction "order[ing] the reopening of all 99 Job Corps centers and the resumption of Job Corps program operations nationwide," Mot. for Prelim. Inj., at 20, Dkt. 3-1, or a stay of DOL's actions under 5 U.S.C. § 705, *id.*

## II.    LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To prevail, a party seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citations and internal quotation marks omitted). Where a federal agency is the defendant, the last two factors merge. *See Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020). "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)).

### III.   ANALYSIS

#### A.   Likelihood of Success on the Merits

To succeed on the merits, "[a] plaintiff must show a likelihood of success encompass[ing] not only substantive theories but also establishment of jurisdiction," including standing to sue. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015)). The Court will first address the defendants' jurisdictional arguments before considering the merits of plaintiffs' APA claims.

##### 1.   *Jurisdiction*

###### i.   Tucker Act

Whether the Court has subject matter jurisdiction over this action turns on whether the plaintiffs' claims arise out of DOL's operator contracts, *see* Opp'n, at 12–14, Dkt. 20, or WIOA's statutory scheme, *see* Mot. at 12–13. The Tucker Act "confer[s] exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (internal quotation marks omitted); *see* 28 U.S.C. §§ 1346(a), 1491(a). The Act "impliedly forbid[s] contract claims against the Government from being brought in district court under the [sovereign immunity] waiver in the APA." *Crowley*, 38 F.4th at 1106 (citation modified). Whether a claim falls within the exclusive jurisdiction of the Court of Federal Claims depends on (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought." *Megapulse Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

Under the first prong of the *Megapulse* test, courts consider whether "the plaintiff's asserted rights and the government's purported authority arise from the statute"; "whether the plaintiff's rights exist prior to and apart from rights created under the contract"; and "whether the

5

plaintiff seeks to enforce any duty imposed upon the government by the relevant contracts." *Crowley*, 38 F.4th at 1107 (citation modified). The mere fact that a case requires "some reference to or incorporation of a contract" does not render the matter essentially contractual. *Megapulse*, 672 F.2d at 968. The inquiry instead is whether resolution of a plaintiff's claims "requires primarily an examination of the statutes the [agency] has purportedly violated" or the terms of the contracts themselves. *Crowley*, 38 F.4th at 1108–09; *see also Widakuswara v. Lake*, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc) (adopting Judge Pillard's reasoning in 2025 WL 1288817, at *6–14 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting)).

Under the second prong, courts ask whether a plaintiff seeks to enforce a statutory mandate or obtain a contractual remedy—such as money damages, *Crowley*, 38 F.4th at 1107, or specific performance, *Perry Cap., LLC ex rel. Inv. Funds v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017). "[T]he mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate." *Megapulse*, 672 F.2d at 971.

Here, the plaintiffs assert that DOL violated *statutory* mandates by failing to comply with WIOA's procedural requirements. *See Crowley*, 38 F.4th at 1109; *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 137 (D.D.C. 2025). They do not allege that DOL breached any contract. *See*, *e.g.*, Opp'n at 5 (explaining that DOL was permitted to terminate the contracts under their Termination for Convenience clauses). Indeed, the parties agree that the plaintiffs are not party to any contract with DOL and cannot assert rights arising out of DOL's operator contracts. Opp'n at 15; Reply at 4, Dkt. 28; *see Crowley*, 38 F.4th at 1108. Thus, the

6

plaintiffs' asserted rights exist independently of any contract between DOL and the Job Corps center operators.

Nor do the plaintiffs seek a contractual remedy. Instead, they seek an injunction barring DOL from taking any actions that violate the WIOA. Mot. at 1–2. An injunction would afford the plaintiffs "non-monetary relief that has [independent] considerable value"—that is, the resumption of services that plaintiffs had enjoyed in the absence of the contested agency action. *Kidwell v. Dep't of the Army Bd. for Corrections of Military Records*, 56 F.3d 279, 284 (D.C. Cir. 1995) (internal quotation marks omitted). While that may result in DOL's performance of contractual duties to parties other than the plaintiffs, that indirect result does not render the relief plaintiffs seek contractual. *See Megapulse*, 672 F.2d at 971. Because DOL has not made a contractual promise to the plaintiffs, the remedy they seek is not properly characterized as one for specific performance. *See Crowley*, 38 F.4th at 1108.

