# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ANARIA CABRERA, *et al.*,

    *Plaintiffs, on behalf of themselves and others similarly situated*,

      v.

U.S. DEPARTMENT OF LABOR, *et al.*,

    *Defendants*.

Civil Action No. 25-1909 (DLF)

# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Arthur Ago (DC Bar No. 463681)
Aaron S. Fleisher[*][†] (NY Bar No. 4431052)
Southern Poverty Law Center
1101 17th St. NW
Washington, DC 20036

Scott D. McCoy[*] (FL Bar No. 1004965)
Sam Boyd[*] (FL Bar No. 1012141)
Carli Raben[*] (FL Bar No. 1036013)
Southern Poverty Law Center
2 S. Biscayne Blvd. Ste. 3750
Miami, FL 33131

Adam R. Pulver (DC Bar No. 1020475)
Michael T. Kirkpatrick (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th St. NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

Michael Tafelski[*] (GA Bar No. 507007)
Diego A. Soto[*] (DC Bar No. 1029607)
Southern Poverty Law Center
150 E. Ponce De Leon Ave. Ste. 340
Decatur, GA 30030

*Counsel for Plaintiffs*

[*] *Admitted* pro hac vice
[†] *Not admitted to practice law in DC*

October 10, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

LEGAL BACKGROUND .................................................................................................. 2

STATEMENT OF FACTS ................................................................................................. 5

I.      DOL identifies possible options to address Job Corps budget shortfalls ........................... 5

II.     DOL decides to "eliminate" Job Corps and quickly close all centers. ............................... 8

III.    Job Corps centers began to shut down, terminating services to Plaintiffs. ...................... 11

PROCEDURAL HISTORY .............................................................................................. 14

LEGAL STANDARD ....................................................................................................... 15

ARGUMENT .................................................................................................................... 16

I.      This Court has jurisdiction over Plaintiffs' claims. .......................................................... 16

        A.      Plaintiffs have standing. ........................................................................................ 16

        B.      Plaintiffs' claims are not subject to the exclusive jurisdiction of the Court of
                Federal Claims. ....................................................................................................... 17

II.     DOL closed 99 Job Corps centers without complying with statutorily mandated
        procedures. .......................................................................................................................... 19

III.    DOL's actions are contrary to other provisions of WIOA. .............................................. 22

IV.     DOL's suspension of Job Corps center operations was arbitrary and capricious. ............ 24

V.      DOL's indefinite suspension of the Job Corps program exceeded its statutory
        authority. ............................................................................................................................. 28

VI.     DOL's indefinite suspension of the Job Corps program violated appropriations law. ...... 29

VII.    Vacatur is the appropriate remedy. .................................................................................... 30

CONCLUSION ................................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L. Pharma, Inc. v. Shalala*,
  62 F.3d 1484 (D.C. Cir. 1995) ............................................................................................. 31

*Air Excursions LLC v. Yellen*,
  66 F.4th 272 (D.C. Cir. 2023) .............................................................................................. 16

*Al-Eryani v. Immigrant Investor Program Office*,
  754 F. Supp. 3d 101 (D.D.C. 2024) ................................................................................ 15, 16

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................................................. 31

\*Allina Health Services v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) ........................................................................................... 31

*American Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ........................................................................................... 30

*American Center for International Labor Solidarity v. Chavez-DeRemer*,
  No. CV 25-1128 (BAH), 2025 WL 1795090 (D.D.C. June 30, 2025) ................................... 30

\*American Radio Relay League, Inc. v. Federal Communications Commission*,
  524 F.3d 227 (D.C. Cir. 2008) ............................................................................................. 25

*American Wild Horse Presidential Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ............................................................................................. 24

*Americans for Safe Access v. Drug Enforcement Administration*,
  706 F.3d 438 (D.C. Cir. 2013) ............................................................................................. 16

*Baker v. Masco Builder Cabinet Group, Inc.*,
  912 F. Supp. 2d 814 (D.S.D. 2012) ...................................................................................... 19

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ............................................................................................................. 18

*Burlington Truck Lines v. United States*,
  371 U.S. 156 (1962) ............................................................................................................. 25

\*Capital Power Corp. v. Federal Energy Regulatory Commission*,
  __F. 4th __, No. 23-1134, 2025 WL 2738420 (D.C. Cir. Sept. 26, 2025) .............................. 28

*Child Trends, Inc. v. U.S. Department of Education*,
   __ F. Supp. 3d __, Civ. No. 25-1154-BAH, 2025 WL 2379688 (D. Md. Aug. 15,
   2025) .................................................................................................................. 30

*City of Arlington v. Federal Communications Commission*,
   569 U.S. 290 (2013) ......................................................................................... 28

*City of Dania Beach v. Federal Aviation Administration*,
   628 F.3d 581 (D.C. Cir. 2010) ............................................................................ 9

*Corner Post, Inc. v. Board of Governors of Federal Reserve System*,
   603 U.S. 799 (2024) ......................................................................................... 31

*Crowley Government Services, Inc. v. General Services Administration*,
   38 F.4th 1099 (D.C. Cir. 2022) ................................................................... 17, 18

*Department of Commerce v. New York*,
   588 U.S. 752 (2019) ......................................................................................... 21

*Department of Education v. California*,
   145 S. Ct. 966 (2025) ....................................................................................... 18

*Department of State v. AIDS Vaccine Advocacy Coalition*,
   606 U.S. __, 2025 WL 2740571 (Sept. 26, 2025) ................................................ 30

*Department of Homeland Security v. Regents of the University of California*,
   591 U.S. 1 (2020) ............................................................................................. 28

*Encino Motorcars v. Navarro*,
   579 U.S. 211 (2016) ......................................................................................... 24

*Federal Communications Commission v. AT & T Inc.*,
   562 U.S. 397 (2011) ......................................................................................... 19

*Food & Drug Administration v. Wages & White Lion Investments, LLC*,
   145 S. Ct. 898 (2025) ....................................................................................... 24

*Global Health Council v. Trump*,
   __ F.4th __, No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ............... 30

*Guadamuz v. Ash*,
   368 F. Supp. 1233 (D.D.C. 1973) ...................................................................... 29

*Hardaway v. D.C. Housing Authority*,
   843 F.3d 973 (D.C. Cir. 2016) .......................................................................... 16

*Heartland Regional Medical Center v. Sebelius*,
  566 F.3d 193 (D.C. Cir. 2009)................................................................... 31

*\*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013)........................................................... 24, 29

*International Dark-Sky Ass'n v. Federal Communications Commission*,
  106 F.4th 1206 (D.C. Cir. 2024)................................................................ 24

*J.W. Hampton, Jr. & Co. v. United States*,
  276 U.S. 394 (1928) ........................................................................... 28, 29

*Lexmark International, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ................................................................................. 16

*Local 2677, American Federation of Government Employees v. Phillips*,
  358 F. Supp. 60 (D.D.C. 1973)................................................................. 29

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................. 17

*Marks v. United States*,
  430 U.S. 188 (1977) ................................................................................. 18

*\*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982)................................................................... 17

*\*Motor Vehicle Manufacturers Ass'n of the U.S. v. State Farm Mutual Automobile Insurance Co.*,
  463 U.S. 29 (1983) ................................................................................... 25

*National Job Corps Ass'n v. U.S. Department of Labor*,
  No. 25-cv-04641 (ALC), 2025 WL 1577843 (S.D.N.Y. June 4, 2025) .................................. 12

*National Mine Ass'n v. U.S. Army Corps of Engineers*,
  145 F.3d 1399 (D.C. Cir. 1998)................................................................. 31

*National Institutes of Health v. American Public Health Ass'n*,
  606 U.S. __, 2025 WL 2415669 (Aug. 21, 2025) .................................... 18

*New York v. Trump*,
  769 F. Supp. 3d 119 (D.R.I. 2025) .......................................................... 30

*Oregon Council for Humanities v. United States DOGE Service*,
  __ F. Supp. 3d __, No. 3:25-CV-829-SI, 2025 WL 2237478 (D. Or. Aug. 6, 2025).............. 30

*Perry Capital, LLC ex rel. Investment Funds v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ................................................................ 18

*Sierra Club v. Mainella*,
   459 F. Supp. 2d 76 (D.D.C. 2006) .......................................................... 16

*Sierra Club v. Van Antwerp*,
   719 F. Supp. 2d 77 (D.D.C. 2010) .......................................................... 31

