**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ANARIA CABRERA, et al.,

        *Plaintiffs,*

        v.

U.S. DEPARTMENT OF LABOR, et al.,

        *Defendants*.

Civil Action No. 25-1909-DLF

**DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION**
**TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

I.      Statutory and Regulatory Background .................................................................. 3

II.     The Job Corps Program Was Unsustainable ....................................................... 4

III.    The Department Ends the Contracts of All Privately Operated Job Corps Centers........... 8

PROCEDURAL HISTORY ............................................................................................... 11

LEGAL STANDARDS ..................................................................................................... 12

ARGUMENT .................................................................................................................... 12

I.      The Tucker Act Divests This Court of Jurisdiction ........................................... 12

II.     Plaintiffs' APA Claims Fail ............................................................................... 19

        A.      Plaintiffs' APA claims should be dismissed because there are adequate
                alternative remedies available (Claims 1-5). ............................................ 19

        B.      The Department was not mandated to follow any procedure to pause Job
                Center operations (Claim 1)...................................................................... 19

        C.      The Department did not violate a statutory or regulatory prohibition when
                it paused operations at the privately run Job Corps centers (Claim 2). .... 23

        D.      The Department did not exceed its statutory authority (Claim 4). ........... 24

        E.      The Department's decision to pause centers was not arbitrary and
                capricious. ................................................................................................ 25

        F.      The Department did not violate appropriations law (Claim 5). ................ 27

CONCLUSION.................................................................................................................. 28

# TABLE OF AUTHORITIES

**CASES**

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) ................................................................. 15

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
  No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025).................................. 14, 17

*Am. Biosci., Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ............................................................ 12

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984)....................................................................... 27

*Blue Ocean Inst. v. Gutierrez*,
  585 F. Supp. 2d 36 (D.D.C. 2008),
  *appeal dismissed sub nom. Blue Ocean Inst. v. Locke*, 2009 WL 1456322 (D.C. Cir. May 5,
  2009) ..................................................................................... 12

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)................................................................... 14, 18, 19

*Brodie v. U.S. Dep't of Health & Hum. Servs.*,
  796 F. Supp. 2d 145 (D.D.C. 2011) ........................................................ 12

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962)....................................................................... 26

*Citizens to Pres. Overton Park v. Volpe*,
  401 U.S. 402 (1971)..................................................................... 2, 25

*Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*,
  247 F.3d 1378 (Fed. Cir. 2001) ........................................................... 16

*Dep't of Educ. v. California*,
  604 U.S. 650 (2025)................................................................... 13, 14, 17

*FCC v. AT&T Inc.*,
  562 U.S. 397 (2011)....................................................................... 19

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985)....................................................................... 25

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025) ...................................................................................... 27, 28

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) ..................................... 14, 18

*Holley v. United States*,
  124 F.3d 1462 (Fed. Cir. 1997) ................................................................................. 15

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ..................................................................................... 17

*Inv. Co. Inst. v. U.S. Commodity Futures Trading Comm'n*,
  891 F. Supp. 2d 162 (D.D.C. 2012) .......................................................................... 27

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*,
  56 F.3d 279 (D.C. Cir. 1995) ..................................................................................... 15

*Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urb. Dev.*,
  Civ. A. No. 25-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14, 2025) .............. 14

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ................................................................................................... 13

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ....................................................................... 15, 16, 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ....................................................................................... 12, 25, 26

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ................................................................................. 27

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025) ............................................................................................... 17

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013) ................................................................................... 26

*Perry Cap. LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ................................................................................... 15

*Pub. Citizen, Inc. v. Trump*,
  297 F. Supp. 3d 6 (D.D.C. 2018) ............................................................................... 13

*Richards v. Immigr. & Naturalization Serv.*,
  554 F.2d 1173 (D.C. Cir. 1977) ................................................................................. 12

*Sierra Club v. Mainella,*
   459 F. Supp. 2d 76 (D.D.C. 2006) ........................................................................ 12

*Sols. in Hometown Connections v. Noem*,
   CIV. A. No. 25-CV-00885-LKG, 2025 WL 1530318 (D. Md. May 29, 2025),
   *aff'd,* 2026 WL 179590 (4th Cir. Jan. 23, 2026)....................................................... 17

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) .................................................................... 16, 17

*Steel Co. v. Citizens for a Better Envt.,*
   523 U.S. 83 (1998).................................................................................................. 13

*Sustainability Inst. v. Trump,*
   No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ....................................... 17

*Tex. Health Choice, L.C. v. Off. of Pers.l Mgmt.*,
   400 F.3d 895 (Fed. Cir. 2005) .............................................................................. 10

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
   136 F.3d 641 (9th Cir. 1998) ................................................................................ 16

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
   770 F. Supp. 3d 155 (D.D.C. 2025),
   *dismissed,* 2025 WL 1350103 (D.C. Cir. 2025)......................................... 14, 16, 17

*Up State Fed. Credit Union v. Walker*,
   198 F.3d 372 (2d Cir. 1999) ................................................................................. 16

*Util. Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014)............................................................................................... 20

*Vera Inst. of Just. v. U.S. Dep't of Just.*,
   No. 25-CV-1643 (APM), 2025 WL 1865160 (D.D.C. July 7, 2025),
   *appeal filed,* No. 25-5248 (D.C. Cir. July 10, 2025)......................................... 15, 18

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n,*
   82 F.4th 1273 (D.C. Cir. 2023) ............................................................................ 26

## STATUTES

2 U.S.C. § 687...................................................................................................... 27

5 U.S.C. § 702................................................................................................. 13, 14

5 U.S.C. § 704 .......................................................................................................... 19

5 U.S.C. § 706(2) ..................................................................................................... 25

28 U.S.C. § 1346(a)(2) ............................................................................................. 13

28 U.S.C. § 1491(a)(1) ....................................................................................... 13, 14

29 U.S.C. § 3193 ...................................................................................................... 24

29 U.S.C. § 3194(a) .................................................................................................... 3

29 U.S.C. § 3197(a) .................................................................................................... 3

29 U.S.C. § 3197(a)(1) ............................................................................................. 24

29 U.S.C. § 3197(a)(1)(A) ......................................................................... 4, 15, 16, 21

29 U.S.C. § 3197(d) .................................................................................................... 3

29 U.S.C. § 3197(f) ..................................................................................................... 4