The cases on which DOL relies are inapposite. Unlike in *Dep't of Educ. v. California*, 145 S. Ct. 966, 986 (2025), and *Vera Inst. of Just. v. DOJ*, No. 25-cv-1643 (APM), 2025 WL 1865160, at *13 (D.D.C. July 7, 2025), the plaintiffs in this action are not parties to any contract with DOL. Nor do they seek the fulfilment of a contractual promise owed to them. *See California*, 145 S. Ct. at 968; *see also California v. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025); *cf. Vera Inst.*, 2025 WL 1865160, at *13. As discussed, their claims do not "depend on whether the contract[s] permitted termination in the[se] circumstances," and the parties' dispute is therefore not "'entirely contained within the terms of the contract.'" *Contra* Opp'n at 13 (quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985)).

Because the present dispute stems from the language of the WIOA itself, the Tucker Act does not the divest the Court of subject matter jurisdiction.

ii.   Article III Standing

"In the context of a preliminary [relief] motion, [courts] require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (citation modified).  The plaintiff "bear[s] the burdens of production and persuasion." *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).  A plaintiff's "inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction." *Food & Water Watch*, 808 F.3d at 913.  To establish standing, a plaintiff must show: (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted).

The plaintiffs allege injuries—"loss of training, vocational services, housing, and health services"—stemming from the shutdown of the Job Corps centers.  Mot. at 10.  It is well established that the termination of a government benefit to which a plaintiff claims a legal entitlement constitutes a cognizable injury.  *See Hardaway v. D.C. Housing Auth.*, 843 F.3d 973, 978 (D.C. Cir. 2016) (collecting cases).  Further, the plaintiffs' injuries are directly traceable to the challenged action—DOL's allegedly unlawful closure of Job Corps centers—and redressable by injunctive relief setting aside that agency action.

Without citing any legal authority, DOL contends that its efforts to mitigate harms to the Job Corp enrollees eliminated their injuries in fact.  *See* Opp'n at 16–17.  But the only "efforts" the agency points to is providing enrollees with lists of available government resources.  *See* Hr'g Tr., at 61:12–17, Dkt. 41.  These meager efforts fall well short of redressing plaintiffs' asserted

injuries. *See, e.g.*, Sasser Decl. ¶ 9 (describing continued lack of access to medical services provided by the Quentin Burdick Job Corps center); Decl. of Tiffany Davis ¶¶ 10–13, Dkt. 3-9 (describing plaintiff C.D.'s having to move out of a Job Corps dormitory and into temporary housing following shutdown of Job Corps centers).

Accordingly, at this juncture, the Court finds that the plaintiffs have met their burden of demonstrating a substantial likelihood of standing.

2.   *The plaintiffs' APA claims*

Under the APA, a reviewing court shall set aside a final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Absent exceptions not relevant here, *id.* § 701(a), the APA authorizes judicial review of each "final agency action for which there is no other adequate remedy in a court," *id.* § 704.

As a preliminary matter, DOL argues—for the first time in its supplemental brief—that the named plaintiffs may challenge only the shutdown of the seven individual Job Corps centers at which they were enrolled. Defs.' Suppl. Br., at 5, Dkt. 46. Not only is this argument forfeited, *see Klayman v. Judicial Watch, Inc.* 314 F. Supp. 3d 308, 314 (D.D.C. 2018), it is well settled that, under the APA, a plaintiff may seek redress for an agency action which applies a "particular measure across the board" to downstream decisions, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990). The evidence in the record, including DOL's own declarations, plainly shows that the agency issued a single directive that resulted in the shutdown of all privately operated Job Corps centers across the nation. *See, e.g.*, Matz Decl. ¶ 12 (describing receipt of "an instruction" from Department leadership "announcing that performance under the operations contracts at the 99 contractor-operated Job Corps Centers should be terminated immediately"); Job Corps Pause

9

FAQs at 1 ("A pause in Job Corps operations occurred on May 29th when the Department of Labor halted contracts at the 99 contract-operated centers."). Accordingly, the plaintiffs may challenge DOL's across-the-board action under the APA, and not simply the terminations of operator contracts that affected individual Job Corps centers.

Turning to the statute itself, the WIOA requires DOL to engage in certain procedures—including a period of notice and comment—before closing any Job Corps center. *See* 29 U.S.C. §§ 3209(j), 3211(c). The Department failed to comply with these statutory requirements. Opp'n at 18. Thus, the success of the plaintiffs' APA claims largely turns on whether the shutdowns constituted "closures" under the WIOA.[1]

To interpret the WIOA, the court begins with its text. *Advanced Energy United, Inc. v. Fed. Energy Regul. Comm'n*, 82 F.4th 1095, 1109 (D.C. Cir. 2023). The WIOA does not define what it means to "close" a Job Corps center, so the Court considers the term's ordinary meaning. *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011). The term "close" means "to suspend or stop the operations of" something, Merriam Webster's Collegiate Dictionary (11th ed. 2003), or "to conclude" or "bring to an end," Black's Law Dictionary (12th ed. 2024). Here, the agency issued termination and non-renewal notices directing each privately operated Job Corps center to immediately cease all work except that "necessary to provide a safe, orderly and prompt shutdown of center operations." Notice of Termination, Pulver Decl. Ex. 4 at 1. That action plainly falls under the ordinary meaning of closure.