*Spirit Airlines, Inc. v. U.S. Department of Transportation*,
   997 F.3d 1247 (D.C. Cir. 2021) .............................................................. 25

*Utility Air Regulatory Group v. Environmental Protection Agency*,
   573 U.S. 302 (2014) ................................................................................ 29

**Statutes**

2 U.S.C. § 683 ............................................................................................ 29

2 U.S.C. § 683(b) ...................................................................................... 29

5 U.S.C. § 705 ...................................................................................... 14, 15

5 U.S.C. § 706(2)(A) ..................................................................... 14, 15, 22, 24

5 U.S.C. § 706(2)(C) .................................................................................. 15

5 U.S.C. § 706(2)(D) .......................................................................... 14, 15, 19

29 U.S.C. § 2899(g) (1998) ........................................................................ 3

29 U.S.C. § 3193 ............................................................................... 14, 23, 24

29 U.S.C. § 3197(a) ............................................................................. 3, 14, 23

29 U.S.C. § 3197(c) ............................................................................... 14, 23

29 U.S.C. § 3197(d) ..................................................................................... 3

29 U.S.C. § 3198(a) ............................................................................... 14, 23

29 U.S.C. §§ 3199(a)–(b) ....................................................................... 14, 23

29 U.S.C. § 3209(c)(1) ................................................................................ 4

29 U.S.C. § 3209(f) ........................................................................... 4, 19, 20

29 U.S.C. § 3209(f)(2) .................................................................................................. 4, 25

29 U.S.C. § 3209(j) ................................................................ 2, 3, 4, 9, 10, 14, 15, 19, 21

29 U.S.C. § 3211(c) ............................................................................................ 4, 14, 15, 22

Pub. L. 88-452, §§ 101–110, 78 Stat. 508 (1964)................................................................ 2, 3

Pub. L. 105-220, § 159(g), 112 Stat. 936 (1998) ................................................................... 3

Pub. L. 113-128, § 159(j), 128 Stat. 1425 (2014) .................................................................. 3

Pub. L. 118-47, 138 Stat. 460 (2024)..................................................................................... 5

**Rules**

Federal Rule of Civil Procedure

    56(a)............................................................................................................................. 16

    65(a)............................................................................................................................. 14

Local Civil Rule 7(n) .............................................................................................................. 1

**Agency Rules and Regulations**

20 C.F.R. §§ 386.300–360 ...................................................................................................... 5

20 C.F.R. § 686.200(b) (2016)................................................................................................ 5

20 C.F.R. §§ 686.400–490 ...................................................................................................... 5

20 C.F.R. §§ 686.500–760 ...................................................................................................... 5

20 C.F.R. §§ 686.1000–1070 .................................................................................................. 5

41 C.F.R. § 102-75.45............................................................................................................ 22

Department of Labor, Updated Methodology for Selecting a Job Corps Center for Closure and Center Selected for Closure,
    81 Fed. Reg. 12529 (Mar. 9, 2016) ................................................................................ 5

Department of Labor, Job Corps Center Proposal for Deactivation,
    84 Fed. Reg. 25071 (May 30, 2019).......................................................................... 5, 23

**Legislative History**

160 Cong. Rec. S3964-02 ........................................................................................................ 4

H.R. Rep. No. 105-93 ............................................................................................................ 3

H.R. Rep. No. 113-14 ............................................................................................................ 4

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024) ................................................................................ 19

Department of Labor, Job Corps Transparency Report 2025, Apr. 25, 2025,
https://www.dol.gov/sites/dolgov/files/ETA/jobcorps/reports/Job-Corps-Transparency-Report-2025.xlsx) ............................................................................................................ 11

Letter from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Sen. Susan Collins (May 2, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf ............................................................................................................ 8

Merriam-Webster.com Dictionary (June 18, 2025),
https://www.merriam-webster.com/dictionary/close ............................................................................................................ 19

Office of Management & Budget, Technical Supplement to the 2025 Budget, Appendix 638 (2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/appendix_fy2026.pdf. ... 8, 9

## INTRODUCTION

In July 2025, at a hearing before this Court, counsel for Defendants Department of Labor (DOL) and Secretary of Labor stated that the DOL "never had an intent to fully close the program, to close down the [99 contractor-operated Job Corps] centers." July 9, 2025 Hr'g Tr. 39:24–40:1. The certified administrative record proves that statement was false: when DOL directed the shutdown of operations at those 99 centers on May 29, 2025, it did so intending for those centers to permanently cease operations.

In April 2025, DOL identified three "potential strategies" with respect to the Job Corps program, which it identified as "Elimination," "Dismantle," and "Hybrid." AR91.[1] The goal of the "Elimination" strategy was to "close all non-USDA [Job Corps] Centers," and would be achieved by "strik[ing] immediately" and "[c]ancel[ing] 99 contract center contracts … using 'Convenience of the Government' clause in [those] contracts." *Id.* The desired outcome was that there "[n]o longer [be] a massive federally operated [Job Corps] program." *Id.* DOL's two other potential strategies shared the goal of "full elimination" but would achieve that goal incrementally. AR92–94.

In May 2025, with a stated goal "to cease operations at all Job Corps center sites to align with the Trump Administration's workforce priorities and proposed budget," DOL adopted and executed the "elimination" strategy, issuing termination and non-renewal notices to all 99 contractor-operated Job Corps centers, invoking "convenience of the government" clauses. AR1080. While the substance of this action was the same as the proposed "close all non-USDA

---

[1] All "AR##" cites refer to the Certified Administrative Record produced to Plaintiffs on September 20, 2025. *See* ECF 66. Pursuant to Local Civil Rule 7(n), Plaintiffs will file a Joint Appendix containing the cited materials upon the conclusion of briefing on the parties' summary judgment motions.

centers" strategy, DOL now labeled the immediate and indefinite cessation of operations at those centers as "pauses." *Id.* Recognizing that 29 U.S.C. § 3209(j) requires a notice and comment procedure "[p]rior to the closure of any Job Corps center," DOL stated that it would initiate a "formal closure" of each of the 99 centers by publishing notices in the Federal Register after the fact. AR1081. In every other respect—from the communications plan, to the plan for services for Job Corps students who would suddenly be without shelter, job and training services, and other supports—the final plan was the same as the April proposal for "elimination" and "clos[ure]."

This "elimination" of a Federally created program, and the closure of 99 Job Corps centers—halted only by this Court's stay—was unlawful. Congress has mandated specific steps DOL must take before closing any Job Corps center; DOL did not take those steps. Congress has mandated that DOL consider specific criteria in deciding whether to close any Job Corps center; DOL did not consider those criteria. And Congress has mandated that Job Corps centers exist and operate nationwide, providing services to at-risk individuals like Plaintiffs; "eliminating" the Job Corps program is inconsistent with that mandate. Moreover, the administrative record reveals that DOL acted arbitrarily and capriciously, rejecting other cost-saving alternatives that would be less disruptive to students like Plaintiffs based on political expediency and expecting 25,000 students to find replacement housing, job training, and medical services within one week without obtaining answers to vital questions like, "[f]or students who are homeless, where will they go?" AR1073.

Accordingly, the Court should grant Plaintiffs summary judgment on each of their claims, declare DOL's actions unlawful, and vacate DOL's May 2025 two-phase plan "to cease all Job Corps contracted center program operations," including its closure of the 99 centers. AR1080.

## LEGAL BACKGROUND

Job Corps was created by the Economic Opportunity Act of 1964, as part of President Lyndon B. Johnson's War on Poverty. Pub. L. 88-452, §§ 101–110, 78 Stat. 508, 508–11 (1964).

The program was designed to reduce youth unemployment by providing young people with education and training that would "increase [their] employability." *Id*. § 101. The statute tasked the Office of Economic Opportunity with contracting with partners to establish and operate residential centers where enrollees would be provided with education, training, useful work experience, clothing and equipment, and recreational, medical, and health services. *Id.* §§ 102, 103, 105. The first Job Corps center opened in January 1965, and while the program has greatly expanded and the responsibility for the program has been shifted to DOL, its basic structure remains the same. Under current law, DOL is required to enter into contractual agreements for the operation of each Job Corps center, 29 U.S.C. § 3197(a), and may also enter into agreements with the Department of Agriculture for that Department to operate "Civilian Conservation Centers," *id.* § 3197(d).