29 U.S.C. § 3198(a)(2) ............................................................................................. 24

29 U.S.C. § 3199(a)-(b) ........................................................................................... 24

29 U.S.C. § 3206(a) .................................................................................................. 21

29 U.S.C. § 3209(f) ................................................................................................... 22

29 U.S.C. § 3209(f)(2) .............................................................................................. 20

29 U.S.C. § 3209(j) ............................................................................................ 4, 9, 21

29 U.S.C. § 3211(c) .................................................................................................. 23

Contract Disputes Act, 41 U.S.C. §§ 7101-7109 ........................................................ 10

Economic Opportunity Act of 1964, Pub. L. No. 88-452, 78 Stat. 508 (1964) ............................ 3

Workforce Innovation and Opportunity Act, 29 U.S.C. §§ 3191-3212 ...................................... 1, 3

**RULES**

Fed. R. Civ. P. 56(a) ................................................................................................................. 12

**REGULATIONS**

48 C.F.R. § 52.233-1(a)-(b) .................................................................................................... 10

48 C.F.R. § 52.249-2 ................................................................................................................ 25

48 C.F.R. § 52.249-2a ........................................................................................................ 10, 23

**OTHER AUTHORITIES**

*Close*, Merriam-webster.com, https://www.merriam-webster.com/dictionary/close ................... 19

DOL, Job Corps Transparency Report 2025, Apr. 25, 2025,
     https://www.dol.gov/sites/dolgov/files/ETA/jobcorps/reports/Job-Corps-Transparency-Report-
     2025.xlsx ............................................................................................................................ 6

## INTRODUCTION

Job Corps is a residential career-training and education program. The program is intended to assist eligible participants with completing their high school education and to provide those participants with vocational training to help prepare them to enter the workforce, move on to higher education, or join the military. Unfortunately, the Job Corps Program is plagued by low graduation rates, unsafe conditions for participants, and significant financial challenges, including a substantial operating deficit.

Faced with these financial realities and poor performance, the Department of Labor ("Department") made the difficult decision in May 2025 to cancel the contracts of the privately operated Job Corps Centers to allow the Administration an opportunity to evaluate the Job Corps Program consistent with the Administration's priorities. AR1068-79. The Department considered various options and phased approaches, including eventual closure of Job Corps centers, but the Department ultimately decided to pause operations while it considered the future of the program. *Id.*

Plaintiffs, participants in the current Job Corps Program, challenge the Department's pause in operations. Without regard for the need for that pause and reassessment, Plaintiffs urge the Court to require the Department to continue operations at a budget deficit and sub-par performance. But this Court lacks jurisdiction to do so because Plaintiffs' claims, which sound in contract, must be channeled to the Court of Federal Claims under the Tucker Act.

To avoid that result, Plaintiffs frame their claims as a challenge to the Department's "closure" of the Job Corps centers in violation of the Workforce Innovation and Opportunity Act ("WIOA"). 29 U.S.C. §§ 3191-3212. Their artful reframing, however, is not sufficient to convert what is essentially a contract action into an Administrative Procedure Act ("APA") action, and

1

Plaintiffs therefore cannot succeed on any of their APA claims because of the availability of an alternative statutory review scheme—the Tucker Act.  Plaintiffs seek vacatur of the pause of Job Corps operations, but the requested vacatur is mechanically the reinstatement of the Job Corps center contracts, a contractual remedy.  Because Plaintiffs are seeking a contractual remedy, this Court does not have jurisdiction under the Tucker Act.

Alternatively, Plaintiffs' APA claims fail because they are based on a false predicate, namely, the "closure" of the ninety-centers.  The Department, however, did not close those centers. It simply ended the contracts with the operators of the privately run centers.  AR1068-80.  And that is not a distinction without a difference.  Pausing operations at a center through ending a contract is a temporary measure that allows for a critical issue to be assessed or addressed.  Decl. of Erin Leigh McGee ¶¶ 10-15, ECF No. 20-2 ("McGee Decl."); Decl. of Jillian Matz ¶¶ 15-16, ECF No. 20-1 ("Matz Decl."); AR0003-0012.  The Department instructed contractors to wind down their operations and intended to use caretaker contracts to maintain owned and leased facilities.  AR1173-1175 (example of contract notice); AR1080 (discussion of caretaker contracts). In contrast, to close the centers, the Department must "publish a Federal Register Notice as required by WIOA sec.159 providing advance notice of center closures."  AR1081.  To the extent Plaintiffs' claims are predicated on a "closure," they necessarily fail.

To the extent Plaintiffs challenge the pause itself—whether as arbitrary and capricious or contrary to law and in excess of statutory authority—that challenge also fails.  Class Action Compl. for Decl. & Injunctive Relief ¶ 53-64, ECF No. 1 ("Compl.").  In reviewing that decision, the Court should only consider whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  The Department considered the relevant factors for whether the centers should

continue operating: cost and participant outcomes.  AR1097-1104.  The Department performed a classic cost-benefit analysis, which is the prototypical deliberation supporting an agency decision. Its cost-benefit analysis supported cancelling the contracts of the privately run centers and thereby pausing operations there, and the Court should defer to the Department's judgment.

Finally, Plaintiffs bring an Impoundment Control Act (ICA) that under binding D.C. Circuit authority, they cannot bring.  This Court therefore should enter judgment in the Department's favor on that claim as well.

Accordingly, the Court should deny Plaintiffs' Motion for Summary Judgment and Grant Defendants' Motion for Summary Judgment.

## BACKGROUND

### I.    Statutory and Regulatory Background

Job Corps was created by the Economic Opportunity Act of 1964, as part of President Lyndon B. Johnson's War on Poverty.  Pub. L. No. 88-452, §§ 101–110, 78 Stat. 508, 508–11 (1964).  Job Corps provides housing, education, and training to low-income youth so they can earn their high school diploma and receive vocational training to help prepare them to enter the workforce, move on to higher education, or join the military.  McGee Decl. ¶¶ 2-3; *see* 29 U.S.C. § 3194(a) (listing the eligibility requirements for participating in Job Corps).  The program is currently authorized under Title I, Subtitle C, of WIOA, 29 U.S.C. §§ 3191-3212.  Under current law, the Department is required to enter into agreements for the operation of each Job Corps center, *id.* § 3197(a), and may also include "Civilian Conservation Centers" operated by the U.S. Department of Agriculture under an agreement between the Secretary of Labor and the Secretary of Agriculture." *Id.* § 3197(d).