---

[1] Because the Court will conclude that the plaintiffs are likely to succeed on their APA claims under 29 U.S.C. §§ 3209(j) and 3211(c), it will not reach the remainder of the plaintiffs' claims at this juncture, *see* Mot. at 15–17, including that the Department's "indefinite suspension of Job Corps program operations" is a distinct agency action under the APA, *id.* at 11.

The plaintiffs contend that the Court's inquiry ought to end here. *See* Mot. at 13. But the words of a statute must be read "in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (citation modified). As DOL points out, 29 U.S.C. § 3209(f)(2) permits the agency to take certain remedial actions, such as replacing a center operator, relocating a center, or closing a center, with respect to individual Job Corps centers that fail to meet certain statutory performance criteria. 29 U.S.C. § 3209(f)(2). Seizing on this provision, DOL contends that it effectuated a statutorily authorized "pause"—as opposed to a "closure"—when it shuttered operations at all 99 privately operated Job Corps centers. Opp'n at 18–19.

This argument fails because DOL's across-the-board shutdown extended far beyond any "pause" contemplated by the statute. The agency suspended operations at all 99 privately operated Job Corps centers without any expectation of future reopenings. *See infra* at 13. And it effected the mass shutdown without complying with any of the statutory requirements that must precede a "pause" in operations. Opp'n at 18. DOL failed to conduct an individualized assessment or develop a performance improvement plan for any of the 99 centers. *Id.*; 29 U.S.C. § 3209(f)(2). It instead suspended all operations based on the perceived failures of the Job Corps program as a whole. *See* Job Corps Pause FAQs at 2 (noting that "[t]he Job Corps program has been in a financial crisis for years" as justification for DOL's action).

DOL's nationwide shutdown was not only unprecedented, but also inconsistent with its historic "standard of practice." Opp'n at 18 (explaining that DOL has "long differentiated between a center 'closure' and a 'pause' or 'suspension' of center operations"); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). Earlier "pauses" left open a realistic possibility that Job Corps center operations would be resumed. For instance, DOL "paused" operations for two years

11

at the Homestead Job Corps center before ultimately closing the center because necessary improvements would be cost-prohibitive. *See* Job Corps Center Proposed for Closure, 82 Fed. Reg. 35,992, 35,994 (Aug. 2, 2017). During that pause, DOL actively evaluated the feasibility of reopening the center. *See id.* (discussing post-suspension survey conducted by the Job Corps' Engineering Support Contractor). DOL engaged in similar efforts before it proposed closing the Gainesville and Barranquitas Job Corps centers. *See* Job Corps Centers Proposed for Consolidation and Deactivation of Non-Operational Job Corps Centers, 84 Fed. Reg. 16, 18–19 (Jan. 2, 2019).

Here, in contrast, DOL's notices of termination and non-renewal instructed Job Corps center operators to inform departing students that "[t]here should be no expectation of transfer to another center or return to their current center." *See, e.g.*, Notice of Termination at 7. DOL's May 29 press release stated that the Department's "decision aligns with the President's FY 2026 budget proposal," DOL Press Release, Dkt. 3-2, Ex. 3, which recommended the elimination of the Job Corps entirely, *see* Letter from Russell T. Vought to Sen. Susan Collins. And during the hearing on the motion, DOL confirmed that as of the date of the hearing it had made no determination to reopen any center. *See* Hr'g Tr. at 23:9–14, 40:8–20; *see also Nat'l Job Corps Ass'n (NJCA) v. DOL*, No. 25-cv-4641 (ALC), 2025 WL 1752414, at *8 (S.D.N.Y. June 25, 2025) ("DOL concedes that there are no discussions concerning the consolidation or reopening of any of the centers."). Nothing in the record indicates that DOL has any plan to do so.² Hr'g. Tr. at 37:8–38:3.

---

² Government counsel represented at the hearing that DOL officials are engaged in ongoing discussions with Congress about the Job Corp program, but plaintiffs' counsel suggested—and DOL did not dispute—that those discussions primarily concern amending the WIOA to permit the instant closures. *See* Hr'g Tr. at 60:7–21.