In the Workforce Investment Act of 1998, Congress added a provision requiring DOL to undertake a notice-and-comment process "[p]rior to the closure of any Job Corps center." Pub. L. 105-220, § 159(g), 112 Stat. 936, 1020 (1998) (codified at 29 U.S.C. § 2899(g) (1998)). This provision was added to insure that "all Americans [have] the opportunity to have their voices heard regarding the possible loss of any of the [then-existing] invaluable Job Corps Centers." H.R. Rep. No. 105-93, at 553–54 (1998). While the closure of a Job Corps center had previously been committed to DOL's discretion, this provision sought to ensure that the decision to close any of the "scarce centers be closely scrutinized." *Id.*

This notice-and-comment requirement was carried over in WIOA, Job Corps' current authorizing statute. Pub. L. No. 113-128, § 159(j), 128 Stat. 1425, 1557–58 (July 22, 2014), *codified at* 29 U.S.C. § 3209(j)). WIOA also altered eligibility requirements, imposed new standards of conduct, revised enrollment criteria and procedure, updated the requirements for what

3

services must be provided to enrollees, and added a new performance accountability and management system. *Id.* §§ 141–162, *codified at* 29 U.S.C. §§ 3191–3212; *see* Workforce Innovation and Opportunity Act, 160 Cong. Rec. S3964-02 (Jun. 25, 2014) (Statement of the Managers to Accompany the Workforce Innovation and Opportunity Act); H.R. Rep. No. 113-14, at 93, 124–25 (2013).

Among these provisions, the statute requires DOL to set annual expected levels of performance "for a Job Corps center and the Job Corps program" as to specific criteria. 29 U.S.C. § 3209(c)(1). Where, based on an annual assessment, DOL finds a particular Job Corps center does not meet these performance levels, the agency is required to "develop and implement a performance improvement plan … requir[ing] action to be taken during a 1-year period." *Id.* §§ 3209(f)(1)–(2). The statute specifies seven specific actions that can be taken, including "providing technical assistance to the center," making changes to the staff, operator, and/or services provided at the center, "reducing the capacity of the center," "relocating the center," or "closing the center." *Id.* §§ 3209(f)(2)(A)–(G). At the same time, WIOA required DOL to establish and use written criteria "to determine when a Job Corps center … is to be closed and how to carry out such closure." *Id.* § 3211(c).

Pursuant to this last statutory mandate, DOL has specified four criteria for closing a Job Corps center: "[a] methodology for selecting a center for closure based on its chronic low performance"; "[a]n agreement between the Secretaries of Labor and Agriculture to close a [USDA-operated center]"; "[a]n evaluation of the effort required to provide a high-quality education and training program at the center"; or a conclusion that "the deactivation of a center or group of centers" may advance efforts "to reform and strengthen the overall management and operation of the Job Corps program … by focusing program resources on higher performing

4

centers and improving student access to these centers, increasing cost efficiency, and enhancing the geographic match between student demand for the program and center availability." DOL, Employment & Training Admin., Notice, Job Corps Center Proposal for Deactivation, 84 Fed. Reg. 25071, 25072 (May 30, 2019) (adopting fourth criterion); *see also* DOL, Employment & Training Admin., Notice, Updated Methodology for Selecting a Job Corps Center for Closure and Center Selected for Closure, 81 Fed. Reg. 12529, 12530–31 (Mar. 9, 2016) (adopting first three criteria); 20 C.F.R. § 686.200(b) (2016) (recognizing DOL has "established procedures for making decisions concerning the … closing of contract centers").

DOL has also promulgated detailed regulations as to the funding and selection of center operators and service providers, 20 C.F.R. §§ 386.300–360; the recruitment, screening, selection, and assignment of young people to Job Corps centers, *id*. §§ 686.400–490; and the services that both centers and DOL must provide to enrollees, *id.* §§ 686.500–760. DOL regulations also specify how the performance of Job Corps centers will be assessed and how it will use performance improvement plans where specific centers fall short. *Id.* §§ 686.1000–1070.

Congress has continued to authorize the Job Corps program. In the Further Consolidated Appropriations Act of 2024, Congress appropriated $1.6 billion for Job Corps Operations, available for July 1, 2024, through June 30, 2025, and $123 million for the construction, rehabilitation and acquisition of Job Corps Centers, available for July 1, 2024, through June 30, 2027. Pub. L. No. 118-47, 138 Stat. 460, 631–32 (2024).

## STATEMENT OF FACTS

### I.    DOL identifies possible options to address Job Corps budget shortfalls.

In December 2024, DOL explained that, due to a combination of forces, it had become "increasingly difficult to absorb rising costs without compromising program quality in the Job Corps program." AR4. "[D]espite these pressures, the program ha[d] utilized multiple mitigation

strategies, including deferring certain program needs and expenses, reducing National Office contracts, and using low On-Board Strength (OBS) and staff vacancy takebacks." AR23. To address potential budget deficits for program years 2024 and 2025, DOL identified a number of potential "mitigation efforts," taking five "key considerations" into account: "(1) ensuring the financial viability of the current program year; (2) ensuring compliance with the Workforce Innovation and Opportunity Act (WIOA) and all relevant regulations, and other applicable law; (3) minimizing disruption for current students; (4) maintaining quality of service for students; and (5) ensuring long-term financial viability." AR4.

Based on these considerations, DOL decided to descope additional contracts and to "pause" operations at two centers. AR14. DOL defined the term pause as "not exercising an option year, relocating students to other centers, and establishing a caretaking contract of the facilities." AR9. Recognizing an "overarching concern is to limit the impact of this exercise on students and potential students by pausing operations at as few centers as possible," DOL identified centers for pause "based on the physical condition of the centers and the safety environment at the centers," as well as "the number of centers in state and the general proximity of the center to other centers as well as eligible students in the state." AR10. One of the paused centers, Woodstock, was "effectively uninhabitable" and already "under emergency closure" through winter break. *Id.* DOL explained that a pause of this Center could be achieved with minimal impact on students, as "Woodstock is close to several other Job Corps centers" to which "transferred students will be reassigned." *Id.* The other center to be paused, Whitney M. Young, was "in reasonably close proximity to other centers in Kentucky, as well as centers in Indiana and Ohio." *Id.* A "comprehensive center assessment" of that center had revealed "significant compliance deficiencies" and a particularized concern for student safety. AR10–11. DOL believed "that

pausing operations at these two centers w[ould] generate sufficient savings" to address any deficit. AR10. It also recognized the possibility of "unpausing" these centers should the fiscal situation change. AR11.

In April 2025, DOL produced a "Job Corp Potential Strategies" memo. AR91. That document contained three "options" for the program, titled "Elimination," "Dismantle," and "Hybrid." *Id.* The first option was "Elimination by July 1ˢᵗ," and specified a goal of "Close all non-USDA centers." *Id.* Under this option, DOL would "[p]rovide little/or no advance communication" to "avert[] strategic targeting from opposition." *Id.* DOL would "strike immediately" by "[c]ancel[ing] 99 contract center contracts … using 'Convenience of the Government' clause." There would be "no negotiations," and "[n]o center could be re-opened due to political fallout." *Id.* The "aftermath" would include "11k center workers without jobs, 25k students, contract termination fees, equipment, leases, properties … etc." *Id.* The "outcome" of this approach would be "Job Corp Center operations eliminated at all sites but 24 USDA sites" and there would "[n]o longer [be] a massive federally operated program with 99 contracted centers managed by USDOL." *Id.* DOL acknowledged, though, that there was "[l]egislation [] still in place," and thus there would need to be "[r]egulatory and statutory cleanup" should this "Elimination" option be pursued. *Id.*

The second option, "Dismantle," would have a goal of "rectify[ing] budget shortfalls by reducing program size." AR92. This plan would first "dismantle the coalition arm" by deploying a "nationwide communication roll-out plan." *Id.* Then, DOL would "eliminate" some number of "low occupancy, costly, large" Job Corps centers by terminating the contracts for their operation. *Id.* Students at "eliminated" centers would be transferred to other centers that would remain open, resulting in the program continuing to "serve [the] same number of students." *Id.* As "Round 2"

of this option, though, DOL would "eliminate [the] remaining" centers in fiscal year 2026 and either transition to "a non-brick and mortar program by partnering with community colleges" or fund states "to create and manage their own State Job Corp Program." *Id.*

Finally, the "hybrid" option would "advance public knowledge before full elimination." AR92. In this approach, DOL would gain "tactical intelligence" before closing all of the centers. AR93.