WIOA provides that the Department shall enter into an agreement "with a Federal, State, or local agency, an area career and technical education school, a residential career and technical education school, or a private organization, for the operation of each Job Corps center." *Id.* § 3197(a)(1)(A). The contracts are awarded for an initial term of no more than two years. *Id.* § 3197(f). The agency may exercise a contractual option to renew the agreement in one-year increments for up to three additional years. *Id.*

WIOA requires that prior to the "closure" of any Job Corps center, the Department announce its proposed decision to the general public through publication in the *Federal Register* or other appropriate means; that it establish a notice-and-comment period; and that it notify the Member of Congress who represents the district in which such center is located before any final decision. *Id.* § 3209(j). The statute does not define the term "closure."

## II. The Job Corps Program Was Unsustainable

The Job Corps Program had been operating at a deficit for some time before the current Administration. As of December 18, 2024, "[t]he Job Corps program face[d] a projected $139.9 million operating budget deficit for Program Year (PY) 2024." AR3.[1] Many factors contributed to this deficit. First, "[t]he Operations budget for Job Corps has been largely flat since 2018 at $1.6 billion[,]" meanwhile "operations, construction, and materials costs have increased by more than 25 percent due to inflation." *Id.* "Adjusted for inflation, the Job Corps budget for 2024 [sh]ould have been more than $2 billion." *Id.*

"Job Corps has limited funds available to absorb such financial pressures." *Id.* "Of the $1.6 billion annual budget, $1.05 billion is allocated to [fixed cost] center operations contracts and $500 million to costs such as information technology (IT) infrastructure and transportation." *Id.*

---

[1] Defendants adopt the citation style used by Plaintiffs when citing to the Administrative Record.

"After the $1.05 billion and the $500 million, this [left] only $50 million (3 percent) each year to cover unforeseen expenses, making it increasingly difficult to absorb rising costs without compromising program quality."  AR4.

Nor could the Department easily adjust these fixed costs.  Around 2019, the Department "began transitioning to the [firm fixed price] model" for contracts.  AR169.  "[A] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  *Id.*  "This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss."  *Id.*  But "[a]s enrollment numbers dropped due to COVID, any cost savings did not automatically translate into reduced [firm fixed price] payments by DOL."  AR170.  And "a reduction in the [firm fixed price] amounts would be subject to negotiation and could be grounds for dispute and litigation absent contractor agreement."  *Id.*

The previous Administration concluded that these budgetary pressures made "it increasingly difficult to absorb rising costs without compromising program quality."  AR4.  Based on this analysis, the "operating deficit [wa]s expected to grow to at least $213 million in PY 25[.]" *Id.*  Accordingly, the previous Administration "recommend[ed] minimal center pauses," AR9, and planned "not [to] exercise its option at two centers and [] not otherwise re-procure center operations for [] two centers, effectively pausing these centers while Job Corps works on its financial sustainability."  AR45.  These centers' operations would resume once they could "maintain a structurally balanced budget without a projected shortfall."  AR98.  The Department described the action as "not a closure; [] a pause."  AR45.

These budgetary shortfalls continued and informed the challenged decision to end the contracts of the privately-owned centers and thereby pause their operations.  Job Corps was in a

"financial crisis" and there remained a "high risk of violating the Anti-deficiency Act." AR214. "The Job Corps budget has remained largely flat at $1.6 billion since 2018[,]" but "[i]f adjusted for inflation, the budget would have to exceed $2 billion in 2024 to continue operations." *Id.* "Job Corps was operating at a deficit for PY 24—approximately $140 million[,]" and the Department took "several actions to save approximately $119 million including the pausing of centers, cancelling contracts, and reducing costs." *Id.* The "Operating deficit could grow up to $213 million if mitigation strategies do not continue." AR215.

On April 25, 2025, the Department released its Transparency Report that included the cost and student outcomes for Program Year 2023. DOL, Job Corps Transparency Report 2025, Apr. 25, 2025, https://www.dol.gov/sites/dolgov/files/ETA/jobcorps/reports/Job-Corps-Transparency-Report-2025.xlsx. The Department's report assessed:

- Enrollees
- Prorated yearly cost
- Yearly center cost
- Cost per enrollee
- Annualized income of enrollee after separation
- Graduate per WIOA definition
- Graduate from traditional analysis
- Total student separations
- Graduation rate WIOA
- Graduation rate Traditional
- Cost per graduate WIOA
- Cost per graduate traditional
- OBS statistics
- Current Infractions
- Skill gain rate
- Employer retention rate
- Placement rate

AR144-158; *see also* DOL, Job Corps Transparency Report 2025, Apr. 25, 2025. This analysis yielded the following results:

- Average Graduation Rate:

    - Traditional[2]: 32%

    - WIOA Definition: 38%

- Average Cost Per Enrollee (Regardless of Length of Stay): $49,769.53

- Average Cost Per Student Per Year (Average PY23 Headcount): $80,284.65

- Average Total Cost Per Graduate:

    - Traditional: $187,653

    - WIOA Definition: $155,600

- Job Corps participants earn $16,695 annually on average, post separation

- Average of Highest Center Costs per Graduate (Traditional Data):

    - The 10 least efficient programs average $512,800 dollars per graduate

    - The top 50 least efficient programs average $319,085 per graduate

- Average of Highest Center Costs per Graduate (WIOA Data):

    - The 10 least efficient programs average $385,370 per graduate

    - The top 50 least efficient programs average $252,285 per graduate

AR1103.