12

Nor did DOL's actions conform to its past characterization of the term "pause." Although the agency insists that it has no formal definition of the term, Defs.' Supp. Br. at 2 n.1, a 2024 DOL Memorandum explicitly defines "pausing" as "not exercising an option year, relocating students to other centers, and establishing a caretaking contract of the facilities," McGee Decl. Ex. 9 at 7. But here, DOL did not give enrollees the opportunity to relocate to any other Job Corps center. *Contra* 82 Fed. Reg. at 35,994 (describing relocation of students to other Job Corps centers in Florida during the Homestead Center's period of inactivity). Indeed, the agency's termination and non-renewal notices directed center operators to separate students from the Job Corps program entirely, without any expectation of transfer or return. *See, e.g.*, Notice of Termination at 7. To be sure, not every cessation of center operations necessarily constitutes a "closure" subject to WIOA's mandatory procedures. But the Court need not determine the precise boundary between a "pause" and a "closure" because the record unequivocally demonstrates that DOL unlawfully "closed" all 99 privately operated Job Corps centers, in violation of the WIOA.

At bottom, DOL's position is entirely circular: So long as the agency uses the term "pause" and never makes a final decision to "formally close" a center, it is authorized to shutter any Job Corps center indefinitely. *See* Hr'g Tr. at 20:15–21:21; Defs.' Suppl. Br. at 2, n.1. In DOL's view, the WIOA's procedural mandates hinge on the terminology the agency chooses to use, allowing it to sidestep its statutory obligations entirely. *See* Hr'g Tr. at 21:2–22:2. That cannot be correct.

Because DOL unlawfully "closed" all 99 privately operated Job Corps centers, in violation of the WIOA, *see* 29 U.S.C. §§ 3209(j), 3211(c), the Court finds that the plaintiffs have established a likelihood of success on the merits of their APA claims, *see* 5 U.S.C. § 706(2)(A), (D).

### B. Irreparable Harm

To establish irreparable harm, a plaintiff must demonstrate that (1) the harm is "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief" and (2) the harm is "beyond remediation." *Newby*, 838 F.3d at 7–8 (citation modified). The plaintiffs have done so here.

As a result of the Department's decision to close all 99 of its privately operated Job Corp centers, student-enrollees have lost (or soon will lose) access to essential services. *See* Mot. at 18–19. Some have already lost housing and healthcare. *See, e.g.*, Sasser Decl. ¶¶ 7–9 (describing loss of housing and medical services). Others have lost vocational and educational opportunities. *See, e.g.*, Cabrera Decl. ¶ 12 (describing inability to complete Certified Nurse Assistant program). Still others expect to become homeless if their centers close. *See, e.g.*, *id.* ¶ 14 (anticipating being homeless without Job Corps center residence); Davis Decl. ¶ 15. Courts routinely find such harms irreparable. *See, e.g.*, *Brown v. Artery Org., Inc.*, 654 F. Supp. 1106, 1118 (D.D.C. 1987) (wrongful eviction); *NJCA*, 2025 WL 1752414, at *9 ("impending homelessness"); *Risteen v Youth for Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) (loss of health insurance benefits); *Tanner v. Fed. Bureau of Prisons*, 433 F. Supp. 2d 117, 125 (D.D.C. 2006) (loss of specific job opportunities, training, and competitive advantages). The certainty and imminence of such harms are all the greater in cases involving at-risk individuals, as here. *See Risteen*, 245 F. Supp. 2d at 16 n.4 (collecting cases). And DOL has not shown that its mitigation efforts—which consist solely of providing a list of community resources to displaced enrollees, Hr'g Tr. at 61:12–17—had or will have any measurable effect on the plaintiffs' conditions. The Job Corps student-enrollees have shown that they have experienced and are likely to continue to experience irreparable harm absent an injunction. Thus, this factor also favors the plaintiffs.

### C. Balance of Harms and Public Interest

The two remaining factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

DOL contends that it will be harmed by an injunction because it will have to continue to spend funds appropriated by Congress for a program that it believes does not accord with government priorities and fails to "produce good value and outcomes for program participants and others." Opp'n at 28 (citation modified). But the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

In any event, DOL's asserted harms are outweighed by the loss of housing, educational and vocational opportunities, and healthcare services that plaintiffs would suffer in the absence of an injunction. *Accord NJCA*, 2025 WL 1752414, at *9. Further, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands v. United States,* 686 F. Supp. 2d 7, 21 (D.D.C. 2009). Accordingly, these factors weigh in plaintiffs' favor.