Whereas each of the options in the "Job Corp Potential Strategies" memo had a stated goal of "eliminating" the Job Corps program, Job Corps staff produced an alternative document that identified three options for addressing financial concerns that would achieve a "[l]ong-term goal" of "a 'right-sized' Job Corps program that allows for service to the same number of youth and young adults but in fewer locations." AR134. These proposals would achieve cost savings by cutting some subset of centers from the program. AR130, 137–39. One proposal identified twenty-four centers to be "removed," using facility sustainability as the determining factor. AR137. Another identified forty centers to be removed based on a measure of their financial efficiency. AR138. The final option identified forty-five centers for removal based on a measure of program effectiveness. AR139.

## II.    DOL decides to "eliminate" Job Corps and quickly close all centers.

On May 2, 2025, the President submitted to Congress his discretionary funding level recommendations for fiscal year 2026. Letter from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Sen. Susan Collins (May 2, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf. These recommendations proposed to "eliminate[] Job Corps." *Id.* at 28; *see also* Off. of Mgmt. & Budget, Technical Supplement to

the 2025 Budget, Appendix 638 (2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/appendix_fy2026.pdf.[2]

Later that month, DOL formally adopted the strategy that, in substance, was the same as that referred to as the "Elimination" option in the April 2025 document, as reflected in a decision memo dated May 20, 2025. AR1080.[3] With a goal of "ceas[ing] operations at all Job Corps center sites to align with the Trump Administration's workforce priorities and proposed budget," DOL adopted a two-phase plan. *Id.* First, DOL would "pause all Job Corps contract center operations." *Id.* Then, DOL would engage in what it referred to as "formal closures" by issuing notices in the Federal Register that, in its view, would comply with the requirements of 29 U.S.C. § 3209(j). *Id.*[4] In talking points accompanying the final decision memo, DOL emphasized that it was "NOT CLOSING Job Corps centers" because "'[c]losing' requires additional actions," explicitly

---

[2] While these materials were not included in the Certified Administrative Record, they are properly before the Court because DOL explicitly relied upon the President's budget proposal in its contemporaneous explanation of the challenged action. *See* AR1061. *Cf. City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (recognizing court may consider materials not included in certified administrative record that were "deliberately or negligently excluded").

[3] The May 20, 2025, version of this memo is the latest version produced and was treated as final by DOL staff. *See* AR1072 (circulating May 20 memo after decision was announced). An email from the Secretary's Chief of Staff indicates, "[w]e are good to execute on this for 3pm today." AR1069.

[4] This portion of the administrative record contradicts repeated representations of Defendants' counsel at the July 9, 2025, hearing on Plaintiffs' motion for preliminary relief that DOL had not decided to close any of the 99 centers and that the agency was actively considering reopening some of the centers. *See* July 9, 2025, Hr'g Tr. 23:9–10 (counsel's statement that "the government has not made a decision with respect to [the closure of] any one particular center"); *id.* 23:23–25 (counsel's affirmative response to Court's question whether the agency was considering "the possibility of reopening the centers"); *id.* at 24:7–8 (counsel's statement that "that there is no final agency decision that has been made with respect to [closing] any one center"); *id.* 27:14–15 (counsel's statement that "[t]he agency has not made any final decision with respect to closing any center"); *id.* 27:21 (counsel's statement that it was "a possibility" that the centers would be reopened); *id.* 39:24–40:1 (statement that "the agency has indicated it never had an intent … to close down the centers").

referencing the notices required by § 3209(j). AR1082. Yet, at the same time, part of DOL's "Step-by-Step to Realize Center Operations Pause" was for each center to "[d]raft a detailed *closure* timeline." AR1090 (emphasis added).

While the "operational timeline" attached to the final memorandum referenced a six-week period for centers to wind down operations, AR1083, the strategy as approved provided that DOL would inform Job Corps center operators of the "pause" on May 29, 2025, "minutes ahead" of sending them emails notifying them of the termination of their contracts. AR1080. Those emails required centers to commence wind down operations immediately, with all students to return to their "home of record" by June 30, 2025. ER1080. The May 20, 2025, memorandum also stated that the DOL Secretary would meet with the Secretary of the Department of Agriculture to discuss a "joint USDA/DOL effort to cease Job Corps Operations." ER1087. As of May 29, 2025, though, Job Corps staff, including the Acting Administrator, had not received word that the Secretary had approved the plan. AR1065. Those staff members had previously advised agency leadership that there were "many other issues and concerns/questions to address" once the Secretary did so. AR321. On May 28, 2025, those staff members reiterated their concerns, while noting the irreversible nature of the proposed plan. AR1067.

At 11:58am on May 29, 2025, the Chief of Staff to the Secretary emailed Job Corps staff to inform them that they were "good to execute" the plan set out in the May 20 decision memo that afternoon. AR1068. Those staff members subsequently mailed out notices of termination or non-renewal to the center operators as proposed. *See, e.g.*, AR1167–69. Those notices instructed contractors to "begin immediately all work necessary to provide a safe, orderly, and prompt shutdown of center operations." AR 1168. All shutdown work was required to be completed by June 30, 2025. *Id.* The notices also instructed center operators to promptly separate students from

the Job Corps program and to ensure that there be "no expectation of transfer to another center or return to their current center." AR1173–74. No later than June 4, i.e., within one week, centers were to inform DOL of students that would not be returned home by June 6, and to provide a plan for those students' "separation and transportation to their home of record." AR1172. Students were to be "encourage[d]" to visit DOL American Job Centers (also referred to as "one-stops") as well as a DOL-created "resource page for separated students." AR1174.

At some point on May 29, DOL posted on its website a news release announcing "a phased pause in contractor operated Job Corps centers nationwide" to "occur by June 30, 2025." ECF 3-2 (Pulver Decl.), Ex. 2 (News Release); *see also* AR1060 (embargoed version of document without links). The news release stated that the Job Corps program was being suspended because it was experiencing "significant financial challenges under its current operating structure" and was "no longer achieving the intended outcomes that students deserve." ECF 3-2 (citing DOL, Job Corps Transparency Report 2025, Apr. 25, 2025, https://www.dol.gov/sites/dolgov/files/ETA/jobcorps/reports/Job-Corps-Transparency-Report-2025.xlsx). The release noted that the shutdown "decision aligns with the President's FY 2026 budget proposal." *Id.* The agency also posted an "FAQs" document online, which confirmed the "suspension of program operations" on May 29, 2025. AR1078. Under the question, "Why pause operations at all centers?," DOL pointed to a "financial crisis" that had existed "for years." AR1079. Neither the News Release nor the FAQ document addressed other options to address this crisis. As "legal authority," for its actions, DOL pointed to "the delegation of authority to halt center operator contracts," and Federal Acquisition Regulation (FAR) Subpart 49.1 and FAR Clauses 52.249-2, "among others." AR1078.

## III.    Job Corps centers began to shut down, terminating services to Plaintiffs.

In response to DOL's directives, Job Corps centers around the country began to shut down, with immediate impacts on the named plaintiffs and members of the putative class.

Plaintiff Anaria Cabrera is a student enrolled and living at the Turner Job Corps Center in Albany, Georgia. Cabrera Decl. (ECF 3-3) ¶ 3. On May 30, 2025, the Center's director announced to students and staff that Job Corps operations were paused, and students must leave within 30 days, but that DOL could force the center to shut earlier. *Id.* ¶ 9. Students were later told they had to leave the following week, June 13, 2025, though that was put on hold due to a temporary restraining order issued in a related case. *Id.* ¶ 10; *see Nat'l Job Corps Ass'n v. DOL*, No. 25-cv-04641 (ALC), 2025 WL 1577843 (S.D.N.Y. June 4, 2025). On June 6, 2025, Ms. Cabrera was told that she would not be able to move onto the next phase of her Certified Nurse Assistant program, due to the shutdown of program operations. Cabrera Decl. ¶ 12. While Center staff discussed transporting students to their "homes of record," there was little information about what people like Ms. Cabrera, who did not have homes to return to, should do. *Id.* ¶ 13.

Plaintiff Deondre Burkes is a student enrolled and living at the Gulfport Job Corps Center in Gulfport, Mississippi. Burkes Decl. (ECF 3-4) ¶ 2. On June 6, 2025, Center staff informed him the Center would shut down and students would have to find alternative housing by June 11, 2025. *Id.* ¶ 4. The Center later extended this deadline to June 17, 2025, as a result of the *NJCA* temporary restraining order. *Id.* ¶ 5. Nonetheless, the Center ceased providing many services to help students obtain jobs, including placement services, interview coaching, transportation, and services to otherwise transition out of the program. *Id.* ¶ 7.