Based on these metrics, the Department concluded that "the program is not helping students achieve intended outcomes or keeping them safe." AR1063. "After leaving the program, participants go on to earn an average of just over $16,000 annually—barely above the national poverty line." *Id.* The "highest graduation rate among all Job Corps centers was 65.4%"—"[h]igh

---

[2] "The Job Corps Transparency Report's metrics distinguish between two definitions of the term 'graduate': one reflecting traditional program completion in good standing (Traditional), and another using the statutory criteria from Workforce Innovation and Opportunity Act Sec. 116, Sec. 142, which counts individuals who attain a diploma or Career Technical Training completion while enrolled but do not complete the full program." AR1103.

schools with graduation rates below 67% are considered low performing under federal law." *Id.*
"In addition to poor educational outcomes, participants' safety is often at risk - 14,913 serious
incident reports were filed in 2023, even though the program only has under 25,000 participants."
*Id.*

### III.  The Department Ends the Contracts of All Privately Operated Job Corps Centers

Faced with these challenges, the Department considered numerous alternatives before
ultimately deciding to cancel the contracts of the privately operated centers and thereby pausing
center operations.  Initially, the Department considered closing a small number of centers—either
24 centers, 40 centers, or 45 centers.  AR131.  The identification of which centers to cut was made
based on the sustainability, effectiveness, and efficiency of each center.  *Id.*  The long-term goal
was to arrive at a "right-sized" Job Corps Program that allows for service to the same number of
youths and young adults.  AR134.  The Department also conducted a national evaluation of trade
offerings across centers, using labor market information and program performance ratings.
AR1103-1104.   The Department considered eliminating or consolidating underutilized or
duplicative trades, and using continuous improvement plans for lower performing programs.  *Id.*

The Department also considered alternatives to improve student outcomes and reduce
costs.  One option was designating centers near major shipbuilding locations to align all technical
programs to meet entry requirements for employers comprising that industry.  AR99.  Another
option was Job Corps' partnering with eligible training providers identified by local workforce
development boards to provide technical training and providing wrap-around services such as
housing.  *Id.*  The Department even considered partnering with the military to provide training and
services with the ultimate goal of enlisting Job Corps graduates.  AR99-100.

The Department also considered closing centers without a pause.  AR91-94.  In its initial
"reconnaissance" phase—when no decisions had yet been made—the three options were 1)

"clos[ing] all non-USA Centers" by "[c]ancel[ling] 99 contract center contracts . . . using 'Convenience of the Government' clause in contracts," 2) "rectify[ing] budget shortfalls by reducing program size" by "eliminat[ing] X# centers" in round 1, and the remaining centers in round 2, and 3) "advanc[ing] public knowledge before full elimination." AR91-94.  The potential options for a new and improved Job Corps Program were to eliminate the "brick and mortar concept from the program," "partner with community colleges," "establish State Job Corps programs," and/or "incorporate the Job Corps Program at Juvenile Justice Centers."  *Id.*

The Department's thinking evolved, and it ultimately decided to end the contracts of all privately operated centers and therefore pause operations there.  At this point, the Department was cognizant that closure could only be achieved through notice and comment, specified in 29 U.S.C. § 3209(j).  *See, e.g.*, AR343 ("The Department of Labor is NOT eliminating the Job Corp Program. Congress has the legal authority to eliminate the Job Corp Program."); AR1082 ("'Closing' requires additional actions"); *see also* AR168, AR1082, AR1099-1100 (laying out notice-and-comment requirements for closure).  Thus, the Department ended its contracts with the privately operated centers and intended to follow the procedure to close the centers consistent with the WIOA.  AR1080-1081.

On or about May 29, 2025, the Department notified the privately run centers it was terminating their operations contracts as of June 30, 2025, using various contract authorities.[3]  *See, e.g.,* AR1506, AR2001.  Most contracts were ended using the Termination for Convenience of the

---

[3] For most operations contracts, the Department issued a notice terminating contract performance for the Government's Convenience on June 30, 2025.  *See, e.g.*, AR1168 ("Notice of Termination for Convenience" for Brunswick Job Corps Center).  For contracts ending May 30, 2025, the Department extended performance through June 30, 2025, using its authority in the FAR Clause 52.217-8.  *See, e.g.*, AR1793 ("Notice of Extension of Services" for Hartford Job Corps Center). For contracts ending June 30, 2025, the Department gave notice of no intent to extend performance further.  *See, e.g.*, AR1879 ("Notice of Intent Not to Exercise" for Long Beach Job Corps Center).

Government clause, which allows "[t]he Government [to] terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest . . . by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date." 48 C.F.R. § 52.249-2a. A second contract clause, the FAR DISPUTES clause, provides that these contracts are subject to the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101-7109, and that except as provided in that statute, "all disputes arising under or related to this contract shall be resolved under this clause." 48 C.F.R. § 52.233-1(a)-(b). The CDA has established exclusive procedures for resolving disputes related to the ending of those contracts, including channeling through the Court of Federal Claims. *See Tex. Health Choice, L.C. v. Off. of Pers.l Mgmt.*, 400 F.3d 895, 898-99 (Fed. Cir. 2005).

In connection with the attendant pause in operations, the Department ensured that Job Corps participants were provided with transition resources and assistance. For example, the Notices of Termination attached a document setting forth the contracting officer's Orders Regarding Orderly Shutdown of Center Operations that instructed center operators to take all necessary steps to ensure students are safely separated and transported to their homes of record. *See* Matz Decl. at Exs. 3-5. Those instructions were subsequently clarified by email dated June 1, 2025, in which the Department explained that "[t]he paramount consideration is the safety and well-being of students on center . . . there is no hard deadline for transferring students to their home of record, especially where their safety and well-being are concerned. We want to reiterate that [the Department] defer[s] to center operators regarding the length of time necessary to ensure that this transition is as safe and supportive as it can be in these circumstances." *Id*. (emphasis omitted).

In addition, the Department's notices to contractors directed them to register each student with the American Job Center, a Department provided job assistance program, nearest to his or her

home of record and to register each student with his or her home state's Labor Exchange system as well as to discuss with each student the "Authorization to Share Job Corps Student Records for Program Eligibility" form.  *See* Matz Decl., Exs. 6-7. "By signing, the student grants the Department of Labor permission to disclose certain information contained in the Job Corps Student Personnel File to assist students in identifying additional job placement, training, educational and other supportive services." *See id.*  Through its "FAQs," the Department stated "[a]ll students [would] be connected with the resources they need to succeed as this transition takes place." *Id.* The FAQs also informed students of the Department's intent to create a student resource page on the agency's website with links to other job opportunities.  AR1078.  Participants additionally would receive an eligibility determination for YouthBuild and WIOA youth programs offered at the state and local levels and would be offered apprenticeship and Pell grant opportunities.  *See* McGee Decl., Ex. 4;Decl. of Susan Frazier Bearden ¶ 5, ECF No. 20-3 ("Frazier Decl.").