### D. Remedy

Under this Circuit's precedent, the scope of relief under the APA is not party-restricted. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1988) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (internal quotation marks omitted)). In a preliminary posture, the APA authorizes courts to "stay

15

an agency order pending review." *In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985); *see* 5 U.S.C. § 705.

DOL resists this conclusion. Defs.' Suppl. Br. at 3–5. It first argues that a § 705 stay cannot be entered after an agency action has already taken effect. *See id.* at 4. But it provides no authority in support. While some courts have held that an *agency* may not issue a § 705 stay for an already-effective action because that would amount to an amendment requiring a period of notice and comment, *see Ctr. for Biological Diversity v. Regan*, 691 F. Supp. 3d 1, 8 (D.D.C. 2023), that reasoning plainly does not apply to courts.

DOL further contends that any relief under the APA should be limited to the parties before the Court. *See* Defs.' Suppl. Br. at 3–5. But just as vacatur under § 706 is not a party-specific remedy, *see Nat'l Mining Ass'n*, 145 F.3d at 1409, neither is a stay under § 705. Both provisions specify what courts are authorized to do with respect to *agency actions*, not parties. *See* 5 U.S.C. § 705 (a court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights"); *id.* § 706 (a court may "set aside agency action" found to be in violation of the APA). Courts in this circuit have thus consistently applied § 705 to permit wholesale, rather than party-specific, stays of agency action. *See, e.g.*, *In re GTE*, 762 F.2d at 1026; *Gomez v. Trump*, 485 F. Supp. 3d 145, 203 (D.D.C. 2020); *USDA*, 444 F. Supp. 3d at 48; *see also West Virginia v. EPA*, 577 U.S. 1126, 1126 (2016) (staying agency rule under 5 U.S.C. § 705).

Relatedly, DOL argues that § 705—which permits a court to issue "all *necessary and appropriate* process" to stay an agency action, 5 U.S.C. § 705 (emphasis added)—incorporates traditional equitable principles, including that relief be limited to the parties before the reviewing court. Defs.' Suppl. Br. at 4–5 (citing *Starbucks Corp. v McKinney*, 602 U.S. 339, 345 (2024);

16

*Trump v. CASA, Inc.*, 145 S.Ct. 2540, 2563 (2025)). But DOL fails to explain why non-party-specific relief is objectionable only when issued in a preliminary posture. Moreover, there is good reason to think that Congress did not intend to wholly incorporate traditional equitable principles when specifying the kinds of relief a court may grant under the APA. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring). In non-APA cases, "background equitable principles may control" because "Congress has rarely authorized courts to act directly on federal statutes or to prohibit their enforcement against nonparties." *Id.* (citation modified). In contrast, the APA permits courts to act directly on agency actions. *See* 5 U.S.C. §§ 705, 706. And pre-APA cases confirm that an interim form of vacatur was understood by both courts and Congress to be the ordinary preliminary remedy in a challenge to an unlawful agency action. *See, e.g.*, *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9–10 (1942); *cf. Corner Post*, 603 U.S. at 840 (Kavanaugh, J., concurring) (discussing pre-APA statutes authorizing courts to set aside agency actions). The better reading of the "necessary and appropriate process" language in § 705 is that "relief should only involve postponing the effective date of the portions of the [agency action] that [the plaintiff] *actually challenges* and for which it has shown a likelihood of success on the merits." *Career Colls. and Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted on other grounds*, 145 S.Ct. 1039 (2025).

Because the plaintiffs have shown that each of the four preliminary injunction factors weigh in their favor, they are entitled to a stay of DOL's directive to close all 99 privately operated Job Corps centers. *Nat'l Wildife Fed'n*, 497 U.S. at 890 n.2. Accordingly, the Court will stay the challenged action under 5 U.S.C. § 705.

17

## CONCLUSION

For the foregoing reasons, the Court grants the plaintiffs' Motion for a Preliminary Injunction, Dkt. 3, and enters a stay under the APA.[3] 5 U.S.C. §§ 705, 706(2)(A), (D). A separate order consistent with this decision accompanies this memorandum opinion.

July 25, 2025

*signature*
DABNEY L. FRIEDRICH
United States District Judge

---

[3] Because the Court grants a stay under 5 U.S.C. § 705, and not a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, it will deny DOL's request for an injunction bond. *See* Opp'n at 29. Rule 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in any amount that the court considers proper." Fed. R. Civ. P 65(c). But § 705 of the APA contains no such requirement, and DOL cites no authority that supports requiring a bond in these circumstances.