Plaintiff Maddex Davis-Newman lives and studies at the Tongue Point Job Corps Center in Astoria, Oregon. Davis-Newman Decl. (ECF 3-5) ¶ 2. After DOL directed the centers to close, his coursework was halted until the issuance of the *NJCA* temporary restraining order. *Id.* ¶ 6. Center staff had also directed students to pack and be ready to leave no later than June 13, 2025. *Id.* ¶¶ 5–6.

Plaintiffs Athena Sasser and Logan Christensen are students enrolled and living at the Quentin N. Burdick Job Corps Center in Minot, North Dakota. Sasser (ECF 3-6) Decl. ¶ 2; Christensen Decl. (ECF 3-7) ¶ 2. On May 29, 2025, staff at that center told them, and every other student, that they would need to find alternative housing by June 4. Sasser Decl. ¶ 7; Christensen Decl. ¶ 5. Ms. Sasser had no choice but to return to an abusive home she was only able to leave due to the Job Corps program. Sasser Decl. ¶ 8. Mr. Christensen went to stay with family and knows that at least one student had no home to go to and therefore had to sleep on the street. Christensen Decl. ¶ 6. While they and other Quentin Burdick students were able to return to center housing and resume their studies after the *NJCA* temporary restraining order, the Center did not immediately resume the provision of health care services upon which Ms. Sasser, Mr. Christensen, and others rely. *See* Sasser Decl. ¶ 9; Christensen Decl. ¶ 7.

Plaintiff Abigail Shauger lived and studied at the Gerald R. Ford Job Corps Center in Grand Rapids, Michigan. Shauger Decl. (ECF 3-8) ¶ 2. On May 30, 2025, while visiting family in Texas, she was advised that that Center was shutting down and that she would not be able to return to her dormitory or resume her training. *Id.* ¶ 9.

As is explained by his mother and next friend, Plaintiff C.D. lives and studies at the Detroit Job Corps Center in Detroit, Michigan. Davis Decl. (ECF 3-9) ¶ 2. In late May 2025, students there were told that the Center would shut down by June 30, 2025. *Id.* ¶ 10. The next day, Center staff informed students that all classes and services were canceled, and that they would have to find alternative housing that day. *Id.* C.D. was able to stay with his mother in temporary housing for approximately two weeks until the Center reopened in response to the *NJCA* temporary restraining order. *Id.* ¶¶ 13–14.

## PROCEDURAL HISTORY

Plaintiffs filed this action against DOL and Secretary Chavez-DeRemer on behalf of themselves and a putative class of individuals enrolled in Job Corps programs at contractor-operated centers on June 18, 2025. *See* Compl. (ECF 1). Their complaint contains five claims, all pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702, 706. *Id,* ¶¶ 50–70. First, they bring a claim pursuant to 5 U.S.C. § 706(2)(D), alleging that Defendants closed the 99 contractor-operated Job Corps centers without following the notice and participation procedures set out in 29 U.S.C. § 3209(j), and thus took action without observance of procedure required by law. *Id.* ¶¶ 50–52. Second, pursuant to 5 U.S.C. § 706(2)(A), Plaintiffs allege that Defendants' actions were contrary to law as they were inconsistent with various other provisions of WIOA—specifically 29 U.S.C. §§ 3193, 3197(a)(1), 3197(c), 3198(a), 3199(a)–(c), and 3211(c). *Id.* ¶¶ 53–57. Third, pursuant to 5 U.S.C. § 706(2)(A), Plaintiffs allege that Defendants' closure of the 99 centers and/or their indefinite suspension of Job Corps program operations was not the product of reasoned decisionmaking and, thus, was arbitrary and capricious. *Id.* ¶¶ 58–61. Fourth, pursuant to 5 U.S.C. § 706(2)(A), Plaintiffs allege that Defendants' indefinite suspension of Job Corps program operations exceeded their statutory authority. *Id.* ¶¶ 62–65. Finally, Plaintiffs allege that Defendants' actions constituted an unauthorized impoundment of funds. *Id.* ¶¶ 66–70.

Along with their complaint, Plaintiffs filed a motion for a preliminary injunction and stay pursuant to Federal Rule of Civil Procedure 65(a) and 5 U.S.C. § 705, respectively, ECF 3, and a motion for class certification, ECF 4. In opposing the motion for preliminary relief, DOL made several jurisdictional and merits arguments, while also arguing that Plaintiffs were "mistaken" that DOL had made any decision as to the "elimination" of the Job Corps program or to "close" any centers, claiming that they merely had exercised "discretionary authority to suspend center

operations through contract termination to address program management challenges." ECF 20 at 9–10.

On July 25, 2025, this Court granted Plaintiff's motion and stayed DOL's "May 29, 2025 directive to effectuate the closure of all privately-operated Job[] Corps centers" pending resolution of this case. ECF 52. In an accompanying memorandum opinion, the Court held that Plaintiffs were likely to succeed on the merits. ECF 53. As to jurisdiction, the Court held that "the Tucker Act does not the divest the Court of subject matter jurisdiction" and that Plaintiffs had "demonstrat[ed] a substantial likelihood of standing." *Id.* at 7, 9. Then, rejecting DOL's arguments that its "pause" of operations at the 99 centers was not a closure of those centers, the Court concluded that "DOL unlawfully 'closed' all 99 privately operated Job Corps centers, in violation of the WIOA, *see* 29 U.S.C. §§ 3209(j) and 3211(c)." *Id.* at 13. The Court thus did not address the merits of Plaintiffs' other APA claims. *See id.* at 10 n.1. The Court found that Plaintiffs had satisfied their burden as to the other requirements for preliminary relief, and that, pursuant to 5 U.S.C. § 705, a stay of DOL's action as to all 99 privately operated Job Corps centers was the appropriate relief. ECF 53 at 14–17.

## LEGAL STANDARD

The Administrative Procedure Act (APA) provides for judicial review of final agency actions, 5 U.S.C. §§ 702, 704, and directs courts to vacate such actions if they are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D). "In an APA case, **s**ummary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Al-Eryani v. Immigrant Investor Prog. Off.*, 754 F. Supp. 3d 101,

104 (D.D.C. 2024) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). Summary judgment is appropriate "if the moving party 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## ARGUMENT

### I.    This Court has jurisdiction over Plaintiffs' claims.

#### A.    Plaintiffs have standing.

"To establish Article III standing, a plaintiff must show that it 'suffered or is imminently threatened with a concrete and particularized injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision.'" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014)) (cleaned up). Plaintiffs have satisfied each of these requirements.

Each named plaintiff, as well as all of the members of the proposed class, have suffered, or would imminently suffer, a loss of training, vocational services, housing, and health services as a result of the suspension of operations at the Job Corps centers. *See* Cabrera Decl. ¶¶ 13–14; Burkes Decl. ¶¶ 7–10; Davis-Newman Decl. ¶¶ 7–9; Sasser Decl. ¶¶ 8–11; Christensen Decl. ¶¶ 7–10; Shauger Decl. ¶¶ 11–13; Davis Decl. ¶¶ 14–15. As this Court recognized in granting preliminary relief, "[i]t is well established that the termination of a government benefit to which a plaintiff claims a legal entitlement constitutes a cognizable injury." ECF 53 at 8 (citing *Hardaway v. D.C. Housing Auth.*, 843 F.3d 973, 978 (D.C. Cir. 2016) (collecting cases)); *see also Ams. for Safe Access v. DEA*, 706 F.3d 438, 445 (D.C. Cir. 2013) (finding injury-in-fact where agency action "deprives [plaintiff] of services that he is entitled to receive free of charge from the [agency]"). These losses are both "(a) concrete and particularized, and (b) actual or imminent, not

conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). They are also traceable to the challenged actions, without which Plaintiffs would still be receiving the services that they are now being denied. Finally, Plaintiffs' injuries are redressable by an order of this Court setting aside the unlawful suspension of Job Corps program operations and closures of the centers at which they are enrolled.