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on June 18, 2025, alleging five counts under the APA. Compl. ¶¶ 50–70.  Claim 1 alleges that the Department did not follow the WIOA's required notice-and-comment procedures for closing Job Corps centers.  *Id.* ¶¶ 50–52.  Claim 2 alleges that the closure of Job Corps centers was contrary to law.  *Id.* ¶¶ 53–57.  Claim 3 alleges that the closure of Job Corps centers was arbitrary and capricious.  *Id.* ¶¶ 58–61.  Claim 4 alleges that the indefinite suspension of the Job Corps Programs exceeds the Department's statutory authority.  *Id.* ¶¶ 62–65. Claim 5 alleges that the Department impounded funds without authorization.  *Id.* ¶¶ 66–70.

Plaintiffs also filed a motion for preliminary injunction and a motion for class certification on June 18, 2025.[4]  ECF 3, 4.  The Court granted the preliminary injunction on July 25, 2025.  ECF

---

[4] The Court denied the motion for class certification on December 17, 2025.

52. Thereafter, the Parties proposed a schedule for cross-motions for summary judgment, a variation of which the Court entered.

Plaintiffs moved for summary judgment on all claims on October 10, 2025.  Pl.'s Mot. Summ. J., ECF No. 79 ("MSJ").  The Department now cross-moves for summary judgment on those claims.

## LEGAL STANDARDS

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008), *appeal dismissed sub nom. Blue Ocean Inst. v. Locke*, 2009 WL 1456322 (D.C. Cir. May 5, 2009); *see, e.g., Richards v. Immigr. & Naturalization Serv.*, 554 F.2d 1173, 1177 (D.C. Cir. 1977); *see also* Fed. R. Civ. P. 56(a).  A court resolving APA claims on summary judgment does not employ all the traditional summary judgment standards set forth in Federal Rule of Civil Procedure 56(c).  "[B]ecause of the limited role of a court in reviewing the administrative record," *Brodie v. U.S. Dep't of Health & Hum. Servs.*, 796 F. Supp. 2d 145, 150 (D.D.C. 2011), "the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law," *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (citation omitted).  The question is "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).  This standard of review is "narrow," and a court applying it "is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

## I.    The Tucker Act Divests This Court of Jurisdiction

"Before reaching the merits of Plaintiffs' challenge . . . the Court must first satisfy itself that it has Article III jurisdiction." *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 12 (D.D.C. 2018). This Court does not have Article III jurisdiction because Plaintiffs' claims are in essence a contract claim. *Steel Co. v. Citizens for a Better Envt.,* 523 U.S. 83, 94 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (citation omitted)); *see also id.* ("We decline to endorse such an approach [of assuming jurisdiction] because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers."). Notwithstanding Plaintiffs' framing, they seek specific performance of the contracts for each Job Corps center—a contract remedy. Compl., Prayer for Relief. In asking the Court to vacate the Department's decision to pause the Job Corps centers, the Department necessarily would resume the services and payments terminated by the contract cancellations. Accordingly, the claims implicate the Tucker Act.

The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act precludes relief under the APA or otherwise because the APA's waiver of sovereign immunity is limited to claims "seeking relief other than money damages," 5 U.S.C. § 702, and the APA does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit

13

contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). Moreover, Congress has by statute explicitly forbidden district court jurisdiction for such claims. 28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States [unless it is for less than $10,000].").  In sum, by statute and by virtue of the United States' sovereign immunity, this action is founded upon contracts with the United States, and therefore must be dismissed for lack of jurisdiction.

The Supreme Court recently reaffirmed this jurisdictional line in *California*:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." *Ibid*. True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen v. Massachusetts*, 487 U.S. 879, 910, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

604 U.S. at 651; *see also U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 162 (D.D.C. 2025) (explaining that the D.C. Circuit has long "interpreted the Tucker Act as providing the exclusive remedy for contract claims against the government" (citation omitted)), *dismissed*, 2025 WL 1350103 (D.C. Cir. 2025).  Since *California*, courts have recognized this jurisdictional bar in cases involving the types of remedies sought here.  *See, e.g., Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) (granting the Government's motion to stay a preliminary injunction because of *California*); *Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urb. Dev.*, CIV. A. No. 25-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14, 2025) (dissolving temporary restraining order considering the Supreme Court's

14

decision in *California*).

Plaintiffs contend that the Tucker Act is not implicated because they "challenge DOL's decision 'to cease operations at all Job Corps center sites,' and ask the Court to set aside that decision on the grounds that it violated numerous statutory requirements."  MSJ at 17 (citation omitted).  But that is of no moment.  Courts must look to the claims' "substance, not merely [their] form." *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995). Regardless of how a claim is styled, a district court lacks jurisdiction if a case "is in 'its essence' contractual." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004); *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the [challenged action] was wrongful.").

The "longstanding test" in this Circuit "for determining whether a claim falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act" is referred to as the *Megapulse* test.  *Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-CV-1643 (APM), 2025 WL 1865160, at *7 (D.D.C. July 7, 2025) (citation omitted), *appeal filed,* No. 25-5248 (D.C. Cir. July 10, 2025).  Determining whether "a particular action" is "at its essence a contract action" not within the jurisdiction of the district courts requires looking at the two *Megapulse* factors: "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968.  Both prongs support dismissal of the claims here on jurisdictional grounds.

First, the source of the rights Plaintiffs assert are the contracts themselves. The Department had provided the services demanded by Plaintiffs via contracts with Job Corps center operators. 29 U.S.C. § 3197(a)(1)(A). But for the contracts to operate Job Corps centers, Plaintiffs would not receive the specific benefits they want reinstated, including their specific training opportunities and resources. And but for the contract terminations, Plaintiffs would not be harmed. Plaintiffs point to no other source of rights for *these* Job Corps centers operated by *these* contractors. Indeed, the Department is free to contract "with a Federal, State, or local agency, an area career and technical education school, a residential career and technical education school, or a private organization, for the operation of each Job Corps center." *Id.*

"Because the United States's obligation is in the first instance dependent on the contract, these claims are contractually-based" and "the district court lacks jurisdiction under the Tucker Act." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding that district court lacked jurisdiction under the Tucker Act over constitutional claim because it was contractually based). In other words, "it is likely that no cause of action would exist at all," in the absence of the contracts. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted). That Plaintiffs' claims could not "exist[] prior to and apart from rights created under the [agreements]" weighs sharply against district court jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)*; see also Consol. Edison Co. of N.Y. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (directing court to transfer case asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract).