### B. Plaintiffs' claims are not subject to the exclusive jurisdiction of the Court of Federal Claims.

In opposing Plaintiffs' motion for preliminary relief, DOL argued that Plaintiffs' claims are subject to the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act. ECF 20 at 11–14. But Plaintiffs challenge DOL's decision "to cease operations at all Job Corps center sites," AR1080, and ask the Court to set aside that decision on the grounds that it violated numerous statutory requirements. The fact that DOL effectuated that challenged decision by, among other things, terminating contracts, does not make that challenge a contractual one, as the Court correctly recognized in granting Plaintiffs' motion for preliminary relief. *See* ECF 53 at 5.

Whether an APA claim is a disguised contract claim and thus subject to exclusive Tucker Act jurisdiction "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). On the first prong of this analysis, courts ask whether "the plaintiff's asserted rights and the government's purported authority arise from the statute"; "whether the plaintiff's rights exist prior to and apart from rights created under the contract"; and "whether the plaintiff seeks to enforce any duty imposed upon the government by the relevant contracts." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (cleaned up). As to the second, "courts ask whether a plaintiff seeks to enforce a statutory mandate or obtain a contractual remedy—such

as money damages, or specific performance." ECF 53 at 6 (citing *Crowley*, 38 F.4th at 1107 and *Perry Cap., LLC ex rel. Inv. Funds v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017)).

Here, Plaintiffs' claims are based on statutory requirements and obligations, not contractual ones. It is WIOA, not any Job Corps center operator contract, that requires DOL to maintain a national Job Corps program, that requires Job Corps centers to provide specific services to eligible students like members of the putative class, that requires DOL to provide advance notice and an opportunity for comment before closing a center, and that requires DOL to consider specific factors in deciding whether and how to close a center. Plaintiffs are not themselves parties to any relevant contract with the federal government and do not seek to enforce any federal contracts—nor do they even allege that DOL breached any contract. Their "asserted rights exist independently of any contract between DOL and the Job Corps center operators." ECF 53 at 6–7.

As to the second *Megapulse* factor, Plaintiffs seek vacatur of DOL's suspension of Job Corps program operations and its closure of 99 Job Corps centers. That DOL might have to honor existing contracts, or enter into different ones, to comply with its *statutory* obligations to keep the Job Corps centers that Plaintiffs and other putative class members attend open and providing services does not convert the relief sought into specific performance of any contract. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) ("[A] district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)); *cf. NIH v. Am. Pub. Health Ass'n*, 606 U.S. __, 2025 WL 2415669, at *2 (Aug. 21, 2025) (Barrett, J., concurring) (in an opinion that controls under *Marks v. United States*, 430 U.S. 188, 193 (1977), reasoning that district court has jurisdiction to vacate blanket agency action pursuant to which grants were subsequently terminated).

## II.    DOL closed 99 Job Corps centers without complying with statutorily mandated procedures.

Under 29 U.S.C. § 3209(j), DOL is required to undertake a notice and comment procedure "prior to the closure of any Job Corps center." DOL did not do so as to any of the 99 Job Corps centers that DOL ordered shut down by June 30, 2025. Under the statutory text and context, DOL's directive "closed" the 99 Job Corps centers without undertaking that process. As the Court previously recognized, its argument to the contrary "is entirely circular." ECF 53 at 13. And the administrative record makes even clearer that DOL intended to close all 99 centers and did not contemplate ever reopening them. Plaintiffs are therefore entitled to summary judgment on their first count of the complaint, brought pursuant to 5 U.S.C. § 706(2)(D). ECF 1 at ¶¶ 50–52.

Where, as here, "a statute does not define a term, [courts] typically give the phrase its ordinary meaning." *FCC v. AT & T Inc.*, 562 U.S. 397, 403 (2011) (cleaned up). To "close" something is "to suspend or stop the operations of" it. *Close*, Merriam-Webster.com Dictionary (June 18, 2025), https://www.merriam-webster.com/dictionary/close; *see Close*, *Black's Law Dictionary* (12th ed. 2024) ("To conclude; to bring to an end"); *Baker v. Masco Builder Cabinet Grp., Inc.*, 912 F. Supp. 2d 814, 824 (D.S.D. 2012) (applying similar definitions in discerning "the plain meaning of the word 'close'"). That is exactly what DOL has done here with respect to each of the 99 centers. It has indefinitely "suspend[ed]" operations at each center. AR1059. And it has ordered the "shutdown" of every center. *See*, *e.g.*, AR1168. Should these orders be effectuated, none of the centers will be open; they will be closed. As the Court previously noted, DOL's "action plainly falls under the ordinary meaning of closure." ECF 53 at 10.

The statutory context does not suggest that Congress meant something apart from this ordinary meaning. 29 U.S.C. § 3209(f), for example, identifies six things DOL can do short of closing a center as part of a performance improvement plan:

(A) providing technical assistance to the center;

(B) changing the career and technical education and training offered at the center;

(C) changing the management staff of the center;

(D) replacing the operator of the center;

(E) reducing the capacity of the center;

(F) relocating the center, or

(G) closing the center.

This list demonstrates that, while Congress thus contemplated that DOL could take steps short of "closure" as part of a performance improvement plan, a "pause" or "suspension" of all of a Center's operation was not one of them. To the contrary, each of the six listed actions short of closure contemplates that a center's operations will continue.[5]

Here, though, DOL's actions meant that such operations would *not* continue—in the immediate future or *ever.* The actions were part of what DOL described as an "effort to cease Job Corps operations." AR1087. Centers were directed to make sure students had "no expectation of … return" to either the center they attended, or any other center. *See, e.g.*, AR1174. The action was explicitly taken "to align" with the Administration's proposal to Congress to eliminate the program. AR1080. DOL described its actions as "phasing out" what it referred to as the "outdated model" of residential Job Corps centers. AR1085. And DOL itself used the word "close" in describing what it planned to do: stating that it would cancel the 99 contracts pursuant to the termination for convenience clause to achieve its "goal" of "clos[ing] all non-USDA Centers." AR

---

[5] There is no suggestion that the challenged action was *itself* an action taken pursuant to section 3209(f). DOL did not invoke that statutory provision in its contemporaneous explanation of its actions or its legal authority to act, *see* AR1059, 1082, nor is there any evidence of a performance improvement plan as to any of the 99 centers in the certified administrative record.

91. While DOL later switched to using the term "pause," this change in labeling does not control, and the *substance* of the plan DOL adopted in the guise of a "pause" was the same as the one it described as "elimination." *Compare* AR91 (describing process for "closing" all 99 centers as part of "Elimination" strategy), *with* AR1080–81 (describing process for "pausing" all 99 centers); *see also* AR1090 (in part of final plan, referring to need for each center to "[d]raft a detailed closure timeline" as part of "pause"). *Cf. Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (declining to give credence to "an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process"). The administrative record suggests that DOL adopted this change in terminology solely to evade the legal requirements of 29 U.S.C. § 3209(j). *See, e.g.*, AR1082 (emphasizing distinction between pause and closure because of the legal requirements that apply to the latter).

Given the clear evidence that DOL intended to permanently "cease Job Corps Operations," AR1087, whether or not *some* actions characterized as "pauses" in the past constituted closures is irrelevant. As the Court previously recognized, DOL's actions did not "conform to its past characterization of the term 'pause.'" ECF 53 at 13. Those pauses involved different circumstances—students were to be transferred to other centers, and there was an explicit possibility of "unpausing" those centers. AR11. No such transfers or unpausing were possible here. To the contrary, "No center could be reopened" in response to public outcry. AR91. The agency had already decided to proceed with "formal closure" of each of the 99 centers. AR1081.

The only distinction the agency drew between its "pauses" and a "formal closure" that would trigger statutory obligations is an entirely circular one: the pauses were not closures because "'closing' requires additional actions," namely, those required by 29 U.S.C. § 3209(j). AR1082. But while it is true that for a closure to be *lawful* those additional actions were required, the failure

to take those actions does not mean DOL did not engage in a closure; such a "position is entirely circular." ECF 53 at 13. And the two other actions that DOL said it would engage in as part of "formal closures" do not bear on the question of whether a closure of the 99 contract centers occurred either. First, that DOL and USDA "would renegotiate necessary interagency agreements" appears to relate to closures of the USDA-run Job Corps centers—not the 99 centers at issue here. AR1081. And the statement that DOL would "follow federal regulations" relating to the disposal of property is neither here nor there. *Id.* Under the General Services Administration regulations, a property is considered "not utilized" if it is "not occupied for current program purposes … or occupied in caretaker status only." 41 C.F.R. § 102-75.45. DOL's obligations under those regulations kicked in at the time of a "pause" and were not dependent on any "formal closure" (though caretaker contracts would have *also* been necessary in the case of a formal closure). *See* AR1066.