In any event, the other *Megapulse*, 672 F.2d at 968, factor is dispositive here. The nature of relief Plaintiffs seek sounds in contract. *See Conf. of Cath. Bishops*, 770 F. Supp. 3d at 165-

166.  Plaintiffs ask the Court to "[s]et aside the termination of the contracts for the 99 Job Corps centers," "[e]njoin Defendants' efforts to close the 99 Job Corps centers, and order Defendants to take steps necessary to resume the functioning of the 99 Job Corps centers and Job Corps program operations."  Compl., Prayer for Relief.  Thus, Plaintiffs "seek[] the classic contractual remedy of specific performance." *Spectrum Leasing Corp.*, 764 F.2d at 894. But this Court cannot order the Government to continue to perform under a contract. *Id*. at 894-95. Such an order requiring that the government "must perform" on its contract is one that "must be resolved by the Claims Court." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985); *see also California*, 604 U.S. at 651 (the "Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," and "as we have recognized, the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money[.]'" (citation omitted)).  Indeed, where a plaintiff "wants the Government to keep paying up," that by itself is enough to trigger the Tucker Act.  *Conf. of Cath. Bishops*, 770 F. Supp. 3d at 163.  That is effectively what Plaintiffs seek from this Court.  As recognized by the Supreme Court: "An order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants." *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2664 (2025) (Gorsuch, J. concurring).  And as the D.C. Circuit wrote in *Conference of Catholic Bishops*: "[t]he Court squints in vain to see any daylight.  Like those plaintiffs, the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts.  That is something this Court lacks the power to do."  770 F. Supp. 3d at 164; *accord   Am. Ass'n of Colls. for Tchr. Educ.*, 2025 WL 1232337, at *1; *Sustainability Inst. v. Trump,* No. 25-1575, 2025 WL 1587100, at *1 (4th Cir. June 5, 2025); *Sols. in Hometown Connections v. Noem*, CIV. A. No. 25-CV-00885-LKG, 2025 WL 1530318, at *10

(D. Md. May 29, 2025), *aff'd,* 2026 WL 179590 (4th Cir. Jan. 23, 2026).  If Plaintiffs' claims here succeed and the contracts are reinstated by dint of the vacatur, the Department will necessarily be paying money on those contracts to continue providing services to Plaintiffs, and such money damages trigger the Tucker Act.

Plaintiffs argue that the Job Corps center contracts are merely a vehicle for providing statutorily required services, and their claims are statutory.  *See* MSJ at 18.  But virtually every government contract could be described this way.  For example, grant agreements funded under *congressional appropriations*, cooperative agreements permitted by *statute*, and procurement contracts awarded under the *Federal Acquisition Regulations* all depend on regulatory or statutory authorization.  So, the mere fact that the Government's authority to enter into a contract or agreement is statutory does not transform a contract claim into an APA claim.  *See Vera Inst. of Just.*, 2025 WL 1865160, at *7 (holding that "court[s] must be careful to guard against a disguised contract action that seeks to avoid the Tucker Act merely by alleging violations of regulatory or statutory provisions rather than breach of contract" (citation modified)); *see also Megapulse*, 672 F.2d at 968.

In resisting the jurisdictional dismissal warranted here, Plaintiffs mischaracterize *California.*  Relying on *California,* Plaintiffs argue that "[a] district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds."  MSJ at 18 (citation omitted).  But this "possibility" mentioned in *California* was in reference to *Bowen*, where the challenged action was a policy governing payments.  *Bowen*, 487 U.S. at 910.  As the Supreme Court later acknowledged, *Bowen* turned on the challenge to "the method the Federal Government used to calculate reimbursements [] lead[ing] to underpayments in the future."  *Great-W. Life & Annuity Ins. Co.*, 534 U.S. at 212.  Thus, *Bowen*

18

is distinguishable, and therefore *California* should inform the decision here. As in *California*, Plaintiffs are asking the Court to vacate specific contracts terminations, and —reinstatement of those contracts is the heart of their requested remedy. In contrast, the *Bowen* plaintiffs asked the Court to vacate a method of awarding contracts, not the contracts themselves. Because Plaintiffs seek to enjoin the ending of contracts themselves their claims sound in contract and therefore are within the jurisdiction of the Court of Federal Claims.

## II.    Plaintiffs' APA Claims Fail

### A. Plaintiffs' APA claims should be dismissed because there are adequate alternative remedies available (Claims 1-5).

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in a court," *id*., reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen*, 487 U.S. at 903. As already described above, this action is, in essence, a contract action, and there are Tucker Act remedies available.

### B.    The Department was not mandated to follow any procedure to pause Job Center operations (Claim 1).

Each of Plaintiffs' APA claims is premised on a non-existent factual predicate, namely, that the Department "closed" the Job Corps centers. However, the Department merely exercised its right to terminate its contracts with operators of Job Corps centers thereby to determine how to proceed with the program. There is no textual or statutory basis to interpret "close" within WIOA to encompass the resulting pause in operations at those centers.

Although the Court appropriately recognized that its analysis should consider that term, the Court failed to give "closure" its appropriate meaning in context. The WIOA does not define "close," and therefore the Court should consider the term's ordinary meaning. *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011); Mem. Op. at 10, ECF No. 53. Merriam-Webster defines close as "to

suspend or stop the operations of" and "to bring to an end[.]"    *Close*, Merriam-webster.com, https://www.merriam-webster.com/dictionary/close (last visited Jan. 30, 2026).    Because that definition does not resolve the ambiguity, the Court should look at the statute to determine the meaning of "close" in context.    *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014). Plaintiffs point to 29 U.S.C. § 3209(f)(2) to construe "close"—arguing that the remedial measures identified in this subpart contemplate the center's operation will continue unless there is a closure. *See* MSJ at 20.    Plaintiffs apparently concede, and Defendants agree, that a "closure" necessarily means that operations will not continue, or said another way, a closure is permanent rather than temporary—a conclusion that is borne out by the structure of the statute, which has no procedure to "reopen" a "closed" center.    Congress's intent in using the word "closed" therefore presumably means an action that permanently ends operations at a center with no mechanism to resume operations.