As the Court has put it, the notion that "WIOA's procedural mandates hinge on the terminology the agency chooses to use, allowing it to sidestep its statutory obligations entirely," "cannot be correct." ECF 53 at 13. Indefinitely ceasing operations at 99 Job Corps centers, with the explicit intent to later "formal[ly] close" them, and without contemplating the possibility for those centers to ever be "unpaused," constitutes a closure of those centers, and thus compliance with the statutorily mandated procedures was required.

## III.    DOL's actions are contrary to other provisions of WIOA.

DOL's closure of the centers and indefinite suspension of Job Corps program operations violates other provisions of WIOA. Accordingly, Plaintiffs are entitled to summary judgment on the second count of the complaint, brought pursuant to 5 U.S.C. § 706(2)(A). ECF 1 at ¶¶ 53–57.

First, 29 U.S.C. § 3211(c) requires DOL to "establish" and "use" specific written criteria to determine when a center is "to be closed and how to carry out such closure." While DOL has

established such criteria, *see* 84 Fed. Reg. at 25072, the record does not demonstrate those criteria were considered before carrying out the closures discussed above. Its closure of those centers was thus contrary to law.

Second, DOL's action to, in its own words, "cease operations at all Job Corps center sites," AR1089, also was contrary to statutory provisions that obligate DOL to ensure that each Job Corps center is "operated so as to provide enrollees, in a well-supervised setting, with access to activities" described in the statute, 29 U.S.C. § 3197(c), "including English language acquisition programs, career and technical education and training, work experience, work-based learning, recreational activities, physical rehabilitation and development, driver's education, and counseling, which may include information about financial literacy," *id.* § 3198(a); *see* 29 U.S.C.§ 3197(a)(1) (requiring DOL to enter into agreements "for the operation of each Job Corps center"); § 3199(a)–(b) (specifying DOL "shall arrange for assessment and counseling" for program enrollees). Halting operations at all Job Corps center sites indefinitely, leaving enrollees like Plaintiffs without the services specified in the statute, is inconsistent with these statutory provisions. Whatever discretion DOL has in carrying out these provisions, it does not have discretion to simply not carry them out at all.

Finally, 29 U.S.C. § 3193 mandates the existence of "a 'Job Corps.'" DOL described the "goal" of its May 29 actions, though, as "to cease operations at all Job Corps center sites." AR1080. Job Corps does not exist if operations at all Job Corps center sites have "cease[d]." In opposing preliminary relief, DOL argued that it did not violate this provision because "the 25 USDA-run centers continue to operate." ECF 20 at 32. The Administrative Record suggests that DOL intended for those centers to close as well, though, once the interagency agreement between DOL and USDA could be renegotiated as part of "phase 2." AR1080; *see also* AR1087 ("USDA Operational

Plan"). DOL thus cannot point to the operation of centers it also planned to shutter as fulfilling its obligations under 29 U.S.C. § 3193.

While DOL may think these statutory provisions reflect unwise policy choices, the Executive "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). Because DOL's May 29 action was inconsistent with these provisions, it was contrary to law and should be set aside on those grounds.

## IV.    DOL's suspension of Job Corps center operations was arbitrary and capricious.

 "An action is arbitrary and capricious when the agency relies on inappropriate factors, fails to consider important aspects of the problem, or ignores relevant evidence." *Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1213 (D.C. Cir. 2024). Where an agency fails "to consider or to adequately analyze the … consequences of" its actions, it has acted arbitrarily and capriciously. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017). And while "agencies are free to change their existing policies," they must "consider 'serious reliance interests'" when doing so. *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025) (quoting *Encino Motorcars v. Navarro*, 579 U.S. 211, 221–22 (2016)). Because, as confirmed by the administrative record, DOL failed to abide by these standards in suspending operations at the 99 contractor-operated Job Corps centers, Plaintiffs are entitled to summary judgment on the third count of the complaint, brought pursuant to 5 U.S.C. § 706(2)(A). ECF 1 at ¶¶ 58–61.

In its contemporaneous explanation of its action, DOL pointed to "serious incident reports" and its "in-depth fiscal analysis" as the impetus for its "pause in operations." AR1061. Plaintiffs do not dispute that serious incidents and financial issues could have supported DOL making changes to the Job Corps program. But that did not grant the agency *carte blanche* to shut it down. Rather, DOL still had to demonstrate a "rational connection between the facts found and the choice

made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). And DOL was required to consider "alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008). "This principle goes to the heart of reasoned decisionmaking; it is not limited to rulemaking." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021).

Here, there were obvious, far less drastic and disruptive measures that DOL could have taken to respond to its concerns about safety and costs rather than suspending the entire program on one month's notice and putting students on the street without any opportunity to complete their programs. As the Court noted in the hearing on Plaintiffs' motion for preliminary relief, for example, "You could close poorly operated centers. You could take those resources and focus them on others that are performing better. There are ways to reduce or eliminate the deficit short of eliminating every job center except for those that deal with agriculture and wildlife." July 9, 2025, Hr'g Trc. 26:17–22. Indeed, the statute explicitly contemplates the issuance of "performance improvement plans" as to particular centers and identifies six specific actions that DOL can take short of closing a center. 29 U.S.C. § 3209(f)(2). The administrative record does not indicate that DOL considered utilizing this congressionally approved mechanism for addressing programmatic concerns, much less explained why it would be inadequate.

The April 2025 memo itself identifies two alternatives to the "Eliminate" strategy upon which DOL ultimately decided: "rectify budget shortfalls by reducing program size," AR92, and "advance public knowledge before full elimination," AR93. As to the former, the "Right-Sizing" document laid out three possible ways such a strategy could be carried out—reducing program size by alternatively focusing on measures of "facility sustainability," "program efficiency," and

"program effectiveness." AR133–40. *See also* AR142 (noting three options of "[c]ut 24, 40, or 45 centers"). DOL also noted that it could consolidate centers and "serve [the] same number of students," providing students with the opportunity to transfer from any "eliminated centers." AR92. As to the latter path, DOL acknowledged it could "gain deep knowledge of [the] program, supporters, data, the universe, etc." before taking action. AR93.

The record does not reveal any reason why DOL rejected these alternatives, or why it had to act so drastically, and so quickly. To the contrary, DOL acknowledged that the "financial crisis" impacting the program had existed "for years." AR1079. And while DOL identified a "benefit" of the more drastic, "strike immediately" "elimination" strategy would be "avert[ing] strategic targeting from opposition," AR91, such political convenience cannot itself provide the basis of reasoned decisionmaking. DOL's failure to meaningfully consider and explain its rejection of obvious, less drastic alternatives renders its action arbitrary and capricious.

Further, the agency's desire to act quickly to achieve its "goal" of eliminating "a massive federally operated program," AR91, did not obviate it from grappling with other important considerations. And while, in 2024, DOL recognized that "minimizing disruption for current students" and "maintaining quality of service for students" were "key considerations" in any response to financial concerns, AR4, DOL did not meaningfully consider these factors in spring 2025. There is no indication that DOL thought about the fact that many students were in the middle of job training programs that they would not be able to complete upon the shutdown of the Centers they attended. Similarly, there is no indication that DOL considered that many students only had access to health care via Job Corps. And while DOL stated it was committed to an "orderly transition for students, staff, and local communities," AR1061, such a transition was impossible under the short timeline provided—as demonstrated by the predictable chaos that ensued for

Plaintiffs. *See, e.g.*, Davis-Newman Decl. (ECF 3-5) ¶ 5 (noting that, at one center, "Staff members advised students to pack and be ready to leave as soon as the next day because no one knew how long [students] would be allowed to stay on the premises"); Cabrera Decl. (ECF 3-3) ¶¶ 9–10 (noting that, at another center, students were first told they would have to leave in 30 days, but then told they would have to leave the following week); Shauger Decl. (ECF 3-8) ¶¶ 9–10 (explaining that student who was away visiting family was not allowed to return to center even to gather her belongings). Centers were given *one week* to develop transition plans for all of their students. AR1173. In that one week, centers were expected to figure out how to wrap up training programs that were under way, assist students in obtaining new training and employment opportunities, and identify replacement housing, health care, and other support services—all while center staff was dealing with the imminent loss of their own employment. The record includes no indication that DOL gave any thought to the practicality of such a rushed process.