Here, the specific challenged action was not a permanent closure of the contractor-operator centers, but rather contract terminations that resulted in a pause in operations designed to allow the Department to comprehensively assess the myriad issues facing the Job Corps program.    The Department considered phases and approaches throughout its deliberation and planning up until the May 29 action.    AR1080-81.    The Department ultimately "move[d] forward in terminating center operations contracts."    AR1069.    The Department's stated intention for the pause was so that it could "reassess program alignment with the Administration's workforce priorities, proposed budget framework, and overall vision for building a modern and effective workforce development program for America's youth."    AR1077. Mechanically, this pause is different from a closure, because the centers could resume operations through new contractual action whereas a closure permanently shutters a center after following the WIOA closure requirements, precluding any

center operations from resuming, whether through an operations contract, demonstration project agreement, interagency agreement, or other arrangement.  *See* 29 U.S.C. §§ 3197(a)(1)(A), 3206(a).

Center closure was one of several options considered prior to the May 29 action as a potential next step after the May 29 action.  AR 1081-82.  The Department considered other options—such as shipbuilding and partnerships with American Job Centers—as it was gathering information about potential options and in its internal deliberations about the future of the Job Corps program.  AR99-100, 213.  The Department, however, intended to carry out the requirements of WIOA should it have determined to close the centers.  AR588 ("Per 29 U.S.C. § 3209(j), prior to the closure of any Job Corps center, 'the Secretary shall ensure' . . . all legal requirements are met to close centers."); AR603 (same); AR1082 (same).  And the Department did not take any steps to initiate the closure process under WIOA.

The Department has the authority to pause operations by invoking contractual rights to end active contracts.  Such pauses are consistent with prior Department practice.  *See* McGee Decl., Ex 1 and Ex 4.  Over the past decade, the Department has exercised its discretionary authority to pause center operations and/or place centers in "inactive status" on multiple occasions.  *Id*.  Across Administrations and as recently as December 2024, to offset the Job Corps Program's $114 million PY 2024 deficit, the Department reduced program capacity, including "pausing" operations at two centers, by opting not to extend the centers' respective operator contracts.  *Id.* at ¶ 10-15.

In two instances, the Department did not decide to close a paused center for years—and did so *in accordance with the WIOA's closure requirements*.  For example, in November 2015, the Department terminated the contract of a Job Corps contractor that operated a center in Florida, putting the center in "inactive status [after] a violent crime near the campus."  *Id*. at ¶ 11.  But the

Department did not formally close the center until two years later, before which it provided public notice of the proposed closure. *See id.* ¶ 11 & Exs. 5-6. And in September 2017, the Department stopped contract work at Job Corps facilities in Florida and Puerto Rico that had suffered hurricane-related damage and went into "inactive status" thereafter. *Id.* ¶¶ 12-13. But the Department did not formally close two of those centers—Barranquitas and Gainesville—until more than a year later—and when it did, the Department again followed the statutory notice-and-comment process. *See id.* ¶ 14 & Exs. 7-8. In January 2025, in response to the Job Corps' budget issues, the Department paused two centers by taking contractual action to terminate one operator's contract and decline to extend another at Job Corps facilities in Kentucky and Maryland but has not formally closed either facility. *See id.* ¶ 15 & Exs. 9-10. Finally, challenged here, the Department paused the remaining privately run Job Corps centers due to budgetary shortfalls and program outcomes.

Not all of these center pauses led to closure. The Ramey and Arecibo Job Corps Centers were paused in September 2017 due to Hurricane damage. *See id.* ¶ 12. These centers were reopened in 2018 and 2020, respectively.

In its preliminary-injunction opinion, the Court distinguished the decision challenged here from previous pauses based on its scope, absence of individualized assessments, and a perceived lack of intent to lift the pause. ECF 53 at 11. First, the scope of the pause is commensurate with the scope of the problems with the Job Corps program. Second, the Department was not required to make individualized assessments or create a performance improvement plan for the centers pursuant to 29 U.S.C. § 3209(f) because it relied on its contractual rights to take contractual action that had the effect of pausing center operations. Third, Plaintiffs' reliance on references to consideration of *eventually* closing the paused centers within the Administrative Record do not

convert the initial contract terminations into a closure but rather are acknowledgements that additional action would be necessary to close some or all of the centers. *See* MSJ at 1-2 (citing AR1080-81).

Based on the plain text, the statutory context, and prior Department practice, the challenged action is not a closure subject to the WIOA's notice-and-comment requirements. Accordingly, the Department is entitled to judgment in its favor on Count I.

### C.    The Department did not violate a statutory or regulatory prohibition when it paused operations at the privately run Job Corps centers (Claim 2).

The Department acted within its contractual rights in ending the Job Corps contracts when it terminated the contracts for convenience. 48 C.F.R. § 52.249-2a. ("The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest . . . by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date.").

Plaintiffs attempt to point to several different provisions of WIOA to argue that the Department acted contrary to law, but these arguments are premised on the Department's action constituting a "closure" of the Job Corps centers. For example, Plaintiffs invoke 29 U.S.C. § 3211(c), which requires Job Corps Centers to be "operated so as to provide enrollees, in a well-supervised setting, with access to activities," such as "English language acquisition programs, career and technical education and training, work experience, work-based learning, recreational activities, physical rehabilitation and development, driver's education, and counseling, which may include information about financial literacy." 29 U.S.C. § 3211(c). But these services "shall be targeted to helping enrollees, on completion of their enrollment, secure and maintain meaningful unsubsidized employment; enroll in and complete secondary education or postsecondary education

or training programs, including other suitable career and technical education and training, and apprenticeship programs; or satisfy Armed Forces requirements." 29 U.S.C. § 3198(a)(2).

Here, the Department determined, based on the 38% graduation rate and $16,000 post-separation income, AR1103, that the centers were falling short "from a policy and programmatic perspective" and "that this action will provide DOL leadership an opportunity to assess the Job Corps program's alignment with the Administration's workforce priorities." AR1070.

Similarly, Plaintiffs invoke 29 U.S.C. § 3197(a)(1), which requires the Department to enter into agreements for the operation of each Job Corps center. MSJ at 23. But because Job Corps centers are not operational after the contract terminations, the Department did not violate that provision. Moreover, because that provision does not speak to whether a particular center should be operating, only that *if* a center is operational, how its operator should be chosen, that provision is irrelevant here. Likewise, for 29 U.S.C. § 3199(a)–(b), which requires the Department to arrange for assessment and counseling for program enrollees— there would not be enrollees at contractor-operated Job Corps centers whose contracts were terminated or not renewed. Finally, Plaintiffs erroneously invoke 29 U.S.C. § 3193, which establishes the Job Corps Program. MSJ at 23. It is undisputed that the USDA operated centers remained operational following the challenged decision and thus the Department clearly has not violated the statutory command that "there shall be within the Department of Labor a 'Job Corps.'" 29 U.S.C. § 3193; AR1079 ("Will the Department of Labor suspend operations at the 24 USDA centers? No."). Accordingly, the Department is entitled to judgment in its favor on Claim 3.

### D.    The Department did not exceed its statutory authority (Claim 4).

As discussed above, the Department possesses contractual authority to end contracts, which effectuates a suspension of center operations. The Department has the authority to end contracts for convenience by providing notice or allowing contracts to expire without extension. *See, e.g.*,

24

48 C.F.R. § 52.249-2.  ("The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest . . . by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date.").  And the Department "notified [contractors] that the [Job Corps Center] contract[s] [are] being terminated completely for the Government's convenience in accordance with contract clause FAR 52.249-1." *See, e.g.*, AR1493.  Thus, for the same reasons that the Department is not acting contrary to law, it is also not exceeding its statutory authority.

### E.  The Department's decision to pause centers was not arbitrary and capricious.

The Department's decision to terminate its contracts and thereby pause operations at the impacted Job Corps centers was based on the financial difficulties associated with the program and poor student outcomes and therefore was not arbitrary and capricious.  AR1087-1104.  When evaluating APA claims, a court reviews an agency decision based on the Administrative Record, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 420), and may hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law," *see* 5 U.S.C. § 706(2).  Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416.  An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

A court may not "substitute its judgment for that of the agency," *id.*, and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *State Farm*, 463 U.S. at 43). In short, the agency's decision should be affirmed as long as there is a "'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 246 (1962)).

The Department found that the program was in a "financial crisis" and remained a "high risk of violating the Anti-deficiency Act." AR214-215. "Job Corps was operating at a deficit for PY 24—approximately $140 million," and the Department took "several actions to save approximately $119 million including the pausing of centers." *Id.* The "Operating deficit could grow up to $213 million if mitigation strategies do not continue." AR215.

To address the shortfall, the Department considered various strategies. AR1063 (considering 2024 cost-saving strategies but concluding that the deficit would remain); AR1104 (considering "right-sizing" the program). Ultimately, the Department terminated or did not extend its contracts with center operators pending further consideration. This had the benefit of immediate cost savings. And that decision is in no way arbitrary or capricious—it is a rational and supported path to fixing an ailing program. AR1070 ("this action will provide DOL leadership an opportunity to assess the Job Corps program's alignment with the Administration's workforce priorities."). Indeed, the considerations that informed the Department's decision—financial condition—are the types of factors that agencies consider in evaluating and making decisions about program operations, and to which this Court should defer. *See Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1288 (D.C. Cir. 2023) ("[C]ost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency." (citation

omitted)); *Inv. Co. Inst. v. U.S. Commodity Futures Trading Comm'n*, 891 F. Supp. 2d 162, 220 (D.D.C. 2012) ("This Court adheres to long-standing precedent, however, that it must 'review [an agency's] cost-benefit analysis deferentially" (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)). Accordingly, the Department is entitled to judgment on Claim 4.

### F.    The Department did not violate appropriations law (Claim 5).

Plaintiffs' fifth claim, which is predicated on the Department's alleged violation of the ICA, fails under *Global Health*. *See Glob. Health Council v. Trump*, 153 F.4th 1, 17 (D.C. Cir. 2025) ("[T]he grantees have no cause of action to undergird their claim that the defendants have acted contrary to law by violating the ICA"). In *Global Health*, grantees challenged an executive order directing the State Department and U.S. Agency for International Development (USAID) to freeze foreign aid spending and the agency's implementation of that order. *Id.* at 1. The grantees claimed that the agency had acted contrary to law under the APA by violating the ICA and sought to restore the flow of funds. *Id.* at 10. The D.C. Circuit held that the grantees did not have a cause of action under the APA. *Id.* Relying on *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984), the Court found that the ICA created "a complex scheme of interbranch dialogue" that precluded "a backdoor for citizen suits to enforce the ICA." *Glob. Health*, 153 F.4th at 10. In particular, the ICA "created a complex scheme of notification of the Congress, congressional action on a proposed rescission or deferral and suit by a specified legislative branch official if the executive branch violates its statutory expenditure obligations." *Id.* Under the ICA, only the Comptroller General could bring suit, and only 25 days after providing notice to Congress of the "circumstances giving rise to the action contemplated." *Id.* (citing 2 U.S.C. § 687). As in *Global Health*, Plaintiffs here do not have a cause of action under the APA for an alleged violation of the ICA.

Plaintiffs' invocation of the presumption of APA review is unavailing.  MSJ at 30.   In

*Global Health*, the D.C. Circuit squarely addressed this presumption as follows:

> "There is a presumption favoring judicial review of administrative action but it is
> just that—a presumption. As relevant here, it may be overcome by inferences of
> intent drawn from the statutory scheme as a whole.  In particular, at least when a
> statute provides a detailed mechanism for judicial consideration of particular issues
> at the behest of particular persons, judicial review of those issues at the behest of
> other persons may be found to be impliedly precluded."

*Glob. Health Council*, 153 F.4th at 18.  Therefore, the presumption of judicial review is rebutted

by the detailed mechanism for judicial consideration of ICA violations at the behest of the

Comptroller General.  *Id.* at 10.  Accordingly, the Department is entitled to judgment on Claim 5.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in the Department's favor.

DATED: January 30, 2026                Respectfully submitted,

                                       BRETT A. SHUMATE
                                       Assistant Attorney General

                                       JACQUELINE COLEMAN SNEAD
                                       Assistant Branch Director

                                       */s/ Michael Bruns*
                                       Michael Bruns
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, N.W.
                                       Washington, DC 20005
                                       michael.bruns@usdoj.gov

                                       *Counsel for Defendants*