Indeed, in its own rush, DOL also failed to consider many other important factors entirely. For one, DOL did not consider the inefficiency of ending training programs that students had nearly completed, on which DOL had already spent taxpayer dollars. DOL did not consider at all the fact that many Job Corps students receive medical and related services through their centers. And while, in draft materials, DOL said it would "identif[y] and connect[]" students who entered Job Corps as "unaccompanied homeless youth" with housing assistance, AR347, the materials actually sent to centers on May 29 simply directed center staff to "contact the provider … who assisted [such] student[s] when they enrolled." AR1173. Moreover, there was no planning whatsoever for students who may have not been formally designated as "unaccompanied homeless youth" when they enrolled in Job Corps but in June 2025 would have no safe place to go. The only other "transition services" that centers were required to provide to students who were suddenly

without a place to live, education, training, and medical care were: (1) registration of "each student with the American Job Center nearest to their home of record," (2) registration of each student with their "home state's Labor Exchange system," and (3) "discuss[ion] of" sharing information with DOL. AR1173. It is not reasonable to think that these tasks would quickly connect Job Corps enrollees with the basic services they need to survive in the short amount of time provided.

Finally, DOL did not consider the fact that students had made the choice to enroll in the Job Corps program based on the reasonable expectation that they would be able to complete the vocational training programs to which they were accepted and would have a place to live while doing so. *See, e.g.*, Cabrera Decl. (ECF 3-3) ¶ 13 (explaining that closure would leave her unable to complete training program and without a place to live); Burkes Decl. (ECF 3-4) ¶ 8 (explaining how closure would require him "to start all over again" despite "com[ing] so close to completion and transition into gainful employment"). While this expectation did not obligate DOL to continue to run the Job Corps program without change indefinitely, it did create reliance interests that DOL was required to meaningfully consider. *See Cap. Power Corp. v. FERC*, __ F.4th __, No. 23-1134, 2025 WL 2738420, at *4–7 (D.C. Cir. Sept. 26, 2025) (citing *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31–32 (2020)) (holding agency acted arbitrarily by failing to consider reliance interests before taking immediate action). DOL did not do so.

## V.    DOL's indefinite suspension of the Job Corps program exceeded its statutory authority.

When an agency is "charged with administering congressional statutes," its "power to act … is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires, and violates the [APA]." *Id.* (citation omitted). And while agencies have "executive discretion" to "interpret[] a statute and direct[] the details of its execution," *J.W. Hampton, Jr. & Co. v. United*

*States*, 276 U.S. 394, 406 (1928), the "responsibility to carry out the Congressional objectives of a program does not give [an agency] the power to discontinue that program, especially in the face of a Congressional mandate that it shall go on." *Loc. 2677, Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp. 60, 77–78 (D.D.C. 1973); *see also Guadamuz v. Ash*, 368 F. Supp. 1233, 1240 (D.D.C. 1973) (holding that authority to administer a program does not grant "power to terminate the program"). *Cf. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").

Here, DOL has been granted the authority to administer the Job Corps program—not the authority to eliminate it. But, as the administrative record makes explicit, that is exactly what DOL was trying to do. DOL's indefinite suspension of the program is thus ultra vires and exceeds its statutory authority. While the President is free to ask Congress to eliminate the Job Corps program, DOL must ensure the program's continued existence and operation until and unless Congress does so.

## VI.    DOL's indefinite suspension of the Job Corps program violated appropriations law.

By halting Job Corps program operations, DOL has also violated appropriations law. "Where the executive has policy reasons ... for wanting to spend less than the full amount appropriated by Congress for a particular project or program, … even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill," pursuant to the Congressional Budget and Impoundment Control Act of 1974 (ICA), 2 U.S.C. § 683. *In re Aiken Cnty.*, 725 F.3d at 261 n.1. Absent compliance with that procedure, congressionally appropriated funds "shall be made available for obligation." 2 U.S.C. § 683(b).

That procedure has not been deployed here, yet DOL still purported to "cease operations at all Job Corps center sites to align with the … *proposed* budget" that zeroed out the Job Corps program. AR1080 (emphasis added). The ICA does not allow the Executive to spend money based on the budget he wants Congress to enact, as opposed to the one it has.

Plaintiffs acknowledge that the D.C. Circuit has recently held that violations of the ICA may not be enforced via the APA. *Global Health Council v. Trump*, __ F.4th __, No. 25-5097, 2025 WL 2480618, at *9–11 (D.C. Cir. Aug. 28, 2025).[6] Plaintiffs respectfully disagree with that holding, as "the mere fact that the Impoundment Control Act affirmatively empowers the Comptroller General to sue is not sufficient to overcome the 'strong presumption' in favor of review under the APA." *Am. Ctr. for Int''l Lab. Solidarity v. Chavez-DeRemer*, No. CV 25-1128 (BAH), 2025 WL 1795090, at *22 (D.D.C. June 30, 2025). *See also Child Trends, Inc. v. U.S. Dep't of Educ.*, __ F. Supp. 3d __, Civ. No. No. 25-1154-BAH, 2025 WL 2379688, *12 (D. Md. Aug. 15, 2025) ; *Oregon Council for Humans. v. United States DOGE Serv.*, __ F. Supp. 3d __, No. 3:25-CV-829-SI, 2025 WL 2237478, at *23 (D. Or. Aug. 6, 2025); *New York v. Trump*, 769 F. Supp. 3d 119, 138 n.13 (D.R.I. 2025). Plaintiffs thus seek to preserve Count V of their complaint for further review.

## VII.    Vacatur is the appropriate remedy.

When a court finds an agency action unlawful under the Administrative Procedure Act, vacatur is the presumptive remedy. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C.

---

[6] The Supreme Court's recent interim decision in the same case addressed a different question, finding that the Government had made a "sufficient showing" that the ICA precluded the APA claim in that case based on the underlying appropriations law. *Dep't of State v. AIDS Vaccine Advocacy Coalition*, 606 U.S. __, 2025 WL 2740571, at *1 (Sept. 26, 2025). The Court noted that this conclusion was only its "preliminary view" and "should not be read as a final determination on the merits." *Id.*

Cir. 2001); *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring). Here, the Court should vacate DOL's May 29, 2025, suspension of operations at all 99 contractor-operated Job Corps centers.

This case does not present exceptional circumstances that would warrant departing from that normal remedy. To the contrary, both of the *Allied-Signal* factors—"the 'seriousness of the [action's] deficiencies' and the likely 'disruptive consequences' of vacatur" — counsel against any such deviation. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 110 (D.C. Cir. 2014) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). As to the seriousness of DOL's errors, a failure to provide required notice and opportunity for public participation "is a 'fundamental flaw' that almost always requires vacatur." *Id.* (quoting *Heartland Reg'l Med Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)). And DOL's other errors— including its disregard of statutory mandates and failure to consider less-drastic alternatives— means there is no "serious possibility that [DOL] will be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151. As to the second *Allied-Signal* factor, there is no likelihood that vacatur would have disruptive consequences; to the contrary, a remand *without* vacatur would have disruptive consequences similar to those faced before this Court issued a stay of DOL's action. *See Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 80 (D.D.C. 2010) (recognizing that vacatur is appropriate remedy where necessary "to prevent significant harm resulting from keeping the agency's decision in place" (citing *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995)).

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment on each of their claims, and vacate the Department's May 29, 2025, suspension of operations.

31

Dated: October 10, 2025

Respectfully submitted,

/s/ Adam R. Pulver
Adam R. Pulver (DC Bar No. 1020475)
Michael T. Kirkpatrick (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

Arthur Ago (DC Bar No. 463681)
Aaron S. Fleisher[*†] (NY Bar No. 4431052)
Southern Poverty Law Center
1101 17th St. NW
Washington, DC 20036

Scott D. McCoy[*] (FL Bar No. 1004965)
Sam Boyd[*] (FL Bar No. 1012141)
Carli Raben[*] (FL Bar No. 1036013)
Southern Poverty Law Center
2 S. Biscayne Blvd. Ste. 3750
Miami, FL 33131

Michael Tafelski[*] (GA Bar No. 507007)
Diego A. Soto[*] (DC Bar No. 1029607)
Southern Poverty Law Center
150 E. Ponce De Leon Ave. Ste. 340
Decatur, GA 30030

*Counsel for Plaintiffs*

[*] *Admitted* pro hac vice

[†] *Not admitted to practice law in DC*